UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

Filed with Classified
Information Security Officer

CISO ~~Mykterm~~

Date 6 | 12 | 12

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| v. | ) **Criminal No. 1:12-cr-00127-LMB** |
| | ) |
| **JOHN KIRIAKOU,** | ) **Filed in Camera and Under Seal** |
| | ) **with the Classified Information** |
| **Defendant.** | ) **Security Officer** |

**MOTION TO DISMISS COUNTS 1, 2, 3, AND 4 OF THE
INDICTMENT FOR VAGUENESS AND OVERBREADTH**

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, defendant John Kiriakou, through his undersigned counsel, respectfully moves for an order dismissing Counts 1 through 4 of the indictment on the grounds that 50 U.S.C. § 421(a), the statute charged in Count 1, and 18 U.S.C. § 793(d), the statute charged in Counts 2, 3 and 4, are void for vagueness under the Due Process Clause of the Fifth Amendment and impermissibly overbroad in violation of the First Amendment.

The grounds for this motion are set forth more fully in the memorandum of law below.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNTS
1, 2, 3 AND 4 OF THE INDICTMENT FOR VAGUENESS AND OVERBREADTH**

John Kiriakou served his country with distinction as a CIA intelligence officer from 1990 to 2004. The indictment in this case focuses on conduct that allegedly took place after his retirement from the agency. Counts 1-4 of the indictment allege that from 2007 to 2009, Mr. Kiriakou had several email communications with two journalists in which he revealed information about CIA employees who had been involved in counterterrorism operations during Mr. Kiriakou's tenure at the agency. The indictment charges Mr. Kiriakou under the Intelligence Identities Protection Act, 50 U.S.C. § 421(a) – a rarely used statute whose meaning and

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

constitutionality have never been passed on by any court – and under the more general espionage statute, specifically 18 U.S.C. § 793(d).

There is no doubt about the importance of the continuing confidentiality obligations that are placed on former CIA officers. But the government may not proceed criminally against *any* person under statutes that violate the First and Fifth Amendments. As will be demonstrated below, Counts 1 through 4 of the indictment should be dismissed because Sections 421(a) and 793(d) are unconstitutionally vague and overbroad.

## FACTUAL BACKGROUND

### A.    Allegations in the Indictment

Counts 1 through 4 of the indictment center on disclosures allegedly made by Mr. Kiriakou to journalists concerning two CIA officers – "Covert Officer A" and "Officer B" – who were involved in CIA counterterrorism operations in Pakistan and elsewhere.[1]

As set forth in the indictment, in or about March 2002, the CIA conducted an operation in Pakistan to capture terrorism subject Abu Zubaydah (the "Abu Zubaydah operation"). The indictment states that "[t]he Abu Zubaydah operation fell within the scope of a CIA counterterrorism program known as the Rendition, Detention, and Interrogation Program (the 'RDI Program')." Indictment, ¶ 10. The indictment alleges that "Covert Officer A" was a covert CIA employee whose associations with the CIA and the RDI program were both classified. Indictment, ¶ 11. "Officer B" is not described as a covert agent, and the fact that he was employed by the CIA was not itself classified. Indictment, ¶ 12. However, the indictment asserts

---

[1]    Count 5 of the indictment, which is not at issue in this motion, alleges that Mr. Kiriakou made false statements to the CIA in the course of obtaining clearance to publish his book, *The Reluctant Spy: My Secret Life in the CIA's War on Terror* (2009).

that Officer B's associations with the RDI Program and the Abu Zubaydah operation were classified. *Id.*

The indictment alleges that in 2008 and 2009, Mr. Kiriakou had communications with "Journalist A" in which he disclosed Covert Officer A's name and the fact that he was a branch chief in a specific CIA office and team leader on a specific CIA operation. Count 1, ¶¶ 2-7. Count 1 charges that these disclosures violated the Intelligence Identities Protection Act (the "IIPA"), 50 U.S.C. § 421(a). Count 2 alleges that these same facts constitute a violation of the Espionage Act, 18 U.S.C. § 793(d). Count 2, ¶¶ 1-3. There is no allegation in either count that the identity of Covert Officer A was publicly disclosed or otherwise broadly disseminated.

Counts 3 and 4 relate to Officer B. Count 3 alleges that in 2008, Mr. Kiriakou confirmed to "Journalist B" that Officer B was involved in the Abu Zubaydah operation and in the RDI program, information that was then classified. Count 3, ¶¶ 3-5. Count 4 alleges that Mr. Kiriakou revealed and confirmed Officer B's association with the RDI program to Journalist A. Count 4, ¶¶ 2-5. Both counts charge that the alleged conduct was a violation of 18 U.S.C. § 793(d).

All of the allegations in the indictment involve information in purported email communications written by Mr. Kiriakou to Journalists A or B. There is no allegation that Mr. Kiriakou transferred any government documents, photographs, or other tangible items to unauthorized individuals.

## B.     The Problem of Over-Classification

Executive Order 13526 establishes the current framework for the classified information system. Exec Order No. 13526, 75 Fed. Reg. 707 (2009). Executive Order 12958, its predecessor in effect during the timeframe of the indictment, largely mirrors the current order. Exec. Order No. 12958, 3 C.F.R. 333 (1995). Under this scheme, information may be classified as

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

"confidential," "secret," or "top secret" depending upon the reasonably expected damage to national security upon disclosure. *See* Indictment, ¶ 4. Both Executive Orders mandate that classified information be declassified "as soon as it no longer meets the standards for classification …" Exec. Order No. 13526 at § 3.1 (2009); Exec. Order No. 12958 at § 3.2 (1995).

In recent years, including immediately after the period covered by the indictment, the Obama Administration has acknowledged over-classification and set out to remedy this systemic problem. For example, President Obama ordered a review and overhaul of classified information and controlled unclassified information, specifically requesting recommendations as to Executive Order 12958 regarding "[e]ffective measures to address the problem of over classification, including the possible restoration of the presumption against classification, which would preclude classification of information where there is significant doubt about the need for such classification." Presidential Memorandum for Heads of Executive Departments and Agencies re: Classified Information and Controlled Unclassified Information, 74 Fed. Reg. 26,277, 26,277 (May 27, 2009).

Congress also recognized the rampant problem of over-classification and passed the Reducing Over-Classification Act, with findings that "security requirements nurture over-classification and excessive compartmentation of information among agencies." Pub. L. No. 111-258. 124 Stat. 2648, 2648 (2010) (including the Congressional finding that "[o]ver-classification of information causes considerable confusion regarding what information may be shared with whom, and negatively affects the dissemination of information within the Federal Government and with State, local, and tribal entities, and with the private sector").

Based upon the annual reporting of the Information Security Oversight Office ("ISOO"), it is clear that vast amounts of classified information are not categorized correctly or are not

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

properly declassified within the parameters set forth by the Executive Order. The Mandatory Declassification Review ("MDR") process augments the automatic and systemic declassification programs established by executive order and allows certain individuals to request review for declassification of classified information. *See* Exec. Order No. 13526. In the ISOO's 2008 Annual Report, it noted that for Fiscal Year 2008, "[u]nder mandatory declassification review, agencies declassified 190,291 pages in their entirety, declassified 50,219 pages in part, and retained classification of 20,774 pages in their entirety" based upon initial requests. ISOO, Report to the President at 1 (2008), *available at* http://www.archives.gov/isoo/reports/2008-annual-report.pdf (last visited June 11, 2012). In total, in addition to the documents declassified under the automatic and systematic programs, 92 percent of the additional classified pages reviewed solely based upon an initial request resulted in some declassification. That yearly rate was comparable to the 91 percent declassification rate, including partial declassifications, for dispositions of initial MDR requests from 1996 to 2008. *Id.* at 15.

## ARGUMENT

### A. The Statutes at Issue

**1.** **50 U.S.C. § 421(a).** Although the Intelligence Identities Protection Act ("IIPA") was adopted in 1982, the defense is aware of no reported decisions in which this statute

has been construed by a court or in which its constitutionality has been considered.[2] The statute is specifically aimed at the disclosure of the identities of covert agents. As its legislative history makes clear, the focus of Congress's concern was on facilitating the prosecution of persons who, like Philip Agee, were systematically engaged in "an effort to identify and expose covert agents with the intent to impair or impede the foreign intelligence activities of the United States by the fact of such identification and exposure." S. Rep. 97-201 (1981), *reprinted in* 1982 U.S.C.C.A.N. 145, 153.[3] The committee noted that "current law," which included the 1917 Espionage Act, "has proven inadequate to prevent" these disclosures, since no one had been indicted "under the espionage laws or any other law" as a result of these activities. The committee called this fact "effective testimony for the proposition that, if these wanton disclosures are to be stopped, a specific new law is needed." S. Rep. 97-201, *reprinted in* 1982 U.S.C.C.A.N 145, 152.

The statute divides potential defendants into three categories depending upon their level of access to classified information. *See* 50 U.S.C. § 421(a), (b), (c). Mr. Kiriakou is charged under Section 421(a), which at the time of the alleged offense read as follows:

> Whoever, having or having had authorized access to classified information that identifies a covert agent, intentionally discloses any information identifying such covert agent to any individual not authorized to receive classified information, knowing that the information disclosed so identifies such covert agent and that the

---

[2] There are only two reported cases that discuss 50 U.S.C § 421 in any depth. In *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), the court was called on to determine whether the statute was a comprehensive remedial scheme for purposes of assessing the availability of a *Bivens* action. *Id.* at 710. The court did not address the constitutionality of the statute in relation to a criminal defendant. The other case, *In Re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006), only mentions § 421 to note that some method for prosecuting the revelation of covert identities exists, *id.* at 1143, 1179, and because the statute is cited in letters from the special counsel to the court seeking to obtain testimony, which the opinion quotes. *Id.* at 1181.

[3] As set forth in the legislative history, Philip Agee was the author of two books that revealed the names of over 1,000 alleged CIA officers. S. Rep. 97-201, *reprinted in* 1982 U.S.C.C.A.N 145, 151-52

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

United States is taking affirmative measures to conceal such covert agent's intelligence relationship to the United States, shall be fined not more than $50,000 or imprisoned not more than ten years, or both.

50 U.S.C. § 421(a) (2006).

The statute only criminalizes the disclosure of information about persons who fall within the definition of "covert agent" in Section 426(4). With respect to CIA officers and employees, the term "covert agent" means:

> (A) a present or retired officer or employee of an intelligence agency ...--
>
> > (i)     whose identity as such an officer, employee or member is classified information, and
> >
> > (ii)    who is serving outside the United States or has within the last five years served outside the United States ....

50 U.S.C. § 426(4)(A). The definition of covert agent also includes other U.S. citizens, and non-citizens, whose "intelligence relationship" to the United States is classified information. 50 U.S.C. § 426(4)(B), (C).

> **2.      18 U.S.C. § 793(d).** Section 793 criminalizes the gathering and transmission of information related to the national defense. Section 793(d), the specific section charged here, provides:

> [w]hoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it.

18 U.S.C. § 793(d).

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

Mr. Kiriakou is not charged with transmitting a "document, writing, code book" or any other tangible item; instead, Counts 2-4 allege that he wrongfully disclosed "information relating to the national defense" within the meaning of Section 793(d). Disclosures of such intangible information are only covered by the statute if the defendant had "reason to believe [that the information] could be used to the injury of the United States or to the advantage of any foreign nation." 18 U.S.C. § 793(d).

In *United States v. Rosen*, 445 F. Supp.2d 602 (E.D.Va. 2006), the court described Section 793(d) as punishing "only those people who transmit information related to the national defense, in tangible or intangible form, to one not entitled to receive it." 445 F. Supp.2d at 643. The *Rosen* court then summarized the key elements of the offense as construed by it. First, to show that national defense information is involved,

> the government must prove: (1) that the information relates to the nation's military activities, intelligence gathering or foreign policy, (2) that the information is closely held by the government, in that it does not exist in the public domain; and (3) that the information is such that its disclosure could cause injury to the nation's security.

*Id.* To show that the recipient was not entitled to the information,

> the government must prove that a validly promulgated executive branch regulation or order restricted the disclosure of information to a certain set of identifiable people, and that the defendant delivered the information to a person outside this set. In addition, the government must also prove that the person alleged to have violated these provisions knew the nature of the information, knew that the person with whom they were communicating was not entitled to the information, and knew that such communication was illegal, but proceeded nonetheless.

*Id.* Finally, in a case – such as this one – involving only intangible information,

> the government must prove that the defendant had a reason to believe that the disclosure of the information could harm the United States or aid a foreign nation, which the Supreme Court has interpreted as a requirement of bad faith.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

*Id.* ( internal citation omitted).

**B.      Standards Governing Statutory Challenges Based on Vagueness and Overbreadth**

**1.      Vagueness.** The Due Process Clause of the Fifth Amendment prohibits punishment based upon a statute so vague that "men of common intelligence must necessarily guess its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)); *accord City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (noting vagueness "may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits"). If a law is "vague or highly debatable," an issue decided by the court as a matter of law, then the "defendant – actually or imputedly – lacks the requisite intent to violate it." *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985) (quoting *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974)). Due process ensures that a potential defendant have fair warning of conduct that may be proscribed. *See, e.g., United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). The doctrine also protects against the concern that vague statutes may allow arbitrary and discriminatory enforcement because they fail to provide adequate guidelines to law enforcement. *See Kolender v. Lawson,* 461 U.S. 352, 358 (1983).

Thus, under the Fifth Amendment criminal statutes must make "reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267. Courts may supply some "judicial gloss" on an uncertain statute, but "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id* at 266. The degree of vagueness allowable

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

under the Constitution is less for criminal penalties than civil ones. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498-99 (1982).

2.    **Overbreadth.** The overbreadth doctrine holds that a law is unconstitutional if it punishes a substantial amount of protected free speech when judged in relation to the statute's plainly legitimate sweep. *Virginia v. Hicks,* 539 U.S. 113, 118-19 (2003). A successful showing that a law is overbroad "suffices to invalidate *all* enforcement of that that law until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression. *Id.* at 119 (emphasis in the original) (internal citations omitted).

Moreover, a defendant is entitled to challenge a statute on overbreadth grounds even if the conduct alleged in the indictment could be validly prohibited. "In these First Amendment contexts, the courts are inclined to disregard the normal rule against permitting one whose conduct may validly be prohibited to challenge the proscription as it applies to others because of the possibility that protected speech or association activities may be inhibited by the overly broad reach of the statute." *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 633 (1980).

C.    **Count 1 of the Indictment Must be Dismissed Because Section 421(a) is Unconstitutionally Vague.**

As discussed above, Section 421(a) is a statute specifically aimed at the disclosure of information that identifies covert agents. But even a statute with a focused subject matter must comply with the constitutional imperative that it give adequate warning as to the conduct proscribed. Section 421 fails this test in its proscription that disclosures about covert agents are only criminal when the defendant knows that the United States is taking "affirmative measures"

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

to conceal a covert agent's identity. 50 U.S.C. § 421(a). But the statute does not define the ambiguous phrase "affirmative measures" at all. And because there are no cases construing § 421(a), there is no judicial gloss to turn to for guidance.[4]

Here, Mr. Kiriakou is charged with revealing information about a covert officer after Mr. Kiriakou retired from the agency. In order to know whether a particular disclosure violated Section 421(a), a person in Mr. Kiriakou's position would have to know whether the government, at the time of the potential disclosure, was taking "affirmative measures" to conceal an agent's identity. But without any definition, how would one know? There is no standard in the statute against which to measure any steps taken by the government, and, therefore, no way to determine in advance whether any particular disclosure is prohibited by the statute. In the absence of a definition of this vague phrase, a person in Mr. Kiriakou's position is left to "guess its meaning." *United States v. Lanier*, 520 U.S. at 266. Accordingly, the statute cannot pass muster under the Fifth Amendment.

### D.  Counts 2-4 of the Indictment Must Be Dismissed Because Section 793(d) is Unconstitutionally Vague.

The government's application of 18 U.S.C. § 793(d) in this prosecution also violates the Fifth Amendment's Due Process Clause under the vagueness doctrine. The statute criminalizes, in pertinent part, disclosure of "information relating to the national defense" that the defendant has reason to believe "could be used to the injury of the United States or to the advantage of any foreign nation," and is transmitted to any person not entitled to receive it. 18 U.S.C. § 793(d). These broad and undefined phrases can cover a wide range of information relating to virtually

---

[4]    Although the legislative history purports to set forth some possible "affirmative measures," *see* S. Rep. 97-201, *reprinted in* 1982 U.S.C.C.A.N 145, 162-63, this discussion was not included in the statute and has not been adopted by any court.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

any aspect of the military or foreign affairs, and any kind of "injury," down to embarrassment or harm to the government's reputation. The statutory language plainly fails to provide clear notice of what is covered or give even "minimal guidelines" for its application to law enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

While Section 793 survived a facial vagueness challenge in *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988), it is important to note that *Morison* involved the transmission by a naval intelligence officer of classified satellite photographs of Soviet naval preparations – that is, tangible documents. Here, however, Mr. Kiriakou is charged with disclosing agents' names and activities – that is, intangible information. Unlike the defendant in *Morison,* the statute as applicable to Mr. Kiriakou requires proof that he must have had "reason to believe [the information] could be used to the injury of the United States or to the advantage of any foreign nation." 18 U.S.C. § 873(d). The *Morison* court did not have occasion to consider whether that language was constitutionally sufficient to define an offense. The court in *Rosen*, a case involving intangible information transmitted by non-government defendants, found that Section 793(d) survived a vagueness challenge as the result of judicial glosses placed on the statutory language. *United States v. Rosen*, 445 F. Supp.2d 602, 627 (E.D.Va. 2006). The defendant respectfully disagrees with the analysis in these cases and submits that as applied here, Section 793(d) is void for vagueness because it fails to define or cabin the key phrases "information relating to the national defense" and "injury to the United States or … advantage of any foreign nation."

The *Rosen* court acknowledged that "the phrase 'information relating to the national defense' is quite broad and potentially too broad since, especially in time of war, any information could conceivably relate to the national defense." 445 F. Supp.2d at 618 (citing *United States v.*

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

*Heine*, 151 F.2d 813, 815 (2d Cir. 1945)). As the Fourth Circuit recognized, "national defense" is a "generic concept with broad connotations." *United States v. Truong*, 629 F.2d 908, 918 (4th Cir. 1980).

In *Morison* and *Rosen*, the courts found that judicial interpretations of the scope of "information relating to the national defense" saved that phrase from vagueness. *See also Gorin v. United States*, 312 U.S. 19, 27-28 (1941) (construing the precursor of Section 794(a) of the Espionage Act). Courts have limited the meaning of the phrase by requiring the government to prove (1) that the information is closely held by the government and (2) that the information is the type of information that, if disclosed, could cause injury to the nation's security. *Rosen*, 445 F. Supp.2d at 622. But these limitations do not sufficiently address the ambiguities in Section 793(d). For one thing, courts have relied on the classification system to determine whether information is closely held or harmful to the United States. *See United States v. Abu-Jihaad*, 600 F. Supp.2d 362, 387 (D. Conn. 2009) (whether material "has been classified by appropriate authorities and whether it remained classified on the dates pertinent to the Indictment" may be considered in determining whether material was closely held); *see also Morison,* 844 F.2d at 1074; *Rosen,* 445 F. Supp.2d at 623. As shown above, however, the government itself acknowledges that it over-classifies a great deal of information that could, in fact, be safely released to the public. Therefore, the fact that information is classified does not actually clarify whether its disclosure of information could cause any injury to the United States.

Moreover, in this case Mr. Kiriakou is charged with violating both the general provisions of Section 793 and the more specific provisions of Section 421, which is directly focused on disclosures relating to covert agents. The definition of covert agent in Section 426(4) is noticeably limited: it must be an intelligence officer who has served overseas within the last 5

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

years.[5] The specificity of this definition highlights the vagueness of Section 793. Is information relating to the identity or activities of CIA officers who served overseas *more* than 5 years ago national defense information the disclosure of which would harm the United States? If a person whose speech would be constrained by Section 421 relies on its definitions as to what is permitted, can he nevertheless be trapped by the more expansive language of Section 793? There are no answers to these questions that would give a person in Mr. Kiriakou's position clear notice of what conduct is prohibited by Section 793(d). Accordingly, the statute is constitutionally deficient and the counts that rely on it should be dismissed.

> ### E.  Count 1 Must Be Dismissed Because Section 421 is Unconstitutionally Overbroad.

> The First Amendment interest in informed popular debate does not simply vanish at the invocation of the words 'national security.' National security is public security, not government security from informed criticism.

*Morison*, 844 F.2d at 1081 (Wilkinson, J., concurring).

There is no doubt that former CIA employees are held to a standard of confidentiality that is enforceable by the government. *See Rosen*, 445 F. Supp.2d at 635. But those employees nevertheless possess First Amendment rights, even in the face of invocations of "national security" concerns. *See Morison*, 844 F.2d at 1081 (Wilkinson, J., concurring) ("I do not think the First Amendment interests here are insignificant. Criminal restraints on the disclosure of information threaten the ability of the press to scrutinize and report on government activity."); *Id.* at 1085 (Phillips, J., concurring) (rejecting "earlier suggestions that as applied to conduct of the type charged…, the Espionage Act statutes simply do not implicate any first amendment rights");

---

[5] Despite the specificity of this definition, Section 421, as discussed elsewhere in this Memorandum, is impermissibly vague and overbroad in other respects.

*accord Rosen*, 445 F. Supp.2d at 630 (rejecting the "government's proposed categorical rule that espionage statutes cannot implicate the First Amendment" and noting that the majority of the *Morison* panel viewed § 793(e) as implicating the First Amendment). And in a First Amendment overbreadth challenge, a defendant is entitled to raise the effect a statute will have on others' rights to protected speech. *See Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 633 (1980).

An inherent tension exists between the exercise of First Amendment rights, which promotes government transparency and accountability, and the need to protect sensitive information impacting national security. The exchange of information between government officials and outside individuals, including the release of information that other government officials would prefer be kept secret, has been a common practice since the formation of this country. *See Morison*, 844 F.2d at 1081 (Wilkinson, J., concurring ) ("There exists the tendency . . . for government to withhold reports of disquieting development and to manage news in a fashion most favorable to itself."). In light of the competing goals of free expression and national security, "[c]ourts have long performed the balancing task where First Amendment Rights are implicated." *Id*. at 1082 (Wilkinson, J., concurring); *Rosen*, 445 F. Supp.2d at 631 (noting the Supreme Court's prior weighing of the government's interests in Espionage Act prosecutions against the defendants' First Amendment interests).

Here, Section 421(a) criminalizes disclosures by current and former CIA employees about the activities of covert agents, but the statute does not require the government to prove that the defendant intended to injure the United States or had reason to believe that his disclosures would harm the United States or assist an enemy. Without these requirements, the statute fails the

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

constitutional balancing test because it penalizes speech well beyond those instances where the government needs to maintain secrecy in order to prevent actual harm to the national security.

Section 421 does require the government to show that the defendant knew that the disclosed information identified a covert agent and that the government was taking affirmative measures to conceal the agent's intelligence relationship. The government is likely to argue that if those elements are met, the disclosures will, by definition, be harmful to the United States. But as shown above, the term "affirmative measures" is undefined and unconstitutionally vague. Moreover, a covert agent's status for purposes of the IIPA turns on whether his relationship to the agency is classified. *See* 50 U.S.C. § 424(4)(A)(i). The government's acknowledged practice of over-classification means that not all classified information actually has the potential to damage national security if released. In fact, the statute expressly provides that it does *not* cover a covert agent's disclosure of information about himself, *see* 50 U.S.C. § 422(d), demonstrating that all disclosures of such information are not dangerous or harmful to the country. Particularly in a situation where the efficacy and morality of past government operations is a subject of intense public debate, identifying personnel who were involved in those operations may significantly advance the public's knowledge and ability to assess the government's conduct without injuring the interests of the United States.[6]

Thus, because it does not require that the defendant have reason to intend or believe that his particular disclosures will harm the security of the United States, Section 421 imposes an

---

[6] Indeed, the government has declassified some of the information at issue in this case in order to permit this prosecution to go forward. *See* Affidavit in Support of Criminal Complaint and Arrest Warrant, ¶ 26.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

overbroad secrecy obligation and chills protected speech. The statute fails the First Amendment balancing test, and the charges based on it must therefore be dismissed.

**F.     Counts 2-4 Must Be Dismissed Because Section 743(d) is Unconstitutionally Overbroad.**

In addition to the vagueness grounds set forth above, Counts 2, 3 and 4 of the indictment should be dismissed because Section 793(d) is impermissibly overbroad. As set forth in *Morison*, the test for an overbroad statute is one that "infringes on expression to a degree greater than justified by the governmental need which is the valid purpose of the statute." 844 F.2d at 1070 (internal citation omitted). While the courts in *Morison* and *Rosen* upheld Section 793(d) against claims of overbreadth, the defendant respectfully submits that those cases incorrectly calculated the balance between national security and freedom of speech.

First, both *Morison* and *Rosen* relied on the classification system as a means of determining whether a disclosure was national defense information within the meaning of the statute. *See Morison*, 844 F.2d at 1074 ("And courts have recognized the legitimacy of looking to the classification system for fleshing out the phrases such as that [in sections 793(d) and (e)]."); *see also Rosen*, 445 F. Supp.2d at 623 ("[A]lthough evidence that the information was classified is neither strictly necessary nor always sufficient to obtain a prosecution under § 793, the classification of the information by the executive branch is highly probative of whether the information at issue is 'information relating to the national defense' and whether the person to whom they disclosed the information was 'entitled to receive' the information."). But that reliance is fatally undermined by the widespread problem of over-classification, which has been publicly acknowledged by the President and by Congress. If much classified information could

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

be released without harm, then a statutory interpretation that turns on information's classified status will chill speech that should be protected and permitted.

The overlap between Section 421 and Section 793(d) further demonstrates the constitutional infirmities of Section 793(d). As discussed above, Section 421 is part of the IIPA, which was adopted to be the "specific new law" governing disclosures of information about covert agents. S. Rep. 97-201, at 8 *reprinted in* 1982 U.S.C.C.A.N. 145, 152. Although Section 421 has its own constitutional deficiencies, it does set out a number of specific elements that must be proved in order to establish a criminal violation, and provides a definition of the term "covert agent." The statute thus reflects Congress's determination of the types of disclosures about agents that should be criminalized. But as is evident from the indictment, the government is seeking to use Section 793(d) to punish disclosures relating to covert agents without having to prove each of Section 421's elements.

This is particularly true with respect to Count 2. While relying on the same facts set forth in Count 1, Count 2 asserts that it is the "association" of Covert Officer A with the RDI program, rather than his identity, that was the information disclosed in violation of Section 793(d).[7] But there is no meaningful difference between identifying someone as a covert agent and disclosing the association between that agent and a particular CIA operation. Indeed, there would be no way to do the latter without doing the former. The government is evidently trying to use Section 793(d) as a "catchall" provision, to allow it to punish the communications cited in Count 1 even if it cannot meet the specific requirements of Section 421. But if the prosecution's scope is not limited by the specific contours of Section 421, disclosures about CIA agents that Congress did

---

[7]     Counts 3 and 4 are based on the "association" of Officer B, who was not covert, with the RDI program and the Abu Zubaydah operation.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

JNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

not intend to criminalize, and that should be protected under the Constitution, will be chilled by fear of the significant criminal penalties that may be imposed under Section 793(d). For this reason, Section 793(d) is unconstitutionally overbroad when applied to the charges at issue here.

## CONCLUSION

For the reasons set forth above, the defendant respectfully submits that the Court should dismiss Counts 1-4 of the indictment on the grounds that the violations they charge are based on statutes that are unconstitutionally vague and overbroad.

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

Respectfully submitted,

/s/ Plato Cacheris

_____

Plato Cacheris
(Va. Bar No. 04603)
pcacheris@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319


/s/ John F. Hundley

_____

John Francis Hundley
(Va. Bar No. 36166)
jhundley@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

/s/ Robert P. Trout

_____

Robert P. Trout
(Va. Bar No. 13642)
rtrout@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319


/s/ Jesse I. Winograd

_____

Jesse I. Winograd
(Va. Bar No. 79778)
jwinograd@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319


/s/ Mark J. MacDougall

_____

Mark J. MacDougall
(Admitted *Pro Hac Vice*)
mmacdougall@akingump.com
Attorney for John Kiriakou
AKIN GUMP STRAUSS
  HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 887-4510
Fax: (202) 887-4288

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE

## Certificate of Service

I hereby certify that on this 12th day of June, 2012, I filed the foregoing by hand with the Classified Information Security Officer, pursuant to the Protective Order for Classified Information entered in this case. Pursuant to the Protective Order, the Classified Information Security Officer will make arrangements to deliver the foregoing to the Court and to counsel for the United States:

Lisa L. Owings
Lisa.owings@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Ryan P. Fayhee
ryan.fayhee@usdoj.gov
U.S. Department of Justice
Trial Attorney, Counterespionage Section
600 E Street, N.W.
Washington, D.C. 20004

Iris Lan
Iris.lan@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Mark E. Schneider
Mark.schneider@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

/s/ Jesse I. Winograd

Jesse I. Winograd, (Va. Bar No. 79778)
jwinograd@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

UNCLASSIFIED / CLEARED FOR PUBLIC RELEASE