IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:12cr127-LMB |
| | ) | (Hon. Leonie M. Brinkema) |
| JOHN C. KIRIAKOU | ) | |
| | ) | |
| Defendant. | ) | |

**CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A BILL OF PARTICULARS AND TWO MOTIONS TO DISMISS**

The United States of America, by its undersigned counsel, hereby files this Consolidated Response in Opposition to the Defendant's Motion for a Bill of Particulars ("Bill of Particulars Mot."); Motion to Dismiss Counts One, Two, Three, and Four of the Indictment for Vagueness and Overbreadth ("Vagueness Mot."); and Motion to Dismiss Counts One, Two, Three, and Four of the Indictment for Selective and/or Vindictive Prosecution, or, in the Alternative, for Discovery ("Vindictive Pros. Mot."). For the reasons set forth below, defendant's motions should be denied.

**BACKGROUND**

Defendant John C. Kiriakou, a former intelligence officer who signed multiple non-disclosure agreements acknowledging that unauthorized disclosures of classified information could cause irreparable injury to the United States or be used to advantage by a foreign nation, is charged in a five-count indictment ("Indictment") with four instances of illegally disclosing classified, intelligence-related information to unauthorized persons and with one instance of attempting to trick

the CIA into allowing him to publish other classified information.  Specifically, the Indictment alleges that Kiriakou disclosed the name of a covert agent whose association with the CIA had been classified for more than twenty years ("Covert Officer A"), in violation of 50 U.S.C. 421(a) (Indictment at 8-10 (Count One)); disclosed national defense information pertaining to Covert Officer A's intelligence activities, in violation of 18 U.S.C. 793(d) (*id.* at 11 (Count Two)); disclosed national defense information pertaining to another career CIA employee ("Officer B") whose association with certain CIA activities was classified (*id.* at 12-15 (Counts Three & Four)); and lied to the CIA Publications Review Board ("PRB") in a failed effort to trick the Board into permitting the defendant to write about a classified investigative technique in his memoirs, in violation of 18 U.S.C. 1001(a)(1) (*id.* at 16-19 (Count Five)).

As set forth in the criminal complaint filed in this matter, the investigation that led to the discovery of Kiriakou's illegal disclosures was conducted by a Special Attorney appointed to investigate the circumstances surrounding the discovery of photographs of CIA and other sensitive government personnel in the cells of high-value detainees at Guantanamo Bay, Cuba, along with the inclusion of the identities of covert personnel in a classified defense filing before the Military Commission at Guantanamo.  (Affidavit in Support of Criminal Complaint, No. 1:12MJ33 (January 23, 2012) (hereinafter, "Complaint Affidavit") at 2-3, ¶4-6).  The investigation ultimately revealed that Kiriakou disclosed information pertaining to Covert Officer A and Officer B to a journalist, who in turn disseminated the information to a defense investigator, who used the information Kiriakou illegally disclosed to identify, locate and secretly photograph Officer B and to name Covert Officer A and Officer B in the defense filing.  (*Id.* at 4-7, ¶10-12).

With respect to Counts One to Four, the primary evidence at trial against Kiriakou will consist of his recovered emails, which contain the charged disclosures (Indictment at 8-9, ¶ 2-7, at 12, ¶4-5, at 14, ¶3-5), the non-disclosure agreements that Kiriakou entered while employed by the CIA (*id.* at 3-6, ¶7-8), a recorded interview with the FBI in which Kiriakou acknowledged the classified and sensitive nature of the information he disclosed, while denying that he made any such disclosures (Complaint Affidavit at 51-52, ¶25-26), and other records and witnesses.  The government does not intend to seek the testimony of either journalist to whom Kiriakou made the charged disclosures. The evidence regarding Count Five will largely consist in the defendant's correspondence with the Publications Review Board, the statements and emails described in the Complaint Affidavit, and other witnesses and records.  (Complaint Affidavit at 21-24, ¶41-50).

<u>**RESPONSES**</u>

**I.    The Defendant's Motion for a Bill of Particulars Should Be Denied**.

Kiriakou moves for a bill of particulars for various information related to Counts One through Four of the Indictment.  (*See* "Bill of Particulars Mot."). For the reasons discussed below, this motion should be denied.  Kiriakou has failed to demonstrate that the Indictment is insufficient, and the Government's extensive discovery will also provide further information that he seeks.

**A.    Applicable Law**

"A bill of particulars is appropriate when an indictment fails to provide adequate information to allow a defendant to understand the charges and to avoid unfair surprise." *United States v. Gibson*, 327 F. App'x 391, 392-93 (4th Cir. 2009) (citing *United States v. Am. Waste Fibers Co., Inc.*, 809 F.2d 1044, 1047 (4th Cir. 1987)); *see Wong Tai v. United States*, 273 U.S. 77 (1927) (upholding a district court's denial of a defendant's motion for a bill of particulars, because "there is nothing in

3

the record indicating that the defendant was taken by surprise in the progress of the trial, or that his substantial rights were prejudiced in any way by the refusal to require the bill of particulars").

"'[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Quinn*, 359 F.3d 666, 672 (4th Cir. 2004) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see United States v. Mendez-Colon*, 417 F. App'x 320, 321 (4th Cir. 2011) ("An indictment must contain elements of the offense charged, fairly inform the defendant of the charge, and enable the defendant to plead double jeopardy as a defense to future prosecutions for the same offense.") (citing *United States v. Resendiz- Ponce*, 549 U.S. 102, 108 (2007)).  The Federal Rules of Criminal Procedure "require[] that an indictment 'shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Bereano*, 161 F.3d 3, 5 (4th 1998) (quoting Fed. R. Crim. P. 7(c)(1)).

When a bill of particulars is required, its purpose is "'not . . . to provide detailed disclosure of the government's evidence in advance of trial,'" *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) (quoting *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985)), but rather "to amplif[y] the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." *Id.* (citing *United States v. Howard*, 590 F.2d 564, 567 (4th Cir. 1979)).  Further, even "[w]here the indictment fails to provide the full panoply of . . . information, a bill of particulars is nonetheless unnecessary if the information is available through some other satisfactory form, such as discovery." *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) (quotations omitted); *see United States v. Soc'y of Indep. Gasoline Marketers of Am.*,

624 F.2d 461, 466 (4th Cir. 1980) (hereinafter "*SIGMA*") (upholding the district court's decision to deny the defendant's request for a more detailed bill of particulars "[i]n light of this extensive disclosure by the Government"); *United States v. Byrd*, No. 1: 07CR0005, 2007 WL 773924, at *1 (W.D. Va. Mar. 12, 2007) (upholding a magistrate judge's decision to deny the defendant's motion for a bill of particulars, given that "[t]he government has confirmed that it will engage in extensive voluntary disclosure in this case"; noting that disclosure is "an important factor to consider in deciding whether to order a bill of particulars.") (citing *id.*); *United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 772-73 (E.D. Va. 2004) ("an indictment that fails . . . to provide a defendant with sufficient information to prepare a defense . . . may be remedied through discovery").

### B.    Analysis

Viewed in light of these legal standards, the defendant's motion for a bill of particulars should be denied.  As an initial matter, the Indictment in this matter provides more than "adequate information to allow a defendant to understand the charges and to avoid unfair surprise." *Gibson*, 327 F. App'x at 392.  The Indictment charges the defendant in 19-pages and alleges all of the essential elements required to prove each count. (*See* Indictment at 1-7 (providing relevant background); *id.* at 8-10 (alleging Count One); *id.* at 11 (alleging Count Two); *id.* at 12-13 (alleging Count Three); *id.* at 14-15 (alleging Count Four); *id.* at 16-19 (alleging Count Five)).  Indeed, for Counts One and Two, both of which charge the defendant with illegal disclosures related to Covert Officer A, the Indictment describes the exact emails in which the defendant made the disclosures, providing not only the date of the relevant emails, but also the nature and content of the disclosures. (*See, e.g.*, Indictment at 8, ¶3a ("In a second email, Journalist A asked, 'Presumably [first name of Covert Officer A] worked in that group though, right?' KIRIAKOU replied, 'I assume he did.  And

actually, I'm not sure he was the chief of it. He was the team leader on [specific CIA operation], though.'"); *id.* at 9, ¶ 6 ("On or about August 19, 2008, defendant JOHN C. KIRIAKOU emailed the first and last name of Covert Officer A to Journalist A"); *see also* Indictment at 11 (re-alleging the same and additional paragraphs for Count Two)). Similarly, for Counts Three and Four, both of which charge the defendant with illegal disclosures related to Officer B, the Indictment also details relevant information regarding the timing and nature of the disclosures. (*See, e.g.*, Indictment at 12, ¶5 ("On or about May 29, 2008, . . . KIRIAKOU sent an email to Journalist B in which KIRIAKOU stated that Officer B was in Pakistan in March 2002"); *id.* at 14, ¶4 ("On or about May 20, 2008, KIRIAKOU answered, '[First name of Officer B] was not trained in the enhanced techniques. He was simply there to ask the questions that the analysts had posed. . . . Your assertion on individual roles is correct.'")). As such, the defendant cannot credibly claim that the Indictment is deficient under Rule 7 of the Federal Rules of Criminal Procedure, as the Indictment contains more than enough information to permit the defendant to prepare a defense and plead double jeopardy in any future prosecution. *Gibson*, 327 F. App'x at 392-93.

Nevertheless, Kiriakou claims that a bill of particulars is required with respect to each of Counts One through Four. Regarding Count One, which charges the defendant with disclosing the identity of Covert Officer A in violation of 50 U.S.C. § 421(a), Kiriakou seeks information that "(1) Covert Officer A was 'covert' within the meaning of 50 U.S.C. § 426(4); [and that] (2) the United States took 'affirmative measures' to conceal Covert Officer A's intelligence relationship with the United States." (Bill of Particulars Mot. at 2). This request should be rejected. The Indictment provides more than sufficient information regarding the essential elements of Count One, and with respect to Covert Officer A's covert status and relationship with the United States, the Indictment

6

also provides that his "association with the CIA has been classified for more than two decades." (Indictment at 6, ¶11). While the Indictment does not detail every other affirmative measure that the Government has taken to conceal his relationship with the United States, such a list is not required in the Indictment, and as reflected in the legislative history of Section 421, the defendant can reasonably anticipate that such other examples could include "the creation of a 'cover' identity (a set of fictitious characteristics and relationships) to conceal the individual's true identity and relationship to an intelligence agency, the use of clandestine means of communication to conceal the individual's relationship with United States government personnel, and the restricting of any mention of the individual's true identity or intelligence relationship to classified documents and channels." S. Rep. No. 97-201 at 162 (1981). In any event, as a part of classified discovery, the Government is producing employment records and other documents associated with Covert Officer A, which reflect his status and the affirmative measures taken to conceal his relationship with the United States. Such discovery renders a bill of particulars unnecessary. *See SIGMA*, 624 F.2d at 466.

Regarding Counts Two through Four, each of which charges the defendant with violating Title 18 U.S.C. § 793, Kiriakou asserts that a bill of particulars is required to provide information regarding "the injury to the United States or its national security, and/or the advantage to any foreign nation, that the defendant would have had reason to believe would arise from the disclosures." (Bill of Particulars Mot. at 7). This request too should be rejected. The Indictment alleges that Kiriakou, "lawfully having had access to . . information relating to the national defense, . . . which information the possessor had reason to believe could be used to the injury of the United States and to the advantage of any foreign nation" committed unauthorized disclosures (Indictment at 11, ¶3 (Count Two); *id.* at 13-14, ¶6 (Count Three); *id.* at 15, ¶6 (Count Four)), and provides more than sufficient

information for Kiriakou to understand the charges against him on this element. For example, the Indictment provides extensive detail regarding the non-disclosure agreements signed by Kiriakou, in which Kiriakou agreed, among other things, that "unauthorized disclosure . . . of classified information by me could cause irreparable injury to the United States or could be used to advantage by a foreign nation." (Indictment at 4-5, ¶ 7b; *see id.* at 5, ¶8 (seven additional non-disclosure agreements reflecting the same language); *see also, e.g.*, *id.* at 3-4, ¶7a (Secrecy Agreement signed by Kiriakou at the outset of his employment reflecting that "I understand that in the course of my employment . . . I may be given access to information or material that is classified . . . that, if disclosed in an unauthorized manner would jeopardize intelligence activities of the United States Government")). The Government has also produced these agreements in full in classified discovery and intends to produce additional materials in classified discovery reflecting the defendant's employment and training at the Central Intelligence Agency. As such, the defendant will not be subject to any unfair surprise on this issue.

## II.   The Defendant's Motion For Dismissal of the Indictment Should be Denied Because Has Not Shown That He Is the Victim of a Selective or Vindictive Prosecution.

Kiriakou asserts that his Indictment arises not from a legitimate government interest, but instead represents a "vindictive and/or selective prosecution" for the defendant's exercise of the First Amendment right to speak critically of the government. (*See* Vindictive Pros. Mot.). Defendant's claim that he is the victim of a selective or vindictive prosecution is meritless, the motion to dismiss the indictment should be denied, and no discovery concerning these allegations should be ordered.

### A.   Pertinent Facts Concerning the Defendant, Investigation, and Charges

Kiriakou states that he has a "long history of speaking his mind" and that he has spoken

publicly about a variety of national security matters. (Vindictive Pros. Mot. at 2-4). The Department of Justice has never filed criminal charges against him in connection with any of these matters. Among the topics about which Kiriakou has spoken is the interrogation technique known as waterboarding, about which he has expressed evolving opinions at various times.

Beginning with an ABC interview in December 2007, Kiriakou described waterboarding as necessary ("And at the time I – I felt that water boarding was something that we needed to do"), effective ("It did [make a difference]. The threat information that [Abu Zubaydah] provided disrupted a number of attacks, maybe dozens of attacks.") and legally approved ("It was very clear from the beginning that this had to be done within the rules."). *Transcript of ABC News Interview with John Kiriakou*, dated Dec. 10, 2010. Despite developing misgivings about the technique, which he described to ABC as torture, Kiriakou described his ABC statements as "a pro-agency story" and "intelligence success story," notwithstanding immediate public outcry suggesting that he had disclosed classified information. *NPR All Things Considered: Ex-CIA Officer Speaks Out Against Waterboarding*, dated Dec. 12, 2007. Defendant acknowledged that "in retrospect, I probably should have" sought permission before discussing the subject, *id.*, expressed surprise that the interview covered this topic, and described his comments as unplanned.[1] Kiriakou later discussed these topics again, including in a critical manner in the epilogue of his memoirs, which the CIA approved for publication. *See* John Kiriakou, *The Reluctant Spy* 185-192 (Bantam 2009). Now seeking to adopt the ill-fitting mantle of whistleblower, defendant asserts that his statements about these and other

---

[1]"The interview was supposed to be about the destroyed tapes, but [Brian] Ross [of ABC] spent only the first two or three minutes on them before he segued to the issue of waterboarding and Abu Zubaydah. I probably should have demurred then and there, saying that these were subjects that I didn't want to discuss publicly. Instead, I responded to Brian's questions." John Kiriakou, *The Reluctant Spy* 187-192 (Bantam 2009).

subjects improperly motivate the prosecution against him.  As the Complaint Affidavit makes clear, the genesis of this prosecution has nothing to do with waterboarding, the national conversation about its wrongness or rightness, the defendant's opinions, or other public statements he may or may not have made.

To the contrary, as the Complaint Affidavit explains, the special investigation that gave rise to the Indictment focused in the first instance on the circumstances surrounding apparent security breaches at Guantanamo Bay, Cuba.  (Complaint Affidavit at 2-5, ¶4-10).  As the investigation ultimately revealed, including through interviews with the detainees' defense team and the execution of multiple search warrants, the chain of events that led to Officer B's photographs being provided to a detainee, and Covert Officer A being identified and named in a commission filing, was ultimately traced back to the defendant and specifically to his illegal disclosures concerning these two career government employees. (Complaint Affidavit, *passim*).

Despite the accusation of vindictiveness, Kiriakou recognized the seriousness of the underlying circumstances that motivated the investigation and praised the appointment of a Special Attorney.  *See, e.g.*, from John Kiriakou, dated Mar. 23, 2010 ("Did you see the article in the latest Newsweek about CIA operatives photos??? Holder appointed . . . a special prosecutor!  So we're finally moving in the right direction!").  Kiriakou later wrote, "I don't mean to sound parochial, but the jobs we've chosen are difficult and stressful enough, without having to worry about an attorney outing you to an accused terrorist.  I do indeed think it puts the interrogators in danger.  The government owes them a little protection."  Email from John Kiriakou, dated May 25, 2010.

Prior to charges being filed, the FBI interviewed Kiriakou and recorded the meeting. (Complaint Affidavit at 25-26, ¶51-52).  Kiriakou described the discovery of the photographs as

"terrifying," and warned, "Once they get the names, I mean, this is scary." (Transcript at 20, 44).[2]

The defendant confirmed that Covert Officer A was "always undercover. His entire career was undercover." (Transcript at 38). With respect to Officer B, he described specific damage the disclosures could cause and verified that Officer B's association with relevant CIA activities was classified. (Transcript at 24, 35-36). Kiriakou described Journalist A — to whom he emailed Covert Officer A's name — as "a dangerous son of a gun." (Transcript at 29). And rather than acknowledging a mistake, or offering some explanation for his conduct, Kiriakou flatly and repeatedly denied to federal agents that he had made the very disclosures memorialized in his own email. (*See, e.g.*, Transcript at 22-23, 37, 40, 48, 50, 58-59, 61-62). This prosecution followed.

**B.      The Executive Branch's Prosecution Decision Is Accorded a Presumption of Regularity and Entitled to Substantial Deference**.

The decision to seek charges against a particular defendant is accorded great deference, given the Executive Branch's obligation and responsibility for the enforcement of federal criminal law:

> A selective prosecution claim asks a court to exercise judicial power over a special province of the Executive. The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws . . . . As a result, [t]he presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.

*United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citations and quotations omitted). Thus, the

---

[2]Should the Court request, the government is prepared to submit for *in camera* review, through the Classified Information Security Officer, the 63-page transcript of the defendant's interview with the FBI on January 19, 2012, and the underlying audio recording.

11

Fourth Circuit cautions, courts must not unduly intrude upon the broad discretion given to prosecutors in making charging decisions. *United States v. Lighty*, 616 F.3d 321, 369 (4th Cir. 2010) ("A selective-prosecution claim asks a court to exercise judicial power over a special province of the Executive Branch and, accordingly, must pass a high threshold in order to succeed."). While a prosecutor's conduct is always subject to constitutional constraints, *e.g. Armstrong*, 517 U.S. at 464-65, the deference shown to it is particularly strong in the pretrial phase. *See United States v. Goodwin*, 457 U.S. 368, 381 (1982) ("[A] change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.").

### C.      The Defendant Has Not Overcome the Presumption of Regularity.

Kiriakou seeks to overturn the presumption of regularity by asserting that the decision to charge him must have arisen from some illegitimate prosecutorial motive, rather than the investigation having followed the facts where they led. However, the defendant fails to offer clear evidence to support his claim, and falls far short of satisfying the high burden required to overcome the presumption of regularity. *See United States v. Passero*, 577 F.3d 207, 219 (4th Cir. 2009) ("[u]nless a defendant provides 'clear evidence' to overcome the presumption that a government prosecutor has acted lawfully and without discrimination-a 'particularly demanding' standard-he cannot demonstrate a constitutional violation for selective prosecution." (citation omitted)). To the contrary, the evidence, including in the sworn Complaint Affidavit, supports the presumption of regularity. Given that defendant's theory is based upon little more than speculation and surmise, there is "no basis for judicial interference with that discretion." *Id.* ("Indeed, criminal defendants commonly complain that other persons are more worthy of criminal prosecution.").

To prevail on a selective prosecution claim, the "defendant must establish both (1) that he has been 'singled out' while others similarly situated have not been prosecuted; and (2) that the decision to prosecute him was 'invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to exercise his constitutional rights.'" *United States v. Greenwood*, 796 F.2d 49, 52 (4th Cir. 1986) (citation omitted). In this context, "defendants are similarly situated when their circumstances present *no* distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (emphasis added); *United States v. Khan*, 461 F.3d 477, 498 (4th Cir. 2006).  Lawful considerations include "'such factors as the strength of the evidence against a particular defendant, the defendant's role in the crime, . . . the defendant's candor and willingness to plead guilty, the amount of resources required to convict a defendant, the extent of prosecutorial resources, the potential impact of a prosecution on related investigations and prosecutions, and prosecutorial priorities for addressing specific types of illegal conduct.'" *Lighty*, 616 F.3d at 370 (quoting *Olvis*, 97 F.3d at 744).  Indeed, in this area in particular, "any prosecution . . . will in every case pose difficult problems of balancing the need for prosecution and the possible damage that a public trial will require by way of the disclosure of vital national interest secrets in a public trial." *United States v. Morison*, 844 F.2d 1057, 1067 (4th Cir. 1988).  The defense proof must establish more than "speculation" and the court is entitled to consider the government's explanation for its conduct.  *Greenwood*, 796 F.2d at 52.

Kiriakou attempts to satisfy the first prong by assembling newspaper stories authored by journalists to whom improper disclosures may have been made.  This falls far short of identifying

13

similarly situated subjects; if true, it proves only a crime problem that would counsel in favor of bringing prosecutions when, as here, the evidence is available and compelling. The defense does not identify the sources it proposes should be prosecuted, for an understandable reason: those who illegally disclose classified information to journalists demand anonymity and are difficult to identify. Nor does it suggest that the government should subpoena the journalists, a step not taken lightly. Nor does it address the evidence against Kiriakou or how it was acquired. As the complaint reveals and indictment alleges, Kiriakou passed his information via email, admitted in a audio-recorded interview that he knew the information was classified, and boasted about his lies to the Publications Review Board — in another email. Nor does it address the defendant's lack of candor or the harm caused by defendant's crimes, including the provision of a CIA employee's photograph to a terrorism detainee. Indeed, the defendant has offered no reason to believe that any of defendant's unnamed, anonymous sources are viable prosecution candidates, much less similarly situated ones with "no distinguishable factors." *Olvis*, 97 F.3d at 744.

Kiriakou similarly fails to make a credible showing concerning the second required prong, namely, that the prosecution was "'invidious or in bad faith, *i.e.*, based upon . . . the desire to exercise his constitutional rights.'" *Greenwood*, 796 F.2d at 52 (citation omitted). It is a "basic-and itself uncontroversial-principle" that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort.*" Goodwin*, 457 U.S. at 372 (citations and quotations omitted). However, defendant wholly fails to show that he is being

punished for lawful speech; the evidence supports precisely the opposite conclusion.[3]   Indeed, defendant points to *no person* who has been criminally prosecuted for discussing waterboarding. Defendant states that the CIA filed a crimes report concerning his ABC interview in 2007 pertaining to waterboarding. (Vindictive Pros. Mot. at 3).  What is noteworthy is that *no prosecution* has been brought against Kiriakou related to any such disclosures he may or may not have made nearly five years ago.  Instead, Kiriakou is being prosecuted for disclosures related to the identities of two career CIA employees, together with lying to the PRB, all arising from a separate investigation.

But, insofar as the defendant may have disclosed other classified information other than that charged in the Indictment, the First Amendment affords him no protection.  It is well-settled that "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to effective operation of our foreign intelligence service." *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980); *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983) ("[T]he CIA censorship of 'secret' information contained in former agents' writings and obtained by former agents during the course of CIA employment does not violate the first amendment.").  In fact, a pattern of illegal conduct concerning the handling and disclosure of classified information, as defendant's emails revealed, would be a legitimate factor to consider in reaching a prosecution decision.

---

[3]The defendant also lodges a bizarre claim that the prosecution is retaliation for his work on behalf of U.S. Senator John Kerry and the Senate Foreign Relations Committee.  (Vindictive Pros. Mot. at 4-5). This allegation is frivolous and without any credible basis.

**D.** **The Defendant Is Not Entitled to Discovery Into the Government's Internal Prosecution Deliberations**.

"The justifications for a rigorous standard for the elements of a selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 468. Enforcing a "rigorous standard" is required to prevent the diversion of prosecutors' resources and avoid disclosure of the Government's prosecutorial strategy, *see id.*, and to "protect[] the Government from attempts by the defense to seek discovery as a means of harassment or of delay." *Wayte v. United States*, 470 U.S. 590, 624 (1985). For example, Kiriakou has already requested the following in discovery: "A list of all instances where the United States has learned of potential violations of 50 U.S.C. § 421 and declined to prosecute, and the reasons the United States declined prosecution as well as all documentation related to the investigation of these cases." Letter from Defense Counsel (May 25, 2012). The law gives no sanction to such a "fishing expedition." *Greenwood*, 796 F.2d at 53. Instead, the law intends that the requisite "showing 'should itself be a significant barrier to the litigation of insubstantial claims,'" like those lodged by Kiriakou in this motion. *Khan*, 461 F.3d at 498 (quoting *Armstrong*, 517 U.S. at 464).

To establish the right to discovery, the defendant must establish a "credible showing" for a selective prosecution claim. *Armstrong*, 517 U.S. at 470. As addressed above, this requires a "credible showing of different treatment of similarly situated persons," *id.* at 470, that is, persons whose "circumstances present *no* distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Khan*, 461 F.3d at 498 (citing *Olvis*, 97 F.3d at 744 (emphasis added)). The defendant has failed to make the required showing and the Court should not order discovery concerning these allegations.

16

III.     **Sections 793(d) and 421(d) Are Neither Unconstitutionally Vague Nor Overbroad.**

The defendant argues that the statutes charged in Counts One through Four — 50 U.S.C. §

421(a) and 18 U.S.C.§ 793(d) — are unconstitutional, because they are impermissibly vague and

overbroad.  For the reasons described below, this argument should be rejected.

    **A.**     **Vagueness**

        **1.**     **Applicable Law**

The vagueness doctrine is a component of the Fifth Amendment right to due process.  *United*

*States* v. *Williams,* 553 U.S. 285, 304 (2008); *see Morison*, 844 F.2d at 1070 ("The vagueness

doctrine is rooted in due process principles") (citing *Connally v. Gen'l Const. Co.*, 269 U.S. 385, 391

(1926)).  In challenging a statute on vagueness grounds, a defendant can mount an as-applied

challenge, *i.e.*, an assertion that a statute is impermissibly vague as applied to him, or a facial

challenge, *i.e.*, a claim that a statute is too vague to be applied to anyone, not just the defendant.

Because the permissibility of a facial challenge sometimes depends upon whether the challenged law

was constitutional as applied the complainant, "[a] court should . . . examine the complainant's

conduct before analyzing other hypothetical applications of the law."  *Vill. of Hoffman Estates v.*

*Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).

In the context of an as-applied challenge, a statute is unconstitutional if it "'either forbids or

requires the doing of an act in terms so vague that men of common intelligence must necessarily

guess at its meaning and differ as to its application.'" *Morison*, 844 F.2d at 1070 (quoting *Connally*,

269 U.S. at 391).  However, a statute will not be struck down as vague if its "prohibitions . . . are

set out in terms that the ordinary person exercising ordinary common sense can sufficiently

understand and comply with, without sacrifice to the public interest . . . , even though marginal cases

could be put where doubts might arise." *Arnett v. Kennedy*, 416 U.S. 134, 159 (1974).  "[I]in any event, it is settled beyond controversy that if one is not of the rare 'entrapped' innocents but one to whom the statute clearly applies, irrespective of any claims of vagueness, he has no standing to challenge successfully the statute under which he is charged for vagueness." *Morison*, 844 F.2d at 1071 (citing *Parker v. Levy*, 417 U.S. 733, 756 (1974)).  Finally, in the context of an as-applied challenge, "the statute must be read in its entirety and all vagueness may be corrected by judicial construction which narrows the sweep of the statute within the range of reasonable certainty."  *Id.*

Where a statute implicates First Amendment protections, facial vagueness challenges may go forward only if the challenged "law reaches 'a substantial amount of constitutionally protected conduct.'"  *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (citation omitted); *see also Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976) (noting that a facial challenge for vagueness may go forward where "the statute's deterrent effect on legitimate expression" is "both real and substantial.").  Besides providing notice to citizens of ordinary intelligence, a penal statute should provide at least "minimal guidelines" to law enforcement so as not to permit an arbitrary and "standardless sweep." *Kolender*, 461 U.S. at 357-58 (citation and internal quotations omitted).  The Supreme Court has also "traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Id.* (citing, as examples, *Keyishian v. Bd. of Regents*, 385 U.S. 589, 609 (1967), and *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

### 2.    Analysis

#### a.    Section 421(a) Is Not Impermissibly Vague.

Contrary to the defendant's assertion, the meaning of the term "affirmative measures" is readily intelligible to the average person.  Although Section 421 does not provide its own definition

18

of the term, "the plain meaning and the context in which the term appears provide our best guide"

and easily make clear the meaning of term. *United States v. Groce*, 398 F.3d 679, 681 (4th Cir.

2005) (citing *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991)).  Section 421(a) provides that

"[w]hoever, having or having had authorized access to classified information that identifies a covert

agent, intentionally discloses any information identifying such covert agent . . . ,  knowing . . . that

the United States is taking *affirmative measures* to conceal such covert agent's intelligence

relationship to the United States" has committed a crime.  50 U.S.C. § 421(a) (emphasis added).  In

such a context, a straightforward reading of the term "affirmative measures," taking into

consideration the plain meaning of the words from which the term is derived,[4] is that it refers to

some positive actions, steps, or means taken to conceal a covert agent's relationship to the United

States.  Indeed, the obviousness of this interpretation is reflected by the legislative history of Section

421, which provides a ready list of examples of  "affirmative measures" that the government could

take.  *See* S. Rep. No. 97-201 at 162 (1981) ("'[A]ffirmative measures' could include the use of such

techniques as, for example, the creation of a 'cover identity' (a set of fictitious characteristics and

relationships) to conceal the individual's true identity and relationship to an intelligence agency, the

use of clandestine means of communication to conceal the individual's relationship with United

States government personnel, and the restricting of any mention of the individual's true identity or

---

[4] *See American Heritage Dictionary*, http://ahdictionary.com/word/ search.html?q=affirmative (last visited July 1, 2012) (providing one of its definition of "affirmative" as "positive"); *Merriam-Webster Dictionary*, http://www.merriam-webster.com/ dictionary/affirmative (last visited July 1, 2012) (same); *American Heritage Dictionary*, http://ahdictionary.com/word /search.html?q=measure  (last visited July 1, 2012) (defining "measure" as an "action taken as a means to an end."); *Merriam-Webster Dictionary*, http://www.merriam-webster.com /dictionary/measure (last visited July 1, 2012) (defining "measure" as "a step planned or taken as a means to an end").

intelligence relationship to classified documents and channels."")).

Notably, unlike other subsections of Section 421, Section 421(a) limits liability to those individuals who "had authorized access to classified information that identifies a covert agent," *i.e.*, to individuals like Kiriakou who, in order to gain access to classified information, were required to sign non-disclosure agreements, in which they were informed of the grave consequences of unauthorized disclosure of classified information and their "position of special confidence and trust and . . . obligat[ion] to protect the information." (*See, e.g.*, Indictment at 4, ¶ 7a). In other words, the "average person" targeted by this statute is a narrow class of individuals with a specialized understanding of what it means for the government to take affirmative measures to protect its covert agents. Viewed in this light, Kiriakou cannot credibly claim that "affirmative measures" is not readily intelligible to him. Similarly, in light of the narrow application of Section 421(a) to this specialized class of individuals who have no First Amendment right to disseminate such protected information, any facial challenge must fail, as the statute fails to "reach[] 'a substantial amount of constitutionally protected conduct.'" *Kolender*, 461 U.S. at 358 n.8 (citing *Hoffman Estates,* 455 U.S. at 494)). *See McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983) ("[T]he CIA censorship of 'secret' information contained in former agents' writings and obtained by former agents during the course of CIA employment does not violate the first amendment.").

### b.     Section 793(d) Is Not Impermissibly Vague.

Notwithstanding defendant's assertions, the terms of Section 793(d) are also sufficiently clear that "an ordinary person exercising ordinary common sense can sufficiently . . . comply." *See Arnett*, 416 U.S. at 159. Unremarkably, "ordinary common sense" counsels against disseminating classified information designated by Executive Order as having the potential to damage the national security

of the United States.  Moreover, as a CIA officer who signed non-disclosure agreements, defendant is "one to whom the statute clearly applies," not belonging to the class of "rare 'entrapped' innocents," and thus is foreclosed from challenging successfully the statute on grounds of vagueness.[5]  *Morison,* 844 F.2d at 1071.  Unsurprisingly, as defendant concedes, the constitutionality of Section 793 and the espionage statutes has been repeatedly affirmed against vagueness challenges, including by the Fourth Circuit.  *See, e.g.*, *Morison,* 844 F.2d at 1071-73; *United States v. Dedeyan,* 584 F.2d 36, 39 (4th Cir. 1978).

Section 793(d) sets forth the following prohibition: "Whoever, lawfully having . . . information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates . . . the same to any person not entitled to receive it" violates the statute.  18 U.S.C. § 793(d).  By the statute's plain and ordinary meaning and as further narrowed by the courts, the foregoing elements provide sufficient notice for those wishing to avoid criminal liability and sufficient guidance for enforcement.

Most significant is the scienter requirement.  Section 793 requires the government to prove that defendant "willfully" communicated national defense information.  To prove willful intent, the government must prove that the defendant had "knowledge that the conduct was unlawful." *Bryan* v. *United States,* 524 U.S. 184, 196 (1998); *United States* v. *Bursey,* 416 F.3d 301, 309 (4th Cir. 2005).  The Fourth Circuit has approved jury instructions in prosecutions under Section 793 that are

---

[5]Defendant's non-disclosure agreement specifically warned that his conduct could violate Section 793: "In addition, I have been advised and am aware that any unauthorized disclosure of SCI by me may constitute a violation or violations of United States criminal laws, including the provisions of . . . Section 793 . . . of Title 18, United States Code . . . ."  (Indictment at 5, ¶7).

nearly identical. *Morison,* 844 F.2d at 1071-73 (approving Section 793 jury instruction defining willful intent as "specific intent to do something the law forbids. That is to say, with a bad purpose either to disobey or to disregard the law"); *see also United States* v. *Truong,* 629 F.2d 908, 919 (4th Cir. 1980) ("specific intent to do something the law forbids"). Defendant's concern that vagueness might lead an innocent inadvertently to incur criminal liability fails in this instance when intent to violate the law is an element of the offense. *See Hoffman Estates*, 455 U.S. at 499 (willfulness element mitigates vagueness concern); *Screws v. United States*, 325 U.S. 91, 104 (1945) (same).

Nonetheless, defendant professes that "information relating to the national defense" is unconstitutionally vague. The Fourth Circuit has narrowly defined "national defense," a broad concept, to include only such information that the United States government has closely held and taken steps to keep from official public disclosure. *See United States v. Squillacote*, 221 F.3d 542, 576-77 (4th Cir. 2000) (citing *United States v. Heine,*151 F.2d 813, 816 (2d Cir. 1945)). *See also Dedeyan*, 584 F.2d at 39-40 (excluding information "found in sources lawfully available to the general public" and that which the government has "made no effort to guard") (affirming against vagueness challenge). Further, the government must also prove that the possessor communicated the information to a "person not entitled to receive it," yet another safeguard that narrows the category of information and protects against inadvertent violation. *See Morison*, 844 F.2d at 1071-72, 1074 ("entitled to receive" not unconstitutionally vague). Finally, the statute requires that, to violate the statute with respect to information rather than to notes, papers, or objects, the possessor of such information relating to the national defense must also have "reason to believe" that the information "could be used to the injury of the United States or to the advantage of any foreign nation." 18 U.S.C. § 793(d). Contrary to defendant's efforts to distinguish *Morison*, this additional

22

limitation *further* cabins the statute.[6]  After all, papers, notes, and objects are merely media in which information relating to national defense is stored, and the prohibition against their disclosure has been upheld as constitutional, even in the absence of the further limiting instruction.  This additional stricture, in combination with the exacting scienter requirement, provides no basis to accord the prohibition against disseminating information a different constitutional status than the prohibition against disseminating the same information when contained within notes, papers, or objects.

Defendant's opinions about the extent of classification or over-classification have no bearing on the constitutional status of the statute.  "'[T]he courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications . . . .'"  *El-Masri v. United States*, 479 F.3d 296, 305 (4th Cir. 2007) (quoting *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir.1972)).  Moreover, the jury here will decide a separate but related question: whether the information related to the national defense, a term separately defined by case law.  *See, e.g.*, *Gorin v. United States*, 312 U.S. 19 (1941).  But defendant's argument that classification accords him little assistance in understanding his legal obligations is unconvincing.  Specifically in the context of Section 793, "courts have recognized the legitimacy of looking to the classification system for fleshing out the phrases" in the statute.  *Morison*, 844 F.2d at 1074.  The classification system is an executive function, governed by Executive Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009), which "prescribes a uniform system for classifying, safeguarding, and declassifying national security information."  *Id.*  As those to

---

[6] Nor is "injury" vague.  It simply means "damage" or "harm."  *See American Heritage Dictionary*, http://ahdictionary.com/word/search.html?q=injury (last visited July 2, 2012) (defining "injury" to include "damage or harm"); *Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/injury (last visited July 2, 2012) (defining "injury" to include "an act that damages or hurts").

whom classified information is entrusted are advised, classification reflects a determination that, if disclosed without proper authorization, the information could cause exceptionally grave damage to the national security ("Top Secret"), serious damage to the national security ("Secret"), or damage to the national security ("Confidential"). *Id.* (Indictment at 2, ¶4). It also limits the population entitled to receive it. *Morison*, 844 F.2d at 1074-75. Accordingly, an "ordinary person exercising ordinary common sense" who wittingly disseminates classified information does so at his peril and cannot be heard to complain that he lacked notice.[7] *See Arnett*, 416 U.S. at 159.

Insofar as defendant lodges a facial vagueness challenge, that too fails, for many of the same reasons set forth above. The statute sweeps in no "substantial amount of constitutionally protected conduct." *Kolender*, 461 U.S. at 358 n.8. Moreover, the statute and its judicial interpretation provide more than "minimal guidelines" for law enforcement. *Id.* at 358. Given the elements of proof and practical challenges in establishing such proof, it is well-known that "[v]iolations under the Act are not easily established." *Morison*, 844 F.2d at 1067. Accordingly, the risk of somehow sweeping in protected conduct, or even chilling it, is negligible.

**B.      Sections 421(a) and 793(d) Are Not Overbroad**.

**1.      Applicable Law**

Overbreadth challenges — all of which constitute facial attacks — are narrowly

---

[7]Insofar as defendant believes that rampant over-classification exists and argues that this makes legal compliance an unreasonable task, it is noteworthy that Executive Order 13526 mandates declassification under certain conditions, 75 Fed. Reg. at 713, and outlines procedures whereby government employees and members of the public may challenge the classification status of information, 75 Fed. Reg. at 711, 717-18. CIA regulations further authorize the public to challenge classification orders by writing to its Information and Privacy Coordinator. *See* 32 C.F.R. § 1908.03. The CIA Publications Review Board is another available mechanism whereby former CIA employees seek mandatory guidance prior to making public statements concerning intelligence-related matters, a process to which defendant availed himself.

circumscribed.  Because of the wide-ranging effects of striking down a statute on its face at the request of one whose own conduct may be punished consistent with the First Amendment, the Supreme Court has recognized that the overbreadth doctrine "is, manifestly, strong medicine," to be employed "sparingly and only as a last resort."  *Broadrick* v. *Oklahoma*, 413 U.S. 601, 612-13 (1973).  Thus, the Court requires that, "particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep" in order for the statute to be struck down as facially overbroad.  *Id.* at 615. "To be 'substantial' in [this] context, the statute must reach 'a substantial number of impermissible applications.'" *Morison*, 844 F.2d at 1075 (quoting *New York v. Ferber*, 458 U.S. 747, 771 (1982)).  Indeed, the Supreme Court cautions against application of the overbreadth doctrine to laws that are directed at conduct and that only incidentally sweep expressive conduct within their scope.  *See Broadrick*, 413 U.S. at 615-16 ("[F]acial overbreadth adjudication is an exception to our traditional rules of practice and . . . its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct . . . falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.").  "While . . . vagueness and overbreadth are related constitutional concepts, they are separate and distinct doctrines, subject in application to different standards." *Morison*, 844 F.2d at 1070.  "The vagueness doctrine . . . is basically directed at lack of sufficient clarity and precision in the statute; overbreadth, on the other hand, would invalidate a statute when it infringe[s] on expression to a degree greater than justified by the legitimate government need which is the valid purpose of the statute." *Id.* (citations and quotations omitted).

### 2.    Analysis

### a.    Section 421(a) Is Not Overbroad.

Section 421(a) is not impermissibly overbroad. As discussed above in connection with the

defendant's facial challenge to Section 421(a) (*see supra* at III.A.2.a), this statute is narrowly tailored

to target only individuals who "had authorized access to classified information that identifies a covert

agent."  50 U.S.C. § 421(a).  As such, the law applies to a specialized subset of individuals who, in

order to gain access to classified information, signed non-disclosure agreements, in which they

agreed not to make any unauthorized disclosures of classified information in light of the grave

consequences of such disclosures.  Accordingly, no credible argument can be made that the sweep

of the statute is so "substantial" such that its application would be overbroad. *Broadrick*, 413 U.S.

at 615.  Indeed, Kiriakou does not and cannot demonstrate any legitimate First Amendment basis for

disclosing "information identifying . . . covert agents,"  50 U.S.C. § 421(a), for there is no reason

why an individual with access to classified information should be revealing information identifying

a covert agent to an individual no authorized to receive classified information.

Nevertheless, Kiriakou argues that the statute is overbroad because it "does not require the

government to prove that the defendant intended to injure the United States or had reason to believe

that his disclosures would harm the United States or assist an enemy."  (Vagueness Mot. at 15).

Kiriakou further asserts that, "[w]ithout these requirements, . . . [the statute] penalize[s] speech well

beyond those instances where the government needs to maintain secrecy . . . ." (*Id.*).  But, again,

Kiriakou fails to provide an example of any instance where an individual with access to classified

information had a legitimate need to reveal information identifying a covert agent — let alone

instances in "substantial number." *Ferber*, 458 U.S. at 771.  Along the same lines, Kiriakou's

attempt to invoke over-classification as support for his overbreadth challenge also fails (Vagueness Mot. at 16), as there is no conceivable reason why the identity of a covert officer should not be classified, given the harm to national security that could result from the officer's exposure. These arguments are merely attempts by Kiriakou to litigate his Section 793 claims under the guise of a challenge to Section 421(a), and they should be rejected.

**b.      Section 793(d) Is Not Overbroad.**

Likewise, Kiriakou's overbreadth challenge to Section 793(d) should be rejected. As an initial matter, and as the Fourth Circuit in *Morison* held, in relying on *Branzburg v. Hayes*, 408 U.S. 665 (1972), unauthorized disclosures in violation of Section 793(d), such as the ones made by the defendant here, do not fall under the category of speech entitled to First Amendment protection. *See Morison*, 844 F.2d at 1068 (citing *Branzburg*, 408 U.S. at 691-92); *id.* ("[W]e do not perceive any First Amendment rights to be implicated" in a proper application of Section 793). Like the defendant in *Morison*, Kiriakou, "who, as an employee in [an] intelligence service . . . had been noticed by the terms of his [non-disclosure] agreement[s] with the [CIA], . . . transmitt[ed] [classified] material to one not entitled to receive it," in violation of Section 793(d). *Id.* Accordingly, to the extent the defendant seeks cover under the First Amendment for his illegal conduct, this argument should be rejected.

In any event, Section 793(d) is not overbroad. In upholding Sections 793(d) against the defendant's overbreadth challenge in *Morison*, the Fourth Circuit noted that the statute reflects "an important and vital government interest," *Morison*, 844 F.2d at 1076, *i.e.*, the protection of our nation's defense and security. Indeed, the statute's text alone evinces a legislative intent to prohibit acts and courses of conduct not aimed to serve any informative or communicative function; rather,

27

they show an intent to protect the national security. *See* 18 U.S.C. § 793(d) (criminalizing unauthorized disclosure of "information *relating to the national defense* which information the possessor has reason to believe could be used to the *injury of the United States* or *to the advantage of a foreign nation*") (emphasis added).

The defendant makes no showing that Section 793(d)'s prohibition on unauthorized disclosures reaches a substantial amount of constitutionally-protected activity, nor does he explain why the statute should not be construed to avoid constitutional difficulties. Instead, Kiriakou argues that both *Morison* and *Rosen*, 445 F. Supp. 2d 602 (E.D. Va. 2006) — which also upheld Section 793(d) against an overbreadth challenge — were wrongly decided because they erroneously "relied on the classification system as a means of determining whether a disclosure was national defense information within the meaning of the statute," in light of "the widespread problem of over-classification." (Vagueness Mot. at 17). However, as discussed *supra*, in connection with his vagueness claim, Kiriakou's opinions about the extent of over-classification are irrelevant to the constitutional status of Section 793(d). Contrary to Kiriakou's claim, classification level, a determination to which the executive branch is owed deference, *see El-Masri*, 479 F.3d at 305, is not dispositive as to whether the information constitutes impermissible national defense information, a term separately defined by case law. *See Squillacote*, 221 F.3d at 576-77 (citing *Heine*, 151 F.2d at 816). Accordingly, to focus solely on whether information is classified misunderstands the basic requirement of how national defense information is defined, and Kiriakou's claim provides no basis to disturb the court's holding in *Morison*.

Even assuming *arguendo*, however, that the statute reaches some protected activity by individuals who disclosed classified information that, as it turns out, was not appropriately classified

— and which was also later determined not to fall under the category of national defense information — the statute is still not substantially overbroad, as the remaining applications of the statute could never remotely qualify as protected activity, *i.e.*, to unauthorized disclosures of genuine national defense information.  In other words, because the statute appropriately applies to such a large number of instances of unprotected activity, the statute's "legitimate reach dwarfs its arguably impermissible applications," and the number of hypothetical inappropriate applications amount to, at most, no more than "a tiny fraction of the [instances] within the statute's reach." *Ferber*, 458 U.S. at 773.  In other words, because Section 793(d) in no way "reach[es] a substantial amount of constitutionally protected conduct," Kiriakou's overbreadth challenge must be rejected.  *United Seniors Ass'n Inc.*, 423 F.3d at 406.

Kiriakou also argues that "[t]he overlap between Section 421 and Section 793(d) further demonstrates the constitutional infirmities of Section 793(d)," and points out that Section 421 "set[s] out a number of specific elements . . . and provides a definition of the term 'covert agent,'" while Section 793(d) does not.  (Vagueness Mot. at 18).  But the differences between the two sections merely reflect the different purposes of the respective statutes.  Section 421(a)'s elements reflect the narrow class of individuals to whom the statute targets, *i.e.*, individuals who "had authorized access to classified information that identifies a covert agent," and the specific harm it was designed to prevent, *i.e.*, the unauthorized disclosure of "information that identifies a covert agent."  50 U.S.C. § 421(a).  That 793(d) has a broader purpose of preventing the unauthorized disclosure of information relating to the national defense has no bearing on overbreadth analysis.

29

For these reasons, all of the defendant's motions should be denied.

Respectfully submitted,

Neil H. MacBride
United States Attorney

Mark E. Schneider / Iris Lan / Ryan Fayhee
Special Attorneys to the Attorney General

James L. Trump
Assistant U.S. Attorney


By:           /s/
Iris Lan
New York Bar No. 4141552
Attorney for the United States of America
United States Attorney's Office
One Saint Andrew's Plaza
New York, NY 10007
Phone: 212-637-2263
Fax: 703-299-3981
Email Address: iris.lan@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I caused an electronic copy of the foregoing *Unopposed Motion to Extend Time Period to Respond to Defense Motions* to be filed with the Court and served via ECF on Robert P. Trout, Plato Cacheris, John F. Hundley, and Jesse I. Winograd, counsel for the defendant.

By:              <u>          /s/               </u>

Iris Lan
New York Bar No. 4141552
Attorney for the United States of America
United States Attorney's Office
One Saint Andrew's Plaza
New York, NY 10007
Phone: 212-637-2263
Fax: 703-299-3981
Email Address: iris.lan@usdoj.gov

31