1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA          .      Criminal No. 1:12cr127
                                  .
     vs.                          .      Alexandria, Virginia
                                  .      July 20, 2012
JOHN KIRIAKOU,                    .      9:30 a.m.
                                  .
               Defendant.         .
                                  .
.  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          IRIS LAN, AUSA
                             MARK SCHNEIDER, AUSA
                             JAMES TRUMP, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             RYAN P. FAYHEE
                             Trial Attorney
                             U.S. Department of Justice
                             National Security Division
                             Counterespionage Section
                             600 E Street, N.W.
                             Washington, D.C. 20004

FOR THE DEFENDANT:           ROBERT P. TROUT, ESQ.
                             JESSE I. WINOGRAD, ESQ.
                             Trout Cacheris, PLLC
                             1350 Connecticut Avenue, N.W.
                             Suite 300
                             Washington, D.C. 20036

OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

(Pages 1 - 23)
COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

(Defendant present.)

THE CLERK:  Criminal Case 12-127, United States of America v. John Kiriakou.  Would counsel please note their appearances for the record.

THE COURT:  Counsel, put your names on the record, please.

MR. SCHNEIDER:  Good morning, Your Honor.  Mark Schneider, Iris Lan, Ryan Fayhee, and James Trump on behalf of the United States.

THE COURT:  Good morning.

MR. TROUT:  Good morning, Your Honor.  Robert Trout.  With me at counsel table is Jesse Winograd, from the firm of Trout Cacheris.  Also at counsel table is Mr. Kiriakou.

THE COURT:  All right.  We have three defense motions on the docket this morning, but before we get to any of them, I want to find out from the government what's the status of the discovery in this case, because I've been hearing from the defense in their pleadings and also from our court security officer that there are issues about encryption and the ability of defense counsel to get access to the discovery you're producing electronically.

MR. SCHNEIDER:  Thank you, Your Honor.  Your Honor, we believe at this point that we have satisfied our Rule 16 obligations.  We have produced a large volume of records this

week.  It's obviously possible that in the course of prudential reviews or the further investigation of the case, other things could come up, in which case we'll produce those promptly.

THE COURT:  Well, you're not producing if they can't get access to it, and what I'm hearing is I don't know how you-all produced it or what safeguards you put on it, but whatever they are, unless counsel tell me to the contrary, they're having problems unlocking it, so that's not sufficient.

Let me hear from the defense on this.  Mr. Trout?

MR. TROUT:  Thank you, Your Honor.  My understanding is is that this week, just this week, the encryption problem, we believe, has been solved.  I believe that there was a production yesterday, and I think there was another production this morning.

We were able to get into the material yesterday, although just briefly.  We haven't digested it, obviously, but we do believe that the material that was produced just yesterday, which I believe is what Mr. Schneider was referring to, is -- as the material they were producing this week, we do believe that we can get into that.  We assume we can get into what was produced this morning.

THE COURT:  All right.  Now, within -- I assume, Mr. Schneider, you know what you've produced.

MR. SCHNEIDER:  We do, Your Honor.

THE COURT:  All right.  Among the documents that

4

you've produced, among the information you've produced, have you now given defense counsel the personnel file and background information about Covert Officers A and B?

MR. SCHNEIDER:  Yes, Your Honor.

THE COURT:  So they have all of that?

MR. SCHNEIDER:  Yes.

THE COURT:  Has anything, anything been redacted from that?

MR. SCHNEIDER:  There have been some redactions, Your Honor, largely for purposes of relevancy.  We are evaluating whether we're going to make a filing with respect to some of them.

THE COURT:  Well, I've gotten no CIPA filings in this case.

MR. SCHNEIDER:  We understand, Your Honor.

THE COURT:  And if there's going to be some of that, we need to start moving on it.

MR. SCHNEIDER:  We intend to do so, Your Honor, and our suggestion, Your Honor, was once the defense has an opportunity to review what we've produced this week, if there are redaction issues, some of them we may be able to address in consultation with them.

Our suggestion is that the defense have some opportunity to review what we've looked at this week, we confer with defense counsel, hopefully come up with a proposed order

5

for the Court's consideration with respect to a CIPA schedule, you know, within the next week or two, and then if we're unable to come up with an agreed schedule, to return to Your Honor and get a schedule set for that.

But I think both sides are in conversation about those issues. We recognize there'll be CIPA briefing on this, and it's, I think, in everyone's interests to move that as quickly as we can.

THE COURT: Definitely, all right. The reason why discovery, of course, is significant here is that in terms of the motion for a bill of particulars, as you know, Mr. Trout, those motions are seldom granted in this court certainly, as long as the indictment adequately advises a defendant as to the nature of the charges and what he would need to mount as a defense, and quite frankly, this indictment is a speaking indictment, it gives you more than sufficient information, assuming that the discovery is properly produced, and, for example, the background you want about Covert Officer No. A, that should clearly be in the personnel file that's been revealed to you.

MR. TROUT: Yes, Your Honor. I think that on that issue, hopefully the discovery will address that, and so I don't want to really talk about that.

I do want to talk about the affirmative steps that the government took to conceal the intelligence relationship to

6

the United States, and I also want to talk about the injury, the nature of the injury to the United States. If these are uncomplicated issues, the government should have no problem telling us about it, but if we have to speculate as to what it is that the government's evidence is going to be on that and we say to ourselves, well, they're probably going to be saying A and B, and we prepare a defense to A and B and they show up at trial and say, well, actually, it's C, then we are caught by surprise and without the opportunity to go back, and it may well be that we would have had ample not simply opportunity but ample evidence to rebut C, but because we don't know about it, then we are caught by surprise, and Mr. Kiriakou is severely prejudiced.

As I say, if it's, if it's complicated, all the more reason that we ought to know about it. If it's uncomplicated, all the more reason why it shouldn't be a problem for them to tell us about it, and so we believe that on those two elements, Your Honor, we should be entitled to particulars from the government. Again, we just don't -- you know, as I say, if it's not complicated, what's the problem?

So that's -- those are the two particulars that we would urge the Court, notwithstanding the general approach that the Court has to bill of particulars -- and this is not about whether the indictment is sufficient; it's about whether those two allegations are sufficiently particularized to give us

7

notice of what we have to defend against at trial.

THE COURT: All right. Mr. Schneider, do you want to respond to that?

MR. SCHNEIDER: I can briefly, Your Honor. First of all, with respect to --

THE COURT: You have a good voice, but I still want you at the lectern.

MR. SCHNEIDER: I apologize.

THE COURT: All right.

MR. SCHNEIDER: With respect to affirmative measures, some of that is certainly encompassed in discovery with respect to Covert Officer A. There are also standard techniques that are included in the legislative history, and that should be no surprise to a former CIA officer, what types of techniques are used to protect the identity of covert agents.

The bill of particulars, as the Court knows, the first issue is double jeopardy; the second is undue surprise. In a case like this, given the types of charges that have been brought, I don't think the defense has a leg to stand on in terms of suggesting that they would be, that they would be surprised by the types of very standard mechanisms that intelligence agency used to protect the identities of their agents, and again, I think a lot of that's included in discovery.

Other of it could -- we've produced, frankly, I

8

think, nearly all of the 3500 material that we have so far, but as we prepare for trial, there will obviously be additional 3500 generated that may also address some of these issues.

And then with respect to injury to the United States, the legal requirement is that the defendant simply have reason to believe it could be used to the injury of the United States to the advantage of a foreign nation. I don't believe there's a further particularization requirement with respect to that. That's addressed in the nondisclosure agreement that the defendant signed.

We've also produced the defendant's interview with the FBI agents in which the defendant himself actually speaks about some of the injuries that some of these disclosures could have caused to the United States. So again, I don't think with respect to the type of injury that the United States could incur by the disclosure of the identity of these officers, there's any genuine risk of undue surprise.

THE COURT: All right. Mr. Trout?

MR. TROUT: Thank you, Your Honor. I think the important point here is not what sort of measures do they often use to conceal the covert nature of intelligence officers. It's what did they do --

THE COURT: As to A.

MR. TROUT: -- as to A.

THE COURT: Yeah.

9

MR. TROUT:  And that's what, that's what we want to understand.

And again, I mean, I'm going to leak in a little bit to other issues, other arguments, but one of the things that I wanted to, to call the Court's attention to, there was, there was actually an article that we referred the Court to in March of this year about Roger.  Roger is the head of the Counterterrorism Center at the CIA, and there was this page 1 article talking all about Roger.  The reporter said we're not going to tell you what his actual name is.  We're going to give you his first name of his covert.

The point was it was impossible to figure out whether the government would take the position that they had taken affirmative steps to conceal his identity or whether the government would say:  We've taken affirmative steps to publicize this guy's covert status to reporters.

And so we need the, the particularization of what with respect to A they say they did to take affirmative steps, and if, and if they're going to -- if they're going to draw from the, the examples that are used in the legislative history and say, well, you know, it's this one, this one, and this one, then we can, we can go to town on that in terms of preparing our defense, but if it's -- if we assume that -- if we look at the legislative history and we think that we've got answers to, you know, the A, B, and C that's listed in the legislative

10

history and they come in and say, well, yeah, but what about D? then we are prejudiced, and I don't see why it should be so hard for them to say:  With respect to A, these are the things we did.

THE COURT:  All right.  Well, Mr. Schneider, I mean, in essence, what counsel is asking you to do is to lay out at this point your theory of your case and to give them a very clear road map of your evidence, and it is true at trial you would have to show specifically what steps were taken to keep the identity of A and, I guess, to some degree B as well covert, correct?

MR. SCHNEIDER:  That's right, Your Honor.

THE COURT:  I mean, so at trial, you're going to have to put on evidence, for example, that since the time A has been employed by the agency, that person has always been known as X, a pseudonym, that person has been required to keep an unlisted phone number, has been given a fake address, I mean, specific steps that the government has taken to make sure that this individual was not revealed, if the person is not a U.S. citizen, what efforts may have been taken to make sure that that person's identity, nationality, etc., was not revealed.

That kind of information would have to be presented to the jury.  Otherwise, I don't see how you'd make your case. I mean, do you agree with that?

MR. SCHNEIDER:  We do, Your Honor.  And I, and I

11

think that, for example, one of the documents that we've produced is something called a cover file for this individual.

THE COURT:  And that's going to have some of that in it.

MR. SCHNEIDER:  (Nodding head.)

THE COURT:  Are you going to go beyond that?

MR. SCHNEIDER:  Judge, I don't know that I'm in a position to say that today, Your Honor, but as I say, I don't think there will be any surprises with respect to the type of techniques that are used to -- and I think the employment records that we've produced will provide a pretty clear sense of that as well as the defendant's own relationship with this individual.

THE COURT:  Well, I think what I'm going to do at this point is I'm not going to grant the bill of particulars. I am, however, going to make this decision without prejudice. Defense counsel have not had an opportunity yet to go through the discovery, and my impression as I read the papers was that particularly because you're getting the personnel files, that most likely that information would be contained within those files.

That being the case, what I'm going to do is allow defense counsel a second opportunity to pursue these issues if you can satisfy me that the discovery that you now have received does not adequately give you that information, and so

12

that will be -- that's going to be the ruling on the bill of particulars, all right?

Again, in a case like this, it really does the prosecution team no good to hold back your, your thunder, all right?  Because quite frankly, the majority of these cases are resolved short of trial.  There are real risks to the government in having to try these cases, all sorts of logistical problems with the jury, public access, etc., and therefore, in my view, wise prosecutors in these types of cases give cleared defense counsel as much access to your fireworks as possible so they can make an informed decision about whether this case is really one that they want to try or try to resolve, and so I would expect the prosecution team to go overboard in making sure that these defense counsel, especially this set of counsel, whom you've worked with before, get full access, all right?

MR. SCHNEIDER:  And we have tried to do that, Your Honor.  We've produced, you know, by the end of this week, I think in excess of 10,000 pages of classified discovery, 20, you know, items of electronic media, so that we've, we've tried to be as responsive and generous with respect to discovery as we can be in light of the Court's concerns and our own interests in laying our cards on the table.

THE COURT:  It's laying the cards on the table that's the thing I'm more concerned about, because sometimes the

13

government in its largesse smothers the defense, and sometimes they don't need 10,000 documents.  They only need 50, because those are the 50 you're going to use in your case, and they have the real meat and potatoes of your, of your case.

So again, there's nothing that prevents you-all from -- and you've probably already done this -- from making informal proffers as to what we have, here's pretty much what we would be doing, and again, you've got wise defense counsel who can read those signals adequately, all right?

All right, so that takes care at this point of the bill of particulars.  The remaining two motions are more of a legal nature.  The second motion is the motion to dismiss Counts 1 through 4 for selective or vindictive prosecution or in the alternative for discovery.

I'm denying those motions.  They are interesting; they are provocative; but as you know, Mr. Trout, the standard for the defense is so high to prevail on that type of motion, and simply from this Court's own experience, I've got the Sterling case on my docket, which has many of the same issues that this case does, this is not the first or only type of case of this sort that this current administration has brought.

There's been plenty of stuff in the press about how aggressive, in fact, the administration has been in bringing these types of cases, and I don't find that there's sufficient evidence or a basis in your motion to find that there's either

14

been a selective or vindictive prosecution in this case.  Those motions are therefore denied.

The last motion is the motion to dismiss Counts 1 through 4 again for vagueness, which involves a Fifth Amendment due process analysis, or overbreadth, which would address the First Amendment.  Those have been fully briefed.  Is there anything the government wants to add in response to what's been filed?

MR. SCHNEIDER:  No, Your Honor.

THE COURT:  All right.  Mr. Trout?  I assume these were your motions as well?  I mean, you're the spokesperson on those issues?

MR. TROUT:  I'm sorry, I didn't hear.

THE COURT:  Yeah.  I assume you're the spokesperson on this motion to dismiss as well?

MR. TROUT:  Yes, yes.

THE COURT:  Is there anything you want to add?

MR. TROUT:  I would say there are really two large points that I would -- that really, the overarching point, and one is is that the First Amendment protections being what they are, the government should not be punishing people for First Amendment activity in the absence of a showing of harm to the United States, and 421 lacks that element -- facially lacks that element from the statute, and so we would say that that is one of the reasons why it is deficient.

15

And the other reason that we -- overarching reason, and certainly this is in our brief, is we do not believe that -- we recognize there are many cases that have addressed the Espionage Act, and so far, the defendants have not succeed in convincing the courts that the Espionage Act is unconscionably vague or overbroad, but I don't believe that any of those cases have addressed the real problem.

The reason those cases say that there isn't a problem, because they recognize if you just look at the language, there's a problem, they point to the classification system as being the safe harbor against challenges for -- facial challenges to the statute, but I don't think that they have ever addressed what we believe exists, and that is is that the classification system is broken.

The government says, well, don't listen to Trout on that, and I agree, but you should listen to the President of the United States and you should listen to Congress on that, because they have spoken clearly that they believe there is a very genuine problem of overclassification.

THE COURT:  But that being the case, ought they not be the parts of the government that fix it?

MR. SCHNEIDER:  Well --

THE COURT:  This is the judiciary, and as you know, there's very strong case law and good policy reasons for the doctrine that it's not up to the judiciary to be making

16

classification decisions.

MR. TROUT: I agree with that, but if the classification system itself is broken, it is this Court that on First Amendment grounds, it has to protect the First Amendment interests at stake, and that is why we do not believe -- if you have a broken classification system, yes, Congress needs to fix it, the President needs to fix it, but then in the absence of that fix, there is an -- there is a problem with the inappropriate punishment of First Amendment activity, and until they fix it, this statute is suspect in its application.

THE COURT: Well, in a theoretical -- on a theoretical level, that might be a cogent argument, but in the practical level of this case, where the specific allegations are that your client revealed the names or identities and some of the programs upon which they had worked of two covert agents --

MR. TROUT: Well, one covert agent.

THE COURT: Well, one covert --

MR. TROUT: One who is --

THE COURT: That's right. B was not covert, but his or her relationship with certain activities was considered to be secret.

MR. TROUT: Right.

THE COURT: You know, I must tell you, I mean, I

17

think the average person, ordinary person who will probably be sitting on that jury, common sense would be if somebody is an intelligence officer who is covert, assuming the government's evidence shows that they've really been working on keeping that person's identity secret, nobody should be revealing that name. There's no First Amendment right to do that.

I think in this particular case, with the fairly concrete issues that have been alleged certainly as applied to your client, there can't be any real, in my view any real argument that there's a defect.

MR. TROUT: I understand the Court's point, and -- but I believe that if you, for example, have an overbroad statute that essentially encroaches upon First Amendment values, that even someone who does something that could lawfully be reached, in other words, is not -- is outside the ambit of First Amendment protected activity, the statute itself if it's overbroad, even that person can take advantage of that and essentially has standing to challenge the facial validity of the statute --

THE COURT: I understand.

MR. TROUT: -- and that's -- that is our argument.

THE COURT: All right.

MR. TROUT: Thank you, Your Honor.

THE COURT: Does the government want to add anything to this discussion?

18

MR. SCHNEIDER:  I think we totally agree with Your Honor.

THE COURT:  All right.  I think the issues are -- those issues are sufficiently significant that we'll give you a written opinion on that in the not-too-distant future, all right?

Now, I want to keep this case on track, and I am concerned about potential CIPA issues as well as whether the defense is satisfied that the discovery is all there and you can get to it.  We don't have any other motions dates in this case, do we, at this point?

MR. SCHNEIDER:  No, Your Honor.

THE COURT:  All right.  I mean, how realistic is the expectation that we will have CIPA issues?

MR. SCHNEIDER:  I think it's very likely, Your Honor.

THE COURT:  All right.  Can we now since you're all in court together try to set some schedule for that?  The trial in this case is not that far away when you think about schedules, and I don't want some issue coming up at the last minute that we have to have a continuance, so I'd rather get any CIPA matters out of the way.

MR. TROUT:  Your Honor, there are two, there are two problems that we have on the defense side.  We really don't know what the discovery looks like, and so we don't know what our needs are going to be CIPA-wise as we sit here.  I mean,

19

we've kind of thought about it.

One of the issues that I, that I wanted to raise, although I actually haven't had an opportunity to speak with the defense about it but -- because we've just been thinking about it more recently, so let me speak hypothetically -- and again, this is, this is purely --

THE COURT:  All right.  Mr. Schneider, have a seat while Mr. Trout is talking.

Yes.

MR. TROUT:  This is purely hypothetical.  Let's assume that information that was classified was well known to members of the media and the press, and if that fact bears on the state of mind of a defendant in these circumstances and we then want to go and therefore develop this evidence, that it's classified information, was well known, that this reporter knew it and that reporter knew it and this other reporter knew it, how do we do that in the context of information that is still classified?

How do we have a conversation with a reporter who knows the classified information but still doesn't want to -- or we can't talk about it, they can't talk about it, we can't even talk about it in a SCIF with someone who's not cleared?

And so I simply wanted to flag that as an issue, not to resolve it today, because as I say, we haven't even talked to the government about it.  We've just been thinking about

this problem, but we wanted to put it on the table as soon as we had a -- were thinking about it just so that everybody knew that this was an issue in this case.

We, we are trying to figure out how do we develop the evidence that is out there that can -- that is important to the defense, and yet because it is classified, we can't talk to the people about it.

THE COURT:  Well, this issue has come up in other cases, and I clearly recall a case in which you could pick up *The Washington Post* and see pictures and stories about incidents that had happened but those incidents were still classified, and although it was out there on the front page of *The Post*, the U.S. government would not confirm that, in fact, the events had happened, and the argument, as you know because you've had these cases before, is sort of that mosaic theory of, of intelligence, which is that, you know, fact A and fact B may be kind of neutral.  When you put them all together and you add the fact that the government considers that a secret, that itself is a piece of intelligence that could hurt the government.

So it is difficult to work in that environment. We've worked around it in the past.  We can work around it if it comes up.  It's hypothetical, so I'm not going to spend a whole lot of time on it other than to say there are ways around that problem.

21

MR. TROUT:  Okay.

THE COURT:  Okay.  Was there a second issue?

MR. TROUT:  Well, the only issue that I had was I don't, I don't really know what sort of time we need.  I was wondering if maybe it made sense to try to postpone -- do this in a couple of weeks, come back to the Court with a proposal in terms of a schedule, see if we can get on top of the discovery, and then come back and have a more, for lack of a better word, intelligent conversation about what our needs are --

THE COURT:  Remind me, when is our trial, when is our trial date in this case?

MR. TROUT:  It is regrettably the Monday after Thanksgiving.

THE COURT:  That's right.  All right, so that's not a whole lot of time when you think about it.  I mean, it's the end of July now, and I don't want to be doing CIPA issues, frankly, at all in November.  It's too close to the trial date.

So I'll let you-all work out a schedule, but you need to get it to us fairly soon, that is, the schedule.  And there are a couple of blackout Fridays.  And if there's going to be a CIPA hearing, then we wouldn't do it on a Friday open docket. It would have to be a sealed hearing.  But there is no docket on Friday, October 5, and there may possibly not be a docket or at least I won't be available on November 16.  So those are two Fridays that would not work, but most likely we would do this

22

either on a Friday afternoon or some other day of the week.

So I will leave it to you-all, but I do think that within about, let's say within the next two weeks, no later than August 3, you should together be able to present a schedule.  By then you've had two weeks to digest the discovery that you got to raise any CIPA types of -- preliminary CIPA issues with the government, to further evaluate how you want to proceed in this case, both sides, and then we'll see where we go from there, all right?

MR. TROUT:  Thank you very much, Your Honor.

THE COURT:  Anything further on this case?

MR. SCHNEIDER:  No, Your Honor.  And so Your Honor would like us to be -- to come back on the --

THE COURT:  No, no.

MR. SCHNEIDER:  -- or submit something in writing?

THE COURT:  A proposed order in which you indicate, you know, when the defense is going to make its CIPA requests, your response time, you know, Section 4, Section 5, just get it all out there in a schedule, all right?

MR. SCHNEIDER:  Very good.  Thank you, Your Honor.

THE COURT:  Very good, thank you.

MR. TROUT:  Thank you, Your Honor.

(Which were all the proceedings

had at this time.)

23

CERTIFICATE OF THE REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


                                        /s/
                                 Anneliese J. Thomson

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595