REDACTED / CLEARED FOR PUBLIC RELEASE

Filed with Classified
Information Security Officer
CISO ᴜᴜᴜᴜᴜ
Date 9/14/2012

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 1:12-cr-00127-LMB |
| | ) |
| JOHN KIRIAKOU, | ) Filed In Camera and Under Seal |
| | ) with the Classified Information |
| Defendant. | ) Security Officer |

(U) DEFENDANT'S MOTION TO COMPEL PRODUCTION OF
DOCUMENTS AND MEMORANDUM IN SUPPORT OF MOTION

(U) Defendant John Kiriakou respectfully moves this Court to compel the government to produce certain narrowly-defined categories of documents critical to the preparation of his defense. The specific grounds for this motion are set forth more fully in the accompanying memorandum of law.

(U) MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO COMPEL PRODUCTION OF DOCUMENTS

I. (U) FACTS

In a series of four letters beginning on May 25, 2012, defense counsel have asked the government to produce several categories of documents necessary to the preparation of Mr. Kiriakou's defense at trial. See Exs. A, B, C, & D. The government has produced some of the

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

requested documents in classified discovery,[1] but has refused to produce several categories of documents on the grounds that they are "irrelevant" or beyond the scope of the government's obligations under Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Exs. E & F. In particular, the government has refused to produce, in whole or in part:

> 1. Records pertaining to Mr. Kiriakou's employment with the CIA, including records of commendations or awards that he received, records of the training that he was provided, and records of instances where Mr. Kiriakou placed himself in personal danger or took other extraordinary action in furtherance of the interests of the United States. *See* Ex. A.

---

[1] (U) As the Court is aware from Mr. Kiriakou's pretrial motions to dismiss, the over-classification of non-sensitive information has become a significant problem in the United States, as acknowledged by the President himself. Ironically, there is no better example of over-classification than the government's discovery productions in this case. To date, the government has declared *every single page* of its document productions classified, meaning that the defense is not allowed to view any of the discovery, or even discuss it, outside of a Sensitive Compartmented Information Facility ("SCIF"). Yet the government's productions contain significant tracts of information that are manifestly unclassified, including, for example, hundreds of pages of communications, over non-secure email channels, between Mr. Kiriakou and the CIA's Publication Review Board ("PRB") about draft articles and editorials that the PRB determined *contained no classified information. See, e.g.*, CIA05517, CIA05521-23, CIA05539, CIA05544-46, CIA05552, CIA05554-56. The production also contains correspondence between the PRB and Mr. Kiriakou's attorneys, sent by regular post, informing the attorneys that they are not entitled to review classified drafts of Mr. Kiriakou's book, *see, e.g.*, CIA00236. It also contains portions of Mr. Kiriakou's personnel file, which the government previously stated in correspondence with defense counsel was unclassified, *see* Ex. E. By indiscriminately casting the cloak of classification over its *entire* production, the government has simply relieved itself of its responsibility for making considered classification decisions as to each document produced and has shifted to the defense the burden of conducting substantially all of its pretrial preparations in an offsite SCIF.

2

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

2. Documents relating to certain critical witnesses, most importantly the journalists referred to by pseudonym in the Indictment[2] and the defense investigator for the Guantanamo Bay detainees referred to in the Criminal Complaint, including without limitation records of United States government contacts with those witnesses; reports, files, or other information gathered by the United States government about those witnesses; and any correspondence, testimony, interviews, statements, memoranda or agreements with or relating to those witnesses. *See* Exs. A & B.

3. Documents tending to show that Mr. Kiriakou had no intent to harm the United States. *See id.*

4. Documentation of the level of security clearance, including SCI access, granted to the FBI Special Agents who interviewed Mr. Kiriakou concerning various classified subjects on January 19, 2012. *See* Ex. C.

5. Documents concerning

6. Documents tending to demonstrate that Mr. Kiriakou is being selectively and vindictively prosecuted, including records of declined prosecutions under 50 U.S.C. § 421, records of prior instances of public disclosure of the CIA's

---

[2] (U) For purposes of this motion, the defense will adhere to the naming conventions used in the Indictment, but notes that the identities of "Journalists A and B" are well known and unclassified.

3

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Rendition Detention and Interrogation ("RDI") program that did not result in criminal prosecution, and communications within or among the CIA and other United States government agencies that concern Mr. Kiriakou. *See* Ex. A.

(U) As to each of these requests, the defense asked the government to specify whether the evidence does not exist or exists but is being withheld. *See* Exs. A, B, C, & D. The government has declined to provide even that basic information, but as to each of the categories listed above, the defense has reason to believe – based on Mr. Kiriakou's personal knowledge, the wording of the government's discovery letters, or other evidence produced to do date – that the government does possess additional responsive material that it is refusing to disclose.

II. (U) **LAW**

(U) The government's discovery obligations are clear. At a minimum, constitutional due process requires the government to produce all evidence "favorable" to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence may be "favorable" to the defense without being conclusive of the defendant's innocence, and includes, among other things, evidence that impeaches the credibility of the government's witnesses at trial. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). Evidence that meets the constitutional threshold of "favorability" must be produced in time for the defense to make "effective use [of it] at trial," notwithstanding any contrary timing provisions of the Jencks Act. *United States. v. Beckford*, 962 F. Supp. 780, 788 (E.D. Va. 1997) (quoting *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 531 (4th Cir. 1985)).

(U) Beyond the constitutional minimum set by *Brady* and its progeny, Rule 16 of the Federal Rules of Criminal Procedure requires the government to produce, upon request, all documents "material to preparing the defense." Fed. R. Crim. Pro. 16(a)(1)(E)(i). As the Fourth Circuit has

4

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

recognized, "the disclosure required by Rule 16 is much broader than that required by the due process standards of *Brady*." *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) (quoting *United States v. Conder*, 423 F.2d 904, 911 (6th Cir. 1970)). Accordingly, evidence need not be exculpatory, or even admissible, in order to be discoverable under Rule 16. Rather, the rule requires the government to produce any evidence that might "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Id.* at 621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)); *see also United States v. Salad*, 779 F. Supp.2d 503, 507 (E.D. Va. 2011) (ordering the government to permit examination of a crime scene where "examination may be of benefit to the Defendant").

## III. (U) ARGUMENT

As detailed below, the evidence requested by the defense is discoverable, and must be produced before trial, pursuant to Rule 16, *Brady* and its progeny, or both.

### A. (U) Records Pertaining to Mr. Kiriakou's CIA Employment, Commendations and Awards, and Heroism in Service of the United States

(U) The defense has requested several categories of documents pertaining to Mr. Kiriakou's fifteen years of service to the CIA, the commendations and awards that he received while in the CIA's employ, and specific instances of Mr. Kiriakou's exceptional valor, heroism, and self-sacrifice in service to the United States. *See* Ex. A. The government has responded, without further specification, that it would provide "various records associated with the defendant's prior employment at the CIA." *See* Ex. E. But the defense is aware, based on its review of the discovery provided to date and Mr. Kiriakou's personal knowledge, that the government's production omits substantial evidence concerning, among other things, the bases for Mr.

5

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Kiriakou's commendations and awards and the details of Mr. Kiriakou's service to the CIA prior to his involvement in the capture of terrorist leader Abu Zubaydah in Pakistan in 2002.

(U) This evidence is plainly pertinent to the issue of Mr. Kiriakou's good or bad faith and his intent, or lack thereof, to disclose information that he had reason to believe would harm the national security. Counts Two through Four of the Indictment charge Mr. Kiriakou with "espionage" in violation of 18 U.S.C. §793(d). In order to convict Mr. Kiriakou on those counts, the government will need to prove that Mr. Kiriakou "willfully" disclosed information "relating to the national defense" that he "had reason to believe could be used to the injury of the United States or to the advantage of any foreign nation." 18 U.S.C. §793(d). The Supreme Court, the Fourth Circuit, and another court in this District, have all held that when the information at issue is "intangible" – as it undisputedly was in this case – the statute imposes a requirement of bad faith. *See United States v. Gorin*, 312 U.S. 19, 28 (1941) (interpreting predecessor statute); *United States v. Morrison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988); *United States v. Rosen*, 445 F. Supp.2d 602, 643(E.D. Va. 2006). Evidence that Mr. Kiriakou honorably served the CIA and his country for fifteen years, placed his own safety at risk in order to protect the national security of the United States, and received several commendations and awards for his public service, directly rebuts any evidence the government intends to offer that Mr. Kiriakou, acting willfully and in bad faith, disclosed information that he had reason to believe would harm the national security. The requested evidence is thus both exculpatory and material to the preparation of Mr. Kiriakou's defense, and must be produced before trial pursuant to both *Brady* and Rule 16.

B. (U) **Documents Concerning Critical Witnesses**

(U) The defense has also requested evidence concerning several critical witnesses including, but not limited to, the two journalists referred to in the Indictment by pseudonym and the defense

6

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

investigator for the Guantanamo Bay detainees referred to in the Criminal Complaint. In response, the government has generally replied that it "has already produced, or will produce in the future, any such materials subject to disclosure under Rule 16 . . . *Brady*, *Giglio*, or 18 U.S.C. § 3500." *See* Ex. F. As to the journalists, however, the government has specifically stated that it "does not intend to call reporters as witnesses at trial and thus has no obligations under *Giglio* and 18 U.S.C. § 3500." *See* Ex. B. Based on its review of the discovery provided to date, the defense has reason to believe, however, that the government is aware of additional information responsive to these requests. For example, the documents produced with Bates numbers JK00045-47 consist of communications among certain of these witnesses which make it obvious that there were other such communications among the same witnesses.[3]

$^{(U)}$ As an initial matter, it is irrelevant whether the requested evidence constitutes a prior statement of one of the government's trial witnesses under *Giglio* and the Jencks Act. Even if the government does not intend to call those witnesses, evidence of relevant communications among key witnesses is plainly "material to preparing the defense" under Rule 16, as it unquestionably would "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Caro*, 597 F.3d at 620 (quoting *Lloyd*, 992 F.2d at 351); *see also Salad*, 779 F. Supp.2d at 507. The requested evidence may also be directly exculpatory under *Brady*. For example, in the very article containing one of the

---

[3]    $^{(U)}$ The government has informed the defense that it does not possess these documents. However, given the nature of the communications it seems likely that the government's investigation would have information as to all relevant communication, not just the isolated emails reflected in JK000045-47.

7

REDACTED / CLEARED FOR PUBLIC RELEASE

disclosures for which Mr. Kiriakou is now indicted – specifically, the association of Officer B[4] with the RDI program – Journalist B wrote that "two dozen current and former American and foreign intelligence officials [were] interviewed for this article." *See* Ex. G. Communications between Journalist B and these other sources could hardly be more critical to the preparation of Mr. Kiriakou's defense, and may be directly exculpatory to the extent they show that the information that Mr. Kiriakou is alleged to have disclosed was already circulating within the national security press corps. That evidence, and other evidence like it, are discoverable under both *Brady* and Rule 16, and must be produced if it is in the government's possession (which the government has not denied). The fact that the government does not intend to call the journalist witnesses is no justification for withholding evidence discoverable under *Brady* and Rule 16. To the contrary, it simply means that the timing provisions of the Jencks Act are inapplicable and the evidence should be produced immediately.

C. (U) **Documents Showing Mr. Kiriakou Had No Intent To Harm the United States.**

(U) The defense has also requested all documents reflecting that Mr. Kiriakou had no intent to harm the United States. In response, the government has stated that it "is neither required to nor intends in this case to prove that a defendant had an intent to harm the United States" and that the requested information is therefore "irrelevant" and "outside of the scope of Rule 16." *See* Ex. E.

(U) The government is wrong about the law. In order to convict Mr. Kiriakou on the three "espionage" counts, the government must prove that Mr. Kiriakou disclosed information,

---

[4] (U) As with "Journalists A and B," the defense will use the anonymous identifier "Officer B" for purposes of this motion, but again notes that the identity of "Officer B" is well known and unclassified.

8

REDACTED / CLEARED FOR PUBLIC RELEASE

willfully and in bad faith, which he had reason to believe would harm the national security of the United States. *See, supra*, Part III.A (citing *Gorin*, 312 U.S. at 28 (interpreting predecessor statute); *Morrison*, 844 F.2d at 1071-72; *Rosen*, 445 F. Supp.2d at 643. Evidence that Mr. Kiriakou had no intent to harm the national security directly rebuts the government's proof on these essential elements of the "espionage" counts and must be produced before trial pursuant to both *Brady* and Rule 16. Moreover, the government's legal obligation to produce exculpatory evidence and evidence material to the preparation of Mr. Kiriakou's defense arise under the Constitution and the Federal Rules of Criminal Procedure; these obligations do not depend upon, and cannot be created, destroyed, or limited by, the government's tactical choices about the particular prosecutorial narratives it does or does not intend to pursue at trial. Put simply, whether or not the government intends to prove that Mr. Kiriakou intended to harm the United States, Mr. Kiriakou fully intends to prove that he did not, and he is entitled under *Brady* and Rule 16 to receive the discovery that he needs to prepare his defense.

## D. [U] Documents Concerning FBI Agent Security Clearances

[U] Mr. Kiriakou was interviewed by two FBI agents on January 19, 2012. That interview, which was surreptitiously recorded by the FBI agents, involved in-depth, detailed questioning of Mr. Kiriakou about numerous subjects that the government has declared Top Secret/SCI for purposes of this prosecution, including, but not limited to, the true identity of Covert Officer A. The FBI agents who interviewed Mr. Kiriakou should therefore have been granted the security clearances, including SCI permissions, necessary to permit them to receive the classified information that they elicited from Mr. Kiriakou during the January 19, 2012 interview. The defense accordingly requested documentation of the level of security clearance, including SCI

9

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

access, granted to the FBI agents who interviewed Mr. Kiriakou. *See* Ex. C. The government flatly denied this request as "irrelevant." *See* Ex. F.

$^{(U)}$ The request is far from irrelevant. First, whether the government took steps to ensure that its own investigation did not result in the disclosure of a covert officer's identity to individuals not entitled to learn it is directly relevant to the government's ability to prove that it took legally sufficient "affirmative measures" to conceal the identity of that agent – an essential element of proof on Count One of the Indictment. *See* 50 U.S.C. §§ 421(a), 426(4). Second, if indeed it is the case that the FBI agents who conducted the January 19, 2012 interview did not possess the security clearances and SCI permissions necessary to lawfully question Mr. Kiriakou about these subjects, then the government's deliberate flouting of the very classification procedures that Mr. Kiriakou is indicted for violating could be grounds for suppressing the illegally-obtained statement.[5] Finally, to the extent the government, in the conduct of its own investigation, has permitted the disclosure of classified information, including the identities of covert officers, to persons not authorized to receive that information, such evidence tends to confirm that Mr. Kiriakou is being prosecuted selectively and vindictively – issues that remain very much alive in this case. *See infra*, Part III.F.

    E.

    By letter dated August 24, 2012, the defense asked the government to produce documents concerning

---

[5] $^{(U)}$ Even if the government's violation of lawful classification procedures does not rise to the level of a constitutional violation, it is well-established that this Court "in the exercise of [its] supervisory powers . . . [may] implement a remedy," including the suppression of evidence, "designed to deter illegal conduct" by the government. *United States v. Moussaoui*, 483 F.3d 220, 237 n.13 (4th Cir. 2007) (citing *United States v. Hasting*, 461 U.S. 499, 505 (1983)).

10

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

*See* Ex. D. To date, the government has not responded to this request, even though the defense informed the government that it would be the subject of this motion to compel if an answer was not received by September 12, 2012.

(U)Counts Three and Four of the Indictment charge Mr. Kiriakou with disclosing allegedly classified information to two reporters. The "classified" information at issue on those counts is the association of Officer B with the CIA's RDI program. To convict Mr. Kiriakou on these counts, the government will need to prove that Mr. Kiriakou, acting willfully and in bad faith, disclosed this information to persons not entitled to receive it while having reason to believe that its disclosure could harm the national security of the United States.

11

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

The requested evidence is thus both exculpatory and "material to preparing the defense," and must be produced under both *Brady* and Rule 16.

F.   (U) **Evidence of Selective and Vindictive Prosecution**

(U) Finally, the defense has requested the production of documents tending to demonstrate that Mr. Kiriakou is being selectively and vindictively prosecuted, including records of declined prosecutions under 50 U.S.C. § 421, records of prior instances of public disclosure of the RDI program that did not result in criminal prosecution, and communications within or among the CIA and other government agencies that concern Mr. Kiriakou. *See* Ex. A. The government has refused to produce this evidence, contending that it is "outside the scope of Rule 16." *See* Ex. E.

(U) On June 6, 2012, Mr. Kiriakou moved to dismiss Counts One through Four on the grounds that he is being selectively and vindictively prosecuted, and requested an order allowing discovery into the government's decision to prosecute him. On July 20, 2012, the Court, in a ruling from the bench, denied Mr. Kiriakou's motion, but documents produced in discovery to date – including but not limited to CIA08117, CIA09549, and CIA05353-55 – strongly indicate that Mr. Kiriakou was singled out for prosecution not because of the conduct charged in the Indictment, but because of anger within the CIA over his public discussion of the CIA's use of enhanced interrogation techniques, including waterboarding, on terrorist suspects. Due to this evidence, not available to the defense when it filed Mr. Kiriakou's motion to dismiss on June 6, 2012, Mr. Kiriakou respectfully renews his request for an order allowing additional discovery into the government's decision to prosecute him.

12

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

## III.<sup>(U)</sup> CONCLUSION

(U) WHEREFORE, Defendant John Kiriakou respectfully submits that this motion to compel

the production of documents should be granted.

Respectfully submitted,

/s/ Plato Cacheris

_____
Plato Cacheris
(Va. Bar No. 04603)
pcacheris@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

/s/ John F. Hundley

_____
John Francis Hundley
(Va. Bar No. 36166)
jhundley@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

/s/ Robert P. Trout

_____
Robert P. Trout
(Va. Bar No. 13642)
rtrout@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

/s/ Jesse I. Winograd

_____
Jesse I. Winograd
(Va. Bar No. 79778)
iwinograd@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

/s/ Mark J. MacDougall

_____
Mark J. MacDougall
(Admitted *Pro Hac Vice*)
mmacdougall@akingump.com
Attorney for John Kiriakou
AKIN GUMP STRAUSS
    HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 887-4510
Fax:  (202) 887-4288

13

REDACTED : CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

## (U) Certificate of Service

(U) I hereby certify that on this 14 day of September, 2012, I filed the foregoing motion and memorandum, by hand, with the Classified Information Security Officer pursuant to the Protective Order for Classified Information. Pursuant to the Protective Order, the Classified Information Security Officer will deliver the foregoing to the Court and to counsel for the United States:

Lisa L. Owings
Lisa.owings@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Ryan P. Fayhee
Ryan.fayhee@usdoj.gov
U.S. Department of Justice
Trial Attorney, Counterespionage Section
600 E Street, N.W.
Washington, D.C. 20004

Iris Lan
Iris.lan@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Mark E. Schneider
Mark.schneider@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

W. Neil Hammerstrom, Jr.
Neil.hammerstrom@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

/s/ Jesse I. Winograd

Jesse I. Winograd (Va. Bar No. 79778)
jwinograd@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax:  (202) 464-3319

14

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

EXHIBIT A TO DEFENDANT'S MEMORADUM
IN SUPPORT OF MOTION TO COMPEL
PRODUCTION OF DOCUMENTS

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

## TROUT CACHERIS PLLC

ATTORNEYS AT LAW

ROBERT P. TROUT
(202) 464-3311
RTROUT@TROUTCACHERIS.COM

JOHN F. HUNDLEY
(202) 464-3304
JHUNDLEY@TROUTCACHERIS.COM

1350 CONNECTICUT AVENUE, N.W
SUITE 300
WASHINGTON, D.C. 20036
(202) 464-3300

FAX (202) 464-3319

WWW.TROUTCACHERIS.COM

111 ORONOCO STREET
ALEXANDRIA, VIRGINIA 22314
(703) 519-6840

May 25, 2012

By E-Mail (ryan.fayhee@usdoj.gov)

Ryan P. Fayhee
Counterespionage Section
U.S. Department of Justice
600 E Street, N.W.
Washington, D.C. 20004

Re:   *United States v. Kiriakou*, Case No. 1:12-cr-00127-LMB

Dear Mr. Fayhee:

We are writing to request exculpatory and impeachment material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and related cases. Nothing in this request should be deemed to prejudice our rights to request further information as the case progresses, nor to absolve the government of its general obligations under *Brady* and the discovery order entered in this case. In addition to our continuing request for all information we are entitled to under *Brady*, we are requesting the following specific items:

- All records or other information of instances where John Kiriakou, in true name or in pseudonym, while in the employ of United States, placed himself in personal danger, or took other extraordinary action that might reasonably be construed as furthering the interests of the United States.

- All records of commendations or awards John Kiriakou, in true name or in pseudonym, received based on his work while in the employ of the United States.

- All records of the training John Kiriakou, in true name or in pseudonym, received while in the employ of the United States.

- John Kiriakou's, complete and unredacted personnel files, whether in true name or in pseudonym.

- All internal CIA, or other United States agency communications which mention, reference or allude to John Kiriakou, in true name or in pseudonym, including all communications between agencies.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

# TROUT CACHERIS PLLC

Ryan P. Fayhee
May 25, 2012
Page 2

- All information relating to any United States government contacts with any of the journalists referred to in the indictment or criminal complaint.

- Any reports, files, documents or other information gathered by the United States relating to any of the journalists referred to in the indictment or criminal complaint.

- All FBI 302 reports, or similar reports from other United States government agencies, related to this case, John Kiriakou, in true name or in pseudonym, any journalist referred to in the indictment and/or criminal complaint and Covert Officer A and Officer B.

- Any documents or information tending to demonstrate that John Kiriakou, in true name or in pseudonym, had no intent to harm the United States.

- Covert Officer A's complete and unredacted personnel files.

- Any information or documents tending to indicate Covert Officer A does not satisfy the definition of "covert" set forth in 50 U.S.C. § 426(4).

- Officer B's complete and unredacted personnel files.

- A list of all instances where the United States has learned of potential violations of 50 U.S.C. § 421 and declined to prosecute, and the reasons the United States declined prosecution as well as all documentation related to the investigation of these cases.

- Any instance where the United States, through any employee, contractor or other agent, disclosed or confirmed the existence of the RDI program. If such an instance exists, the reasons the United States declined to prosecute those responsible for the disclosure. For purposes of this request, disclosure or confirmation includes any communication where there is reason to expect the information will be made public, such as, but not limited to, any communication with members of the press or media.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

## TROUT CACHERIS PLLC

Ryan P. Fayhee
May 25, 2012
Page 3

For each request, we ask that the government inform us whether: (1) the material exists and will be produced; (2) the material does not exist; or (3) the material exists, but the government does not believe that it is subject to disclosure.

Sincerely,

Robert P. Trout
John F. Hundley

JFH/sme
cc:　Mark E. Schneider (by E-Mail: mark.schneider@usdoj.gov)
　　　Iris Lan (by E-Mail: iris.lan@usdoj.gov)
　　　Christine Gunning (by E-Mail: christine.e.gunning@usdoj.gov)
　　　Mark MacDougall (by E-Mail: mmacdougall@akingump.com)
rt_Fayhee052512_bradyrequest.doc

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

# EXHIBIT B TO DEFENDANT'S MEMORADUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



**Akin Gump**
Strauss Hauer & Feld LLP

MARK MACDOUGALL
+1 202.887.4510/fax +1 202.887.4288
mmacdougall@akingump.com

August 3, 2012

By E-Mail (ryan.fayhee@usdoj.gov)

Ryan P. Fayhee
Counterespionage Section
U.S. Department of Justice
600 E Street, N.W.
Washington, D.C. 20004

Re:    *United States v. Kiriakou,* Case No. 1:12-cr-00127-LMB

Dear Mr. Fayhee:

This letter supplements our letter to you dated May 25, 2012, in which we requested production of exculpatory and impeachment material pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963) and related cases. Nothing in this request should be deemed to prejudice our rights to request further information as the case progresses, nor to absolve the government of its general obligations under Federal Rule of Criminal Procedure 16(a), *Brady,* and the discovery order entered in this case. In addition to our continuing request for all information we are entitled to under *Brady,* we are requesting the following specific items:

- All correspondence, testimony, interviews, statements, memoranda and agreements, of any kind, with or relating to

- All correspondence, testimony, interviews, statements, memoranda and agreements, of any kind, with or relating to

- All correspondence, testimony, interviews, statements, memoranda and agreements, of any kind, with or relating to

- All correspondence, testimony, interviews, statements, memoranda and agreements, of any kind, with or relating to

- All correspondence, testimony, interviews, statements, memoranda and agreements, of any kind, with or relating to

- All correspondence, testimony, interviews, statements, memoranda and agreements, of any kind, with or relating to

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

**Akin Gump**
Strauss Hauer & Feld LLP

Ryan P. Fayhee
August 3, 2012
Page 2

For each request, we ask that the government inform us whether: (1) the material exists and will be produced; (2) the material does not exist; or (3) the material exists, but the government does not believe that such material is subject to disclosure. In light of the current pre-trial schedule and the prospect that some of the requested material may be classified, we would ask that you respond to this letter without delay.

Sincerely,

Mark MacDougall

cc:  Plato Cacheris (by E-Mail: pcacheris@troutcacheris.com)
Robert P. Trout (by E-Mail: rtrout@troutcacheris.com)
John F. Hundley (by E-Mail: jhundley@troutcacheris.com)
Mark E. Schneider (by E-Mail: mark.schneider@usdoj.gov)
Iris Lan (by E-Mail: iris.lan@usdoj.gov)
Christine Gunning (by E-Mail: christine.e.gunning@usdoj.gov)

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

# EXHIBIT C TO DEFENDANT'S MEMORADUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



**Akin Gump**
Strauss Hauer & Feld LLP
MARK MACDOUGALL
+1 202.887.4510/fax: +1 202.887.4288
mmacdougall@akingump.com

August 17, 2012

By E-Mail (ryan.fayhee@usdoj.gov)

Ryan P. Fayhee
Trial Attorney
Counterespionage Section
U.S. Department of Justice
600 E Street, N.W.
Washington, D.C. 20004

     Re:  *United States v. Kiriakou*, Case No. 1:12-cr-00127-LMB

Dear Mr. Fayhee:

  This letter supplements our letter to you dated May 25, 2012, in which we requested production of exculpatory and impeachment material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and related cases. Nothing in this request should be deemed to prejudice our rights to request further information as the case progresses, nor to absolve the government of its general obligations under Federal Rule of Criminal Procedure 16(a), *Brady*, and the discovery order entered in this case. In addition to our continuing request for all responsive material, we are requesting the following specific items:

> • Documentation of the level of security clearance, including SCI access, granted to FBI Special Agents Joseph Capitano and John Kralik, Jr., as well as any other individuals in attendance during the interview of John Kiriakou on or about January 19, 2012.

  For each request, we ask that the government inform us whether: (1) the material exists and will be produced; (2) the material does not exist; or (3) the material exists, but the government does not believe that such material is subject to disclosure.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

**Akin Gump**
Straus Hauer & Feld LLP

Ryan P. Fayhee
August 17, 2012
Page 2

In light of the current pre-trial schedule, we would ask that you respond to this letter without delay.

Sincerely,

Mark J. MacDougall

Mark MacDougall

cc:    Plato Cacheris (by E-Mail: pcacheris@troutcacheris.com)
Robert P. Trout (by E-Mail: rtrout@troutcacheris.com)
John F. Hundley (by E-Mail: jhundley@troutcacheris.com)
Mark E. Schneider (by E-Mail: mark.schneider@usdoj.gov)
Iris Lan (by E-Mail: iris.lan@usdoj.gov)
Christine Gunning (by E-Mail: christine.e.gunning@usdoj.gov)

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

# EXHIBIT D TO DEFENDANT'S MEMORADUM
## IN SUPPORT OF MOTION TO COMPEL
### PRODUCTION OF DOCUMENTS

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

# TROUT CACHERIS PLLC

ATTORNEYS AT LAW

ROBERT P. TROUT
(202) 464-3311
RTROUT@TROUTCACHERIS.COM

JESSE WINOGRAD
(202) 464-3307
JWINOGRAD@TROUTCACHERIS.COM

1350 CONNECTICUT AVENUE, N.W.
SUITE 300
WASHINGTON, D.C. 20036
(202) 464-3300
——
FAX (202) 464-3319
——
WWW.TROUTCACHERIS.COM

111 ORONOCO STREET
ALEXANDRIA, VIRGINIA 22314
(703) 519-8840

August 24, 2012

By E-Mail (ryan.fayhee@usdoj.gov)

Ryan P. Fayhee
Counterespionage Section
U.S. Department of Justice
600 E Street, N.W.
Washington, D.C. 20004

Re:    *United States v. Kiriakou*, Case No. 1:12-cr-00127-LMB

Dear Mr. Fayhee:

This letter supplements our letters to you dated May 25, 2012, August 3, 2012 and August 17, 2012, in which we requested production of exculpatory and impeachment material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and related cases. Nothing in this request should be deemed to prejudice our rights to request further information as the case progresses, nor to absolve the government of its general obligations under *Brady*, Federal Rule of Criminal Procedure 16, and the discovery order entered in this case. In addition to our continuing request for all responsive material, we are requesting the following specific items:

* All communications regarding the RDI program between the government and

* All documents relating to [                    ] participation, if any, in the RDI program.

* All documents relating to any investigation regarding public disclosure of the RDI program by [            ]

* All reviews undertaken by any government agency regarding the classified or unclassified nature of [                              ]

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

## TROUT CACHERIS pllc

Ryan P. Fayhee
August 24, 2012
Page 2

(U) For each request, we ask that the government inform us whether: (1) the material exists and will be produced; (2) the material does not exist; or (3) the material exists, but the government does not believe that it is subject to disclosure.

(U) In light of the current pre-trial schedule, we ask that you respond to this letter without delay.

Sincerely,

Robert P. Trout
Jesse Winograd

JIW/seg

cc:   Mark E. Schneider (by E-Mail: mark.schneider@usdoj.gov)
      Iris Lan (by E-Mail: iris.lan@usdoj.gov)
      Neil Hammerstrom, Jr. (by E-Mail: neil.hammerstrom@usdoj.gov)
      Christine Gunning (by E-Mail: christine.e.gunning@usdoj.gov)
      Mark J. MacDougall (by E-Mail: mmacdougall@akingump.com)

lt_Fayhee082412_mitchelljessen.doc

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

EXHIBIT E TO DEFENDANT'S MEMORADUM
IN SUPPORT OF MOTION TO COMPEL
PRODUCTION OF DOCUMENTS

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



**U.S. Department of Justice**

July 20, 2012

*By Email*
Plato Cacheris
Robert P. Trout
John F. Hundley
Jesse Winograd
Trout Cacheris PLLC
1350 Connecticut Avenue, N.W., Suite 300
Washington, D.C. 20036

Mark J. MacDougall
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564

    Re:    United States v. John Kiriakou,
            1:12-CR-127 (LMB)

Dear Counsel:

    We write in response to your letter dated May 25, 2012 ("Letter").

- The Government intends to provide various records associated with the defendant's prior employment at the CIA as a part of complying with its obligations under Rule 16 of the Federal Rules of Criminal Procedure. This includes the defendant's unclassified personnel file and certain other files associated with the defendant.

- Regarding your request for "[a]ll internal . . . communications which mention . . . John Kiriakou" (Letter at 1), the Government plans to produce such communications that are relevant to this case and discoverable under Rule 16. Your request otherwise seeks irrelevant information outside of the scope of Rule 16.

- Regarding your requests for information related to journalists, the Government intends to provide any relevant contacts with journalists that fall within the scope of its Rule 16 obligations. Your request otherwise seeks information outside of the scope of such obligations. The Government does not intend to call reporters as witnesses at trial and thus has no obligations under *Giglio* and 18 U.S.C. § 3500.

REDACTED : CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

- The Government intends to produce all reports, regarding the defendant or otherwise, to the extent required by Rule 16. To the extent that your request seeks reports that pertain to unrelated cases or investigations, your request is outside of the scope of Rule 16.

- Your request for "documents or information tending to demonstrate that [the defendant] had no intent to harm the United States," (Letter at 2), seeks information that is irrelevant, as the Government is neither required to nor intends in this case to prove that a defendant had an intent to harm the United States. Accordingly, your request is outside of the scope of Rule 16.

- The Government intends to produce relevant employment records associated with Covert Officer A and Officer B as a part of satisfying its Rule 16 obligations.

- Your last two requests, regarding declined prosecutions, are outside of the scope of Rule 16. The Government has responded to the defense's filed motion regarding selective prosecution separately.

The Government has complied — and will continue to comply — with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). To the extent that you seek immediate production of impeachment material or material required by 18 U.S.C. § 3500, the Government will provide such material in a timely manner prior to trial, in accordance with the schedule agreed to by the parties or ordered by the Court.

Sincerely,

Neil H. MacBride
United States Attorney

By: _____/s/_____
Mark B. Schneider / Iris Lan / Ryan Payhee
Special Attorneys to the Attorney General

2

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

# EXHIBIT F TO DEFENDANT'S MEMORADUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



**U.S. Department of Justice**

September 5, 2012

*Via email*

Mark J. MacDougall
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564

Plato Cacheris
Robert P. Trout
John F. Hundley
Jesse Winograd
Trout Cacheris PLLC
1350 Connecticut Avenue, N.W., Suite 300
Washington, D.C. 20036

      Re:    *United States v. John Kiriakou, 1:12 Cr. 127*

Dear Counsel:

      With respect to your letter of August 3, 2012 requesting information concerning various persons, the government has already produced, or will produce in the future, any such materials subject to disclosure under Rule 16 of the Federal Rules of Criminal Procedure, *Brady*, *Giglio*, or 18 U.S.C. § 3500. The government declines to produce any additional information.

      With respect to your letter of August 17, 2012, the government declines to provide the information you seek, which is irrelevant to the charged offenses.

                         Very truly yours,

                         NEIL MACBRIDE
                         United States Attorney

     By:   /s
           Iris Lan
           Mark E. Schneider
           Ryan Fayhee
           Special Attorneys

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

# EXHIBIT G TO DEFENDANT'S MEMORADUM
# IN SUPPORT OF MOTION TO COMPEL
# PRODUCTION OF DOCUMENTS

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

### The New York Times

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

June 22, 2008

# Inside a 9/11 Mastermind's Interrogation

### By SCOTT SHANE

WASHINGTON — In a makeshift prison in the north of Poland, Al Qaeda's engineer of mass murder faced off against his Central Intelligence Agency interrogator. It was 18 months after the 9/11 attacks, and the invasion of Iraq was giving Muslim extremists new motives for havoc. If anyone knew about the next plot, it was Khalid Shaikh Mohammed.

The interrogator, Deuce Martinez, a soft-spoken analyst who spoke no Arabic, had turned down a C.I.A. offer to be trained in waterboarding. He chose to leave the infliction of pain and panic to others, the gung-ho paramilitary types whom the more cerebral interrogators called "knuckledraggers."

Mr. Martinez came in after the rough stuff, the ultimate good cop with the classic skills: an unimposing presence, inexhaustible patience and a willingness to listen to the gripes and musings of a pitiless killer in rambling, imperfect English. He achieved a rapport with Mr. Mohammed that astonished his fellow C.I.A. officers.

A canny opponent, Mr. Mohammed mixed disinformation and braggadocio with details of plots, past and planned. Eventually, he grew loquacious. "They'd have long talks about religion," comparing notes on Islam and Mr. Martinez's Catholicism, one C.I.A. officer recalled. And, the officer added, there was one other detail no one could have predicted: "He wrote poems to Deuce's wife."

Mr. Martinez, who by then had interrogated at least three other high-level prisoners, would bring Mr. Mohammed snacks, usually dates. He would listen to Mr. Mohammed's despair over the likelihood that he would never see his children again and to his catalog of complaints about his accommodations.

"He wanted a view," the C.I.A. officer recalled.

The story of Mr. Martinez's role in the C.I.A.'s interrogation program, including his contribution to the first capture of a major figure in Al Qaeda, provides the closest look to date beneath the blanket of secrecy that hides the program from terrorists and from critics who accuse the agency of torture.

Beyond the interrogator's successes, this account includes new details on the campaign against Al Qaeda, including the text message that led to Mr. Mohammed's capture, the reason the C.I.A. believed his claim that he was the murderer of the Wall Street Journal reporter Daniel Pearl and the separate teams at the C.I.A.'s secret prisons of those who meted out the agony and those who asked the questions.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

In the Hollywood cliché of Fox's "24," a torturer shouts questions at a bound terrorist while inflicting excruciating pain. The C.I.A. program worked differently. A paramilitary team put on the pressure, using cold temperatures, sleeplessness, pain and fear to force a prisoner to talk. When the prisoner signaled assent, the tormentors stepped aside. After a break that could be a day or even longer, Mr. Martinez or another interrogator took up the questioning.

Mr. Martinez's success at building a rapport with the most ruthless of terrorists goes to the heart of the interrogation debate. Did it suggest that traditional methods alone might have obtained the same information or more? Or did Mr. Mohammed talk so expansively because he feared more of the brutal treatment he had already endured?

A definitive answer is unlikely under the Bush administration, which has insisted in court that not a single page of 7,000 documents on the program can be made public. The C.I.A. declined to provide information for this article, in part, a spokesman said, because the agency did not want to interfere with the military trials planned for Mr. Mohammed and four other Qaeda suspects at Guantánamo Bay, Cuba.

The two dozen current and former American and foreign intelligence officials interviewed for this article offered a tantalizing but incomplete description of the C.I.A. detention program. Most would speak of the highly classified program only on the condition of anonymity.

Mr. Martinez declined to be interviewed; his role was described by colleagues. Gen. Michael V. Hayden, director of the C.I.A., and a lawyer representing Mr. Martinez asked that he not be named in this article, saying that the former interrogator believed that the use of his name would invade his privacy and might jeopardize his safety. The New York Times, noting that Mr. Martinez had never worked undercover and that others involved in the campaign against Al Qaeda have been named in news articles and books, declined the request. (An editors' note on this issue has been posted on The Times's Web site.)

The very fact that Mr. Martinez, a career narcotics analyst who did not speak the terrorists' native languages and had no interrogation experience, would end up as a crucial player captures the ad-hoc nature of the program. Officials acknowledge that it was cobbled together under enormous pressure in 2002 by an agency nearly devoid of expertise in detention and interrogation.

"I asked, 'What are we going to do with these guys when we get them?' " recalled A. B. Krongard, the No. 3 official at the C.I.A. from March 2001 until 2004. "I said, 'We've never run a prison. We don't have the languages. We don't have the interrogators.' "

In its scramble, the agency made the momentous decision to use harsh methods the United States had long condemned. With little research or reflection, it borrowed its techniques from an American military training program modeled on the torture repertories of the Soviet Union and other cold-war adversaries, a lineage that would come to haunt the agency.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

It located its overseas jails based largely on which foreign intelligence officials were most accommodating and rushed to move the prisoners when word of locations leaked. Seeking a longer-term solution, the C.I.A. spent millions to build a high-security prison in a remote desert location, according to two former intelligence officials. The prison, whose existence has never been disclosed, was completed — and then apparently abandoned unused — when President Bush decided in 2006 to move all the prisoners to Guantánamo.

By then, whether it was a result of a fear of waterboarding, the patient trust-building mastered by Mr. Martinez or the demoralizing effects of isolation, Mr. Mohammed and some other prisoners had become quite compliant. In fact, according to several officials, they had become a sort of terrorist focus group, advising their captors on their fellow extremists' goals, ideology and tradecraft.

Asked, for example, how he would smuggle explosives into the United States, Mr. Mohammed told C.I.A. officers that he might send a shipping container from Japan loaded with personal computers, half of them packed with bomb materials, according to a foreign official briefed on the episode.

"It was to understand the mind of a terrorist — how a terrorist would do certain things," the foreign official said of the discussions of hypothetical attacks. Thus did the architect of 9/11 become, in effect, a counterterrorism advisor to the American government he professed to despise.

A Break in Pakistan

When Mr. Martinez flew to Pakistan early in 2002, he was joining an increasingly desperate campaign to catch and question anyone who might know the plans for the next terrorist attack.

Months had passed since Sept. 11, 2001, without a single senior Qaeda figure being taken alive. Intelligence agencies were alarmed by the eavesdropping "chatter" about threats. But without a high-level terrorist in custody, the government had few sources to warn of plots in progress.

Then, in February 2002, the C.I.A. station in Islamabad, Pakistan, learned that Abu Zubaydah, Al Qaeda's logistics specialist, was in Lahore or Faisalabad, Pakistani cities 80 miles apart with a combined population of more than 10 million. The hunt for the terrorist's electronic trail grew intensive.

Armed with Abu Zubaydah's cellphone number, eavesdropping specialists deployed what some called the "magic box," an electronic scanner that could track any switched-on mobile phone and give its approximate location. But Abu Zubaydah was careful about security: he turned his phone on only briefly to collect messages, not long enough for his trackers to get a fix on his whereabouts.

That was when Mr. Martinez arrived, beginning what would be an unlikely engagement with the world's worst terrorists.

The son of a C.I.A. technician who worked on the agency's secret communications and eventually became a senior executive, Mr. Martinez grew up in Virginia, majored in political science at James Madison University

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED   CLEARED FOR PUBLIC RELEASE

and went directly into the C.I.A. training program not long before his father retired. He wound up in the agency's Counternarcotics Center, learning to sift masses of phone numbers, travel records, credit card transactions and more to search for people.

"Deuce had a reputation as one of those eggheads who could sit down with a lot of data and make sense out of it," said one former C.I.A. officer who knew him well. In the agency's great cultural divide, he was a stay-at-home analyst, not an "operator," one of the glamorous spies who recruited foreign agents overseas. His tool was the computer, and until the earthquake of 9/11 his expertise was drug cartels, not terrorist networks.

After the attacks, officials recognized that tracking drug lords was not so different from searching for terrorist masterminds, and Mr. Martinez was among a half dozen or so narcotics analysts moved to the Counterterrorist Center to become "targeting officers" in the hunt for Al Qaeda.

Colleagues say Mr. Martinez, then 36, threw himself into the new work with a passion. On a wall at the American Embassy in Islamabad, he posted a large, blank piece of paper. He wrote Abu Zubaydah's phone number at the center. Then, over a week or so, he and others added more and more linked phone numbers from the eavesdropping files of the National Security Agency and Pakistani intelligence. They excluded known institutions like mosques and shops and gradually built a map of the network of contacts around Abu Zubaydah.

"It was a spider's web," said one person who saw the telephone chart. "Aesthetically it was quite pretty."

Using the numbers, and premises linked to them, Mr. Martinez and his colleagues sought to identify Abu Zubaydah's most likely hide-outs. They could not reduce the list to fewer than 14 addresses in Lahore and Faisalabad, which they put under surveillance. At 2 a.m. on March 28, 2002, teams led by Pakistan's Punjab Elite Force, with Americans waiting outside, hit the locations all at once.

One of the SWAT teams found Abu Zubaydah, protected by Syrian and Egyptian bodyguards, at a handsome house on Canal Road in Faisalabad. It held bomb-making equipment and a safe loaded with $100,000 in cash, according to a terrorism consultant briefed on the event. Photographs of the raid reviewed by The Times last month showed Abu Zubaydah, a cleanshaven 30-year-old Palestinian, shot three times during the raid, lying face down in the back of a Toyota pickup before he was taken to a hospital.

At first, Abu Zubaydah fell in and out of consciousness, emerging occasionally to speak incoherently — once, evidently imagining himself in a restaurant, ordering a glass of red wine, a C.I.A. official said. The agency, desperate to keep him alive, flew in a Johns Hopkins Hospital surgeon to consult. Within a few days, Abu Zubaydah was flown to Thailand, to the first of the "black sites," the agency's interrogation facilities for major Qaeda figures.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Thailand, which had long faced Muslim insurgents in its south, became the first choice because C.I.A. officers had a very close relationship with their counterparts in Bangkok, according to one American intelligence official. At first, the official said, "they didn't even tell the prime minister."

Inside a 'Black Site'

It was at the Thai jail, not far from Bangkok, that Mr. Martinez first tried his hand at interrogation on Abu Zubaydah, who refused to speak Arabic with his captors but spoke passable English. It was also there, as previously reported, that the C.I.A. would first try physical pressure to get information, including the near-drowning of waterboarding. The methods came from the military's SERE training program, for Survival, Evasion, Resistance and Escape, which many of the C.I.A.'s paramilitary officers had themselves completed. A small version of SERE had long operated at the C.I.A.'s Virginia training site, known as The Farm.

Senior Federal Bureau of Investigation officials thought such methods unnecessary and unwise. Their agents got Abu Zubaydah talking without the use of force, and he revealed the central role of Mr. Mohammed in the 9/11 plot. They correctly predicted that harsh methods would darken the reputation of the United States and complicate future prosecutions. Many C.I.A. officials, too, had their doubts, and the agency used contract employees with military experience for much of the work.

Some C.I.A. officers were torn, believing the harsh treatment could be effective. Some said that only later did they understand the political cost of embracing methods the country had long shunned.

John C. Kiriakou, a former C.I.A. counterterrorism officer who was the first to question Abu Zubaydah, expressed such conflicted views when he spoke publicly to ABC News and other news organizations late last year. In a December interview with The Times, before being cautioned by the C.I.A. not to discuss classified matters, Mr. Kiriakou, who was not present for the waterboarding but read the resulting intelligence reports, said he had been told that Abu Zubaydah became compliant after 35 seconds of the water treatment.

"It was like flipping a switch," Mr. Kiriakou said of the shift from resistance to cooperation. He said he thought such "desperate measures" were justified in the "desperate times" in 2002 when another attack seemed imminent. But on reflection, he said, he had concluded that waterboarding was torture and should not be permitted. "We Americans are better than that," he said.

With Abu Zubaydah's case, the pattern was set. With a new prisoner, the interrogators, like Mr. Martinez, would open the questioning. In about two-thirds of cases, C.I.A. officials have said, no coercion was used.

If officers believed the prisoner was holding out, paramilitary officers who had undergone a crash course in the new techniques, but who generally knew little about Al Qaeda, would move in to manhandle the prisoner. Aware that they were on tenuous legal ground, agency officials at headquarters insisted on approving each new step — a night without sleep, a session of waterboarding, even a "belly slap" — in an exchange of encrypted messages. A doctor or medic was always on hand.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

The tough treatment would halt as soon as the prisoner expressed a desire to talk. Then the interrogator would be brought in.

Interrogation became Mr. Martinez's new forte, first with Abu Zubaydah; then with Ramzi bin al-Shibh, the Yemeni who was said to have been an intermediary between the 9/11 hijackers and Qaeda leaders, caught in September 2002; and then with Abd al-Rahim al-Nashiri, the Saudi accused of planning the bombing of the American destroyer Cole in 2000, who was caught in November 2002.

Mr. bin al-Shibh quickly cooperated; Mr. Nashiri resisted and was subjected to waterboarding, intelligence officials have said. C.I.A superiors offered Mr. Martinez and some other analysts the chance to be "certified" in what the C.I.A. euphemistically called "enhanced interrogation methods."

Mr. Martinez declined, as did several other C.I.A. officers. He did not condemn the tough methods, colleagues said, but he was learning that his talents lay elsewhere.

Another Suspect Is Seized

The hunt for Khalid Shaikh Mohammed involved the entire American intelligence establishment, with its billion-dollar arrays of spy satellites and global eavesdropping net. But his capture came down to a simple text message sent from an informant who had slipped into the bathroom of a house in Rawalpindi, near the Pakistani capital, Islamabad.

"I am with K.S.M.," the message said, according to an intelligence officer briefed on the episode.

The capture team waited a few hours before going in on the night of March 1, 2003, to blur the connection to the informant, a walk-in attracted by the offer of a $25 million reward. The informant, described by one American who met him as "a little guy who looked like a farmer," would later get a face-to-face thank you from George J. Tenet, then the C.I.A. director, at the American Embassy in Abu Dhabi, intelligence officials say, and he was resettled with his reward money under a new identity in the United States.

Within days, Mr. Mohammed was flown to Afghanistan and then on to Poland, where the most important of the C.I.A.'s black sites had been established. The secret base near Szymany Airport, about 100 miles north of Warsaw, would become a second home to Mr. Martinez during the dozens of hours he spent with Mr. Mohammed.

Poland was picked because there were no local cultural and religious ties to Al Qaeda, making infiltration or attack by sympathizers unlikely, one C.I.A. officer said. Most important, Polish intelligence officials were eager to cooperate.

"Poland is the 51st state," one former C.I.A. official recalls James L. Pavitt, then director of the agency's clandestine service, declaring. "Americans have no idea."

REDACTED  CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Mr. Mohammed met his captors at first with cocky defiance, telling one veteran C.I.A. officer, a former Pakistan station chief, that he would talk only when he got to New York and was assigned a lawyer -- the experience of his nephew and partner in terrorism, Ramzi Yousef, after Mr. Yousef's arrest in 1995.

But the rules had changed, and the tough treatment began shortly after Mr. Mohammed was delivered to Poland. By several accounts, he proved especially resistant, chanting from the Koran, doling out innocuous information or offering obvious fabrications. The Times reported last year that the intensity of his treatment -- various harsh techniques, including waterboarding, used about 100 times over a period of two weeks -- prompted worries that officers might have crossed the boundary into illegal torture.

His cooperation came in fits and starts, and interrogators said they believed at times that he gave them disinformation. But he talked most freely to Mr. Martinez.

An obvious chasm separated these enemies -- the interrogator and the prisoner. But Mr. Martinez shared a few attributes with his adversary that he could exploit as he sought his secrets. They were close in age, approaching 40; they had attended public universities in the American South (Mr. Mohammed had studied engineering at North Carolina A&T); they were both religious; and they were both fathers.

Mr. Mohammed, according to one former C.I.A. officer briefed on the sessions, "would go through these emotional cycles."

"He'd be chatty, almost friendly," the officer added. "He liked to debate. He got to the stage where he'd draw parallels between Christianity and Islam and say, 'Can't we get along?' "

By this account, Mr. Martinez would reply to the man who had overseen the killing of nearly 3,000 people: "Isn't it a little late for that?"

At other times, the C.I.A. officer said, Mr. Mohammed would grow depressed, complaining about being separated from his family and ranting about his cell or his food -- a common theme for other prisoners, including Abu Zubaydah, who protested when the flavor of his Ensure nutrition drink was changed.

Sometimes Mr. Mohammed wrote letters to the Red Cross or to President Bush with his demands; the letters went to C.I.A. psychologists for analysis.

And there were the poetic tributes to Mr. Martinez's wife, scribbled in Mr. Mohammed's ungrammatical English and intended as a show of respect for his interrogator, according to a colleague who heard Mr. Martinez's account.

But as time passed, Mr. Mohammed provided more and more detail on Al Qaeda's structure, its past plots and its aspirations. When he sometimes sought to mislead, interrogators often took his claims immediately to other Qaeda prisoners at the Polish compound to verify the information.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

The intelligence riches ultimately gleaned from Mr. Mohammed were reflected in the report of the national 9/11 commission, whose footnotes credit his interrogations 60 times for facts about Al Qaeda and its plotting — while also occasionally noting assertions by him that were "not credible."

The interrogations the commission cited began just 11 days after Mr. Mohammed's capture and ended just days before the commission's report was published in mid-2004. Together they amount to a detailed history of Mr. Mohammed's initiation into terrorism along with his nephew, Mr. Yousef; his plotting of mayhem from Bosnia to the Philippines; and his alliance with Osama bin Laden, to whom the egotistical Mr. Mohammed was reluctant to defer.

Mr. Mohammed also claimed a role in a long list of completed and thwarted attacks. Human rights advocates have questioned some of Mr. Mohammed's claims, including the beheading of Mr. Pearl, the Wall Street Journal reporter, suggesting that they may have been false statements made to stop torture.

But Mr. Martinez told colleagues that Mr. Mohammed volunteered out of the blue that he was the man who killed Mr. Pearl. The C.I.A. at first was skeptical, according to two former agency officials. Intelligence analysts eventually were convinced, however, in part because Mr. Mohammed pointed out to Mr. Martinez details of the hand and arm of the masked killer in a videotape of the murder that appeared to show it was him.

"He was a leader," said a foreign counterterrorism official briefed on the episode. "He wanted to demonstrate to his people how ruthless he could be."

Divergent Paths

On June 5, Mr. Mohammed made a theatrical return to the public eye at his Guantánamo Bay arraignment, with a long, graying beard and a defiant insistence that the American military commission could do no more to him than give him his wish: execution and martyrdom.

His interrogator has moved on, too. Like many other C.I.A. officers in the post-9/11 security boom, Mr. Martinez left the agency for more lucrative work with government contractors.

His life today is quiet by comparison with the secret interrogations of 2002 and 2003. But Mr. Martinez has not turned away entirely from his old world. He now works for Mitchell & Jessen Associates, a consulting company run by former military psychologists who advised the C.I.A. on the use of harsh tactics in the secret program.

And his new employer sent Mr. Martinez right back to the agency. For now, the unlikely interrogator of the man perhaps most responsible for the horrors of 9/11 teaches other C.I.A. analysts the arcane art of tracking terrorists.

This article has been revised to reflect the following correction:

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Correction: June 25, 2008

A chart on Sunday with the continuation of a front-page article about the C.I.A.'s secret interrogation program misidentified the Pakistan cities where two major Al Qaeda figures, Abu Zubaydah and Khalid Shaikh Mohammed, were captured. As the article correctly noted, Mr. Zubaydah was captured in Faisalabad, not Rawalpindi, and Mr. Mohammed was captured in Rawalpindi, not Karachi. The chart also misstated the year of Mr. Mohammed's capture. As the article also correctly noted, he was captured in March 2003, not 2002.

The chart also overstated what is known about the location where the two men were held en route from a prison in Poland to Guantanamo Bay, Cuba. While it is possible that the location may have been in the Middle East, that information has not been confirmed.

Copyright 2008 The New York Times Company



REDACTED / CLEARED FOR PUBLIC RELEASE