**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**    ) <br><br>    ) <br><br> **v.**    ) <br>    )    **No. 1:12cr127-LMB** <br>    )    **(Hon. Leonie M. Brinkema)** <br> **JOHN C. KIRIAKOU,**    ) <br>    ) <br>    ) <br> **Defendant.**    ) | |

**MEMORANDUM IN SUPPORT OF MOTION OF WASHINGTON POST RESEARCHER JULIE TATE TO QUASH SUBPOENA**

Defendant has served a subpoena on *Washington Post* senior researcher Julie Tate compelling her to appear and give testimony at a Rule 15 deposition in the above captioned case on October 24, 2012. The subpoena does not identify the nature of the testimony sought, but based on public filings in the case and our discussions with defense counsel, we understand that the purpose of the subpoena is to question Ms. Tate about the methods she may have used to obtain the identities of CIA officers in general and Covert Officer A in particular.

The testimony that defendant seeks from Ms. Tate falls squarely within the qualified First Amendment privilege that protects journalists from the compelled

disclosure of information gathered in the course of their reporting.  In order to overcome this privilege, the party seeking the testimony must put forward evidence to establish that (i) the information sought is of central relevance to his case; (ii) it cannot be obtained from any other source through due diligence; and (iii) there is a compelling need for disclosure.  The defendant has not and cannot put forth such evidence. Accordingly, the subpoena should be quashed.

## BACKGROUND

Ms. Tate has worked as a staff researcher for *The Washington Post* since 2002.[1]  Ms. Tate's name is not typically listed in the byline of an article, but rather in a footer that states in italics: "*Staff researcher Julie Tate contributed to this report.*"  *Id.*  That footer has appeared in countless *Post* articles relating to intelligence and national defense over the past decade.  Due to Ms. Tate's substantial contributions to various Pulitzer Prize winning reports, that footnote has been described as "one of the grandest understatements in journalism."[2]  Ms. Tate's colleagues have publicly stated that she is "as much a reporter as a researcher."  *Id.*  Like a reporter, Ms. Tate "has sources and works them" and her contributions "tend to begin early in a story's development."  *Id.* In particular, Ms. Tate has been recognized for her ability to identify and locate potential sources of information for an investigation.  *Id.*

---

[1] Declaration of Julie Tate at ¶1.

[2] Ex. 2 ("The Unsung Hero of the Washington Post," washingtoncitypaper.com, Apr. 16, 2008).

Ms. Tate specializes in national security, intelligence and defense issues. Decl. ¶1.  In the summer of 2008, Ms. Tate and her colleagues were engaged in an extensive investigation of the CIA's counterterrorism program now widely known as the Rendition, Detention and Interrogation Program" (the "RDI Program").  *Id.* Between the summer of 2008 and the summer of 2009, Ms. Tate contributed to more than a dozen articles related to the RDI Program, including:

- "Audit Finds FBI Reports of Detainee Abuse Ignored; Tactics Continued Against Detainees," Washington Post, May 21, 2008, at A01.

- "Interrogation Tactics Were Challenged at White House," Washington Post, May 22, 2008, at A07.

- "A Blind Eye to Guantanamo?  Book Says White House Ignored CIA on Detainees' Innocence," July 12, 2008, at A02.

- "CIA Tactics Endorsed in Secret Memos; Waterboarding Got White House Nod," Washington Post, Oct. 15, 2008, at A01.

- "Justice Dept. Uses 'State Secrets' Defense; Obama Backs Bush Decision on Rendition Lawsuit," Washington Post, Feb. 10, 2009.

- "CIA Destroyed 92 Interrogation Tapes, Probe Says," Washington Post, March 3, 2009, at A01.

- "Red Cross Described 'Torture' at CIA Jails; Secret Report Implies that U.S. Violated International Law," Washington Post, March 16, 2009, at A01.

- "Detainee's Harsh Treatment Foiled No Plots; Waterboarding, Rough Interrogation of Abu Zubaida Produced False Leads, Officials Say," Washington Post, March 29, 2009, at A01.

- "Psychologists Helped Guide Interrogations; Extent of Health Professionals' Role at CIA Prisons Draws Fresh Outrage From Ethicists," Washington Post, April 18, 2009, at A01.

- "Effectiveness of Harsh Questioning Is Unclear; Detainee May Have Faced Few Traditional Tactics," Washington Post, April 26, 2009, at A01.

- "CIA Urges Judge To Keep Bush-Era Documents Sealed; Al-Qaeda Could Use Contents, Agency Says," Washington Post, June 9, 2009, at A01.

- "CIA Fights Full Release Of Detainee Report; White House Urged to Maintain Secrecy," Washington Post, June 17, 2009, at A01.

- "Internal Rifts on Road to Torment; Interviews Offer More Nuanced Look at Roles of CIA Contractors, Concerns of Officials During Interrogations," Washington Post, July 19, 2009, at A01.

- "How a Detainee Became An Asset Sept. 11 Plotter Cooperated After Waterboarding," Washington Post, Aug. 29, 2009, at A01.

*See* Ex. 1 (collectively the "RDI Articles").

A review of the RDI Articles reveals that many of the sources for the articles were current and former government officials who were willing to speak to the *Post* about sensitive information only on the condition of anonymity. *See, e.g.* Ex. 1 at 8 ("CIA Tactics Endorsed in Secret Memos; Waterboarding Got White House Nod," Wash. Post, Oct. 15, 2008 at A01 (citing numerous current and former intelligence officials on the condition of anonymity)); *Id*. at 33 ("Internal Rifts on Road to Torment; Interviews Offer More Nuanced Look at Roles of CIA Contractors, Concerns of Officials

During Interrogations," Wash. Post, July 19, 2009, at A01 (citing "nearly two dozen [unnamed] current and former U.S. officials")).

Ms. Tate has submitted a declaration in this case attesting to the fact that if she were required to testify about the methods she has used to identify CIA officers—the avowed purpose of the subpoena—she would have to reveal the identities of confidential sources or information that would tend to reveal the identities of confidential sources.  Decl. of Julie Tate ¶ 4.

### SUBPOENA TO MS. TATE

On October 2, 2012, counsel accepted service of a subpoena for Ms. Tate to testify at a sealed hearing before this Court on October 24, 2012.  As noted above, although the subpoena does not specify the scope of the testimony sought from Ms. Tate, public filings in the case and conversations with defense counsel confirm that the purpose of the subpoena is to question Ms. Tate about the methods she may have used to obtain the identity of CIA officers in general and Covert Officer A in particular.  Ms. Tate is not referenced—either by name or otherwise—in the Indictment.

The limited public record makes clear that this case relates to the RDI program that Ms. Tate and her team were investigating back in 2008.  The *Post* was running articles about the RDI program at the very time that defendant is alleged to have leaked the names of CIA interrogators to various unnamed journalist.  *See* Ex. 1. Many of the *Post*'s articles focused on the very same CIA operation that is mentioned in the Indictment:  the 2002 capture and interrogation of suspected al-Qaeda operative,

Abu Zubaydah.  Indictment ¶ 10.  Indeed, one such article—which describes the capture of Abu Zubaydah in detail—quotes the defendant in this case, John Kiriakou.  Ex. 1 at 18 ("Detainee's Harsh Treatment Foiled No Plots; Waterboarding, Rough Interrogation of Abu Zubaida Produced False Leads, Officials Say," Wash. Post, Mar. 29, 2009, at A01).

According to publicly available pleadings, the defendant proposes to introduce evidence at trial concerning "alternative sources for the alleged leaks" and "methods with which non-CIA individuals were able to discover the identities of" Covert Officer A and Officer B.  *See* Government's Response to Defendant's CIPA Section 5 Filing at 28; 33 (Dkt Item 83) ("Gov't's CIPA Resp.").  Defense counsel has confirmed that they not only intend to seek testimony from Ms. Tate regarding these two topics, but they also seek testimony regarding the methods that she uses to identify CIA officers in general.  According to defense counsel, "it is clear that [Ms. Tate] had multiple sources for classified information that [she] had well before the disclosures at issue in the case."  Def.'s Mot. for Rule 15 Depositions ("Motion") (Dkt Item 89) at 7.

Defense counsel's request to question Ms. Tate about her sources falls squarely within the protection of Ms. Tate's First Amendment privilege.  Her invocation of that privilege places the burden on defendant to establish that his need for her testimony is so compelling that it should override the First Amendment privilege—a privilege that courts in this jurisdiction zealously protect.  For the reasons discussed below, defendant simply cannot meet that burden here.  There is nothing in the public

record to suggest that the testimony sought from Ms. Tate would be remotely relevant to this case, much less central to Mr. Kiriakou's defense, as the law would require. Accordingly, the subpoena should be quashed.

**ARGUMENT**

**I.      THE TESTIMONY DEFENDANT SEEKS FALLS SQUARELY WITHIN MS. TATE'S QUALIFIED FIRST AMENDMENT PRIVILEGE.**

As this Court and the U.S. Court of Appeals for the Fourth Circuit have expressly recognized, the First Amendment gives rise to a qualified privilege protecting members of the media from being compelled to testify in civil or criminal proceedings concerning their newsgathering activities.  *See Church of Scientology Int'l v. Daniels*, 992 F.2d 1329 (4th Cir. 1993); *LaRouche v. NBC,* 780 F.2d 1134 (4th Cir. 1986).  This privilege has its roots in Justice Powell's concurring opinion in *Branzburg v. Hayes*, 408 U.S. 665, 709 (1972) (Powell, J., concurring), which makes clear that the majority's decision in *Branzburg* did not in any way preclude journalists from asserting in any case, civil or criminal, a "claim to privilege" that is rooted in "constitutional rights with respect to the gathering of news or in safeguarding [reporter's] sources." *Id*. at 709-10.  Justice Powell emphasized that courts must judge such assertions of privilege "on [their] facts" and on "a case-by-case basis," by balancing the "vital constitutional and societal interests" of

freedom of the press, on the one hand, and the obligation of citizens to give relevant testimony concerning criminal conduct on the other. *Id.* at 710.[3]

As explained above, defendant seeks testimony from Ms. Tate regarding the "methods" that she used to identify not only Covert Officer A, but CIA officers in general, and defendant's Motion confirms that he wishes to question her about "multiple sources of classified information." Mot. at 7. The Fourth Circuit has been extraordinarily protective of journalists who are subpoenaed to testify about their confidential sources. In the forty years since *Branzburg* was decided, the Fourth Circuit has *never* ordered a reporter to testify about the identity of his or her confidential sources. *See, e.g., LaRouche,* 780 F.2d 1134. In its most recent decision involving the reporter's privilege, the Fourth Circuit stated the rationale for its steadfast protection of the privilege in these circumstances: "If reporters were routinely required to divulge the identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic." *Ashcraft v. Conoco, Inc.,* 218 F.3d 282, 284 (4th Cir. 2000).

---

[3] Justice Powell's concurring opinion is the controlling decision in *Branzburg. See, e.g., LaRouche,* 780 F.2d at 1139 (citing Justice Powell's concurring opinion as support for the reporter's privilege); *see also United States v. Sterling,* 818 F.Supp.2d 945, 951-52 (E.D. Va 2011) (same). This memorandum of law focuses principally on the First Amendment reporter's privilege that this Court recognized in *Sterling, see* 818 F. Supp. 2d at 951 n. 3, but we submit that the federal common law privilege provides an additional basis for granting Ms. Tate's motion to quash. *See United States v. Steelhammer,* 539 F.2d 373, 376 (4th Cir. 1976) (Winter, J., dissenting), *adopted by the court en banc,* 561 F.2d at 540.

Where the identification of confidential sources is at stake, "Courts have long held that the reporter's privilege is not narrowly limited to protecting the reporter from disclosing the names of confidential sources, but also extends to information that could lead to the discovery of a source's identity." *United States v. Sterling*, 818 F. Supp. 2d 945, 955 (E.D. Va 2011). Ms. Tate's declaration establishes that the testimony sought by defendant would require her to reveal the identities of confidential sources or information that would tend to reveal the identities of confidential sources. Tate Decl. ¶ 4. Indeed, defendant's Motion explicitly states that he expects Ms. Tate's testimony will reveal "multiple sources for classified information" unrelated to the disclosures in this case. Mot. at 7. That brings this case in line with the Fourth Circuit decisions that have uniformly upheld the privilege for confidential source information.

Even if defendant were not seeking testimony from Ms. Tate regarding confidential sources, to the extent he seeks testimony about information that Ms. Tate acquired in her work as a researcher at the *Post*, the qualified privilege would still apply. This Court has recognized that the First Amendment privilege shields not only the identities of sources, but also unpublished information acquired by a reporter in the course of his or her newsgathering—regardless of whether the information or the source is confidential. *Stickels v. General Rental Co., Inc.*, 750 F.Supp. 729, 732 (E.D.Va. 1990) (extending the "qualified privilege for nonconfidential information and materials acquired by the press in the course of their newsgathering process"). As the Court noted in *Stickels*, "the potential burden on the free flow of information caused by the

disclosure of nonconfidential material [can be] equivalent to the burden of revealing confidential information."  *Id.* at 732.

This Court's recognition that the qualified privilege extends to nonconfidential information is consistent with countless other courts.  *See Food Lion Inc. v. Capital Cities/ABC Inc.*, 951 F. Supp. 1211, 1214 (M.D.N.C. 1996) (collecting Circuit Court cases recognizing "a privilege which protects nonconfidential information and other editorial or resource material[s]").  Courts recognize that limiting the qualified privilege to only confidential source information would have a chilling effect on the press's ability to investigate important issues.  *Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980) ("We do not think that the privilege can be limited solely to protection of sources. The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes.").  If the privilege were confined only to protecting confidential sources, the constant threat of a subpoena would inevitably deter journalists from perusing critical leads and gathering newsworthy information.  *Miller v. Mecklenburg Cnty.*, 602 F.Supp. 675, 679 (W.D.N.C. 1985).

The controlling Fourth Circuit opinion establishing the broad scope of the qualified privilege is *Church of Scientology International v. Daniels*, 992 F.2d 1329 (4th Cir. 1993).  In that case, the Church of Scientology (CSI) sought to obtain materials from a reporter at USA Today, including certain notes, tapes and draft articles.  *Id.* at 1335. Although the source of the information reflected in the materials was not a confidential

source, the Fourth Circuit rightly held that the materials were covered by the qualified privilege. *Id.* After weighing the fact that CSI pursued no alternative sources for the information and the information that CSI sought was "questionable" rather than "critical to the case," the Court affirmed the lower court's refusal to permit discovery of the reporter's nonconfidential materials. *Id.*

*Church of Scientology* is a civil case, but the broad scope of the privilege applies equally here. In *United States v. Sterling*, this Court rejected the proposition that the First Amendment privilege applies differently in civil and criminal cases, noting that "the Fourth Circuit has not drawn any distinction between civil actions and criminal cases." 818 F.Supp.2d at 953; *see also Cuthbertson*, 630 F.2d at 147 ("[T]he interests of the press that form the foundation for the privilege are not diminished because the nature of the underlying proceeding out of which the request for the information arises is a criminal trial.").

To be sure, this Court in *Sterling* noted that "the only proper reading of *In re Shain* is that in criminal cases, as in civil actions, the *LaRouche* test [for applying the reporter's privilege] is triggered by either an agreement to keep sources confidential or evidence of harassment." 818 F. Supp.2d at 953; *see also id.* at 951. But that observation was made to rebut the government's contention that the privilege only applies when the subpoena was issued in bad faith to harass the reporter — the *Sterling* case did not present the question, and the Court was not called on to decide, whether the privilege

may be invoked to protect information other than confidential source information. [4] Moreover, as the Court itself noted in *Sterling*, *Shain's* "holding was limited to 'the circumstances of [the] case,'" *Id.* at 953. More importantly, *Shain* was decided before the Fourth Circuit unequivocally affirmed the extension of the qualified privilege to nonconfidential materials in *Church of Scientology*. Courts have recognized that the majority opinion in *Shain* has been limited by *Church of Scientology,* and that the law in the Fourth Circuit, as elsewhere, is that the qualified privilege "encompasses nonconfidential information from nonconfidential sources." *Penland v. Long*, 922 F. Supp. 1080, 1084 (W.D.N.C. 1995).

## II. DEFENDANT CANNOT MEET HIS BURDEN TO OVERCOME MS. TATE'S QUALIFIED PRIVILEGE.

Whether defendant seeks information relating to Ms. Tate's confidential sources or general newsgathering activities, the undeniable import of the caselaw is clear: Ms. Tate has properly invoked the First Amendment privilege in response to defendant's subpoena. In order to overcome her qualified privilege, defendant must

---

[4] This Court in *Sterling* cited some of the extensive caselaw that recognizes the extension of the privilege to newsgathering materials and information even when confidential sources are not involved. *See, e.g.,* 818 F. Supp. 2d at 955 (citing *Loadholtz v. Fields*, 389 F. Supp. 1299, 1303 (M. D. Fla.1975) ("The compelled production of a reporter's resource materials is equally as invidious as the compelled disclosure of his confidential informants."); *Miller v. Mecklenburg Cnty.*, 602 F. Supp. 675, 679 (W.D.N.C. 1985) ("Although the non-confidential nature of the material will be considered in the balancing of competing interests, the qualified privilege should still apply to such material."); and *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 491 (C.D. Cal. 1981).

satisfy a stringent three part test by establishing: (1) that the testimony he seeks from Ms. Tate is relevant; (2) that the information cannot be obtained by alternative means; and (3) that there is a compelling interest in the information. *LaRouche*, 780 F.2d at 1139. Without such a showing, the subpoena must be quashed.

## A. DEFENDANT CANNOT ESTABLISH THAT THE PROPOSED TESTIMONY IS RELEVANT TO HIS DEFENSE.

To meet his burden, defendant must first establish that Ms. Tate's testimony is relevant to his defense. As Justice Powell stated in *Branzburg*, a subpoena should be quashed whenever a "newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation ." *Branzburg*, 408 U.S. at 710. This requirement is especially compelling where, as here, defendant is seeking Rule 15 testimony, which by rule cannot be broader in scope than that which would be allowed during trial. Fed. R. Crim. P. 15(e)(2).

The testimony defendant seeks from Ms. Tate has no conceivable relevance to this case. Defendant has been charged with unlawfully disclosing classified information to Journalist A and Journalist B—not to Ms. Tate. *Ms. Tate is not mentioned in the Indictment, and there is no evidence in the record that Ms. Tate has ever met or communicated with Mr. Kiriakou.* If the charged offenses occurred, they were completed when defendant conveyed the classified information to the two journalists referred to in the indictment—Ms. Tate was not party to those communications. Whether Journalist A, Journalist B, or any other source may have

subsequently relayed the name of Covert Officer A or any other classified information to Ms. Tate or other third parties is completely irrelevant to the narrow violations charged in the Indictment.

Defendant's Motion purports—but fails—to set forth the "materiality" of Ms. Tate's testimony. *See generally* Mot. at 6-7. First, defendant states that her testimony is relevant to an element of 18 U.S.C. § 793(d) that requires the government to prove that defendant had "reason to believe" that the disclosure "could be used to the injury of the United States." *Id.* at 7. The intent element of Section 793(d) will be negated, defendant contends, through testimony establishing that Ms. Tate "had multiple sources for classified information" and that she had those sources "well before the disclosures at issue in this case." *Id.* The nexus between Ms. Tate's confidential sources and defendant's state of mind is not explained. Nor could it be. Ms. Tate's newsgathering activities are simply irrelevant to the defendant's state of mind.[5]

Defendant's second theory of relevance fares no better. Defendant contends that Ms. Tate's testimony might be used to negate the fact that he acted "intentionally" or "willfully" when he disclosed classified information to Journalist A and B. Mot. at 7. Apparently defendant expects that Ms. Tate may provide testimony

---

[5] The United States apparently agrees: "To the extent that defendant seeks to prove that the reporters to whom the defendant is alleged to have made unauthorized disclosures may have had additional sources of classified information, such evidence serves not to exonerate the defendant, but rather to establish crimes by third parties." *See* Gov't CIPA Resp. at 28.

to establish that defendant did not "act with the requisite state of mind" but instead "was merely induced into disclosing the information." *Id*.  It defies common sense that Ms. Tate—who was not a party to the communications referenced in the indictment—could somehow have *induced* a former CIA officer that she has never communicated with to make classified disclosures to two *other* journalists.  Suffice it to say, a deposition to explore this theory would be the paradigmatic fishing-expedition that Justice Powell said could not be tolerated.  *Branzburg*, 408 U.S. at 709.[6]

### B.     DEFENDANT CAN OBTAIN THE INFORMATION SOUGHT FROM OTHER SOURCES.

The utter lack of relevance of Ms. Tate's testimony should be dispositive. Even if the information defendant seeks from Ms. Tate were relevant, however, defendant would have to establish that the information is not obtainable by alternative means.  Although the record is sealed in this case, Defendant's CIPA Section 5 Notice ("CIPA Filing") establishes that there is a voluminous record of evidence that defendant intends to introduce at trial.  *See generally* Dkt Item 90.  The filing sets forth 75 separate categories of information that the defense apparently intends to use at trial, including more than 3000 pages of documents.  *Id*.

---

[6] The "tenuous" and "remote" theory of relevance offered by defendant provides an independent basis to uphold the privilege and quash the subpoena.  *Branzburg*, 408 U.S. at 710 ("[N]o harassment of newsmen will be tolerated. . . . [I]f the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, . . . . he will have access to the court on a motion to quash and an appropriate protective order may be entered."); *Sterling*, 818 F. Supp. 2d 954 (privilege properly invoked for subpoena issued to "harass the reporter").

The documents that defendant intends to introduce at trial include numerous electronic communications (e-mails, instant messages, wires, etc.); and defendant states that the parties to those communications may be called as witnesses at trial. *See, e.g.*, *id*. at 14. The public record also reflects that a defense investigator named John Sifton already testified at a voluntary deposition, and that the government intends to call him as a witness at trial. Gov't CIPA Resp. at 33.

Defendant has failed to meet his burden of establishing that the information he seeks from Ms. Tate is not otherwise available in the record. *La Rouche*, 780 F.2d at 1139 (the fact that the party seeking the testimony already knew the names of sources made need for information less than compelling); *Church of Scientology*, 992 F.2d at 1335 (same). Nor has defendant established that he is unable to obtain the information from other witnesses who will testify at trial. *Cuthbertson*, 630 F.2d at 148 ("If the material is available from a non-journalistic source, the defendants can obtain the information they seek without intruding on the first amendment interests of CBS. In this situation, both the defendants' need for the information and CBS's first amendment interests are satisfied.").

It would appear, in particular, that defendant has alternative means to explore the methods by which "non-CIA individuals [are] able to discover the identity of'" CIA officers. Gov't CIPA Resp. at 33. The government has explained that the defense investigator, Mr. Sifton, has already provided testimony at his deposition regarding "general techniques he has used to attempt to identify CIA employees, e.g.,

searching for persons using APO addresses and having addresses in Northern Virginia." *Id.* The defense investigator also described "how relevant persons [i.e., CIA officials] had been identified and information about them obtained." Gov.'s Response to Def.'s Mot. to Compel (Dkt Item 82). Compelling testimony from Ms. Tate on the same subject is therefore unnecessary, even if it were somehow relevant to whether the defendant unlawfully disclosed information in a completely separate communication. There is no reason to think that Ms. Tate had any superior methods or techniques for identifying CIA officers than the witness who has already testified—much less any that would be relevant to the defense.

In *Sterling*, this Court quashed the government's subpoena where the government failed to provide "the Court with a summary of its trial evidence, and [failed to show] that [the] summary contained holes that could *only be* filled with [the reporter]'s testimony." 818 F. Supp. 2d at 945 (emphasis added). Defendant has not even offered a plausible theory of relevance for Ms. Tate's testimony, much less a "clear and specific" showing that the information is otherwise unavailable. *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir. 1982). Ms. Tate's First Amendment interests cannot be so readily circumvented.

C.     **DEFENDANT CANNOT ESTABLISH A COMPELLING NEED FOR MS. TATE'S TESTIMONY.**

The third prong of *LaRouche* requires defendant to establish a compelling need for the testimony. This Court has stated that "for a compelling interest to exist, the

information must be necessary or, at the very least, critical to the litigation at issue." *Sterling*, 818 F. Supp. 2d at 959.  Whether the standard is "necessary" or "critical," the bottom line is clear: *LaRouche* imposes a stringent test on those who seek testimony from members of the media to demonstrate that the material sought is more than just relevant to their case.  *Church of Scientology*, 992 F.2d at 1335 (denial of request for newsgathering materials because the information was "questionable, rather than critical . . . , as the law requires.").  Defendant has yet to articulate even a coherent theory of relevance, much less establish that Ms. Tate's testimony is necessary or critical to his case.

As this Court stated in *Sterling*: "A criminal trial subpoena is not a free pass . . . to rifle though a reporter's notebook."  818 F. Supp. 2d at 960; *accord Cuthbertson*, 630 F.2d at 174.  The law places the burden on the defendant to establish that he has a need for Ms. Tate's testimony that is so compelling that it outweighs the First Amendment interests at stake.  That burden has not been met.  Defendant's "general assertions of necessity" provide this Court with absolutely no basis to make the "specific findings" necessary to enforce this subpoena.  *Riley v. City of Chester*, 612 F.2d 708, 717 (3d Cir. 1979).   Accordingly, the subpoena should be quashed.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:        /s/              
              Kevin T. Baine * (kbaine@wc.com)
Kevin Hardy* (khardy@wc.com)
William L. Doffermyre (wdoffermyre@wc.com)
Virginia Bar No.: 73968
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000 (telephone)
(202) 434-5029 (facsimile)

* Motion to appear *Pro Hac Vice* Pending

Attorneys for Julie Tate

Dated: October 11, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of October 2012, I served the foregoing filing

on the following via e-mail via the ECF system:

Lisa L. Owings
Lisa.owings@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Iris Lan
Iris.lan@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Mark E, Schneider
Mark.schneider@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Ryan P. Fayhee
ryan.fayhee@usdoj.gov
U.S. Department of Justice
Trial Attorney
Counterespionage Section
600 E Street, N.W.
Washington, D.C. 20004

Robert Trout
rttout@troutcacheris.com
Plato Cacheris
pcachcris@troutcacheris.com
John Hundley
jhundley@troutcachcris.com
Jesse Winograd
jwinograd@troutcacheris.com
Trout Cacheris, PLLC
1350 Connecticut Avenue, N.W., Suite 300
Washington, D.C. 20036

Mark J. MacDougall
mmacdougall@akingum.com
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, N.W.

George R. A. Doumar, Esq.
gdoumar@doumarmartin.com
Doumar Martin PLLC
2000 N. 14th Street, Suite 210
Arlington, VA 22201

Mark S. Zaid, Esq.
Mark@MarkZaid.com
Mark S. Zaid, P.C.
2000 N. 14th Street, Suite 210 1250 Connecticut Avenue, N.W.
Arlington, VA 22201 Suite 200

_____/s/_____
William L. Doffermyre
(Va. Bar #73968)
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel:  (202) 434-5000
Fax: (202) 434-5029