# Exhibit 1

Audit Finds FBI Reports Of Detainee Abuse Ignored; Tactics Continued Against Detainees The Washington Post May 21, 2008 Wednesday

# The Washington Post

## washingtonpost.com

The Washington Post

May 21, 2008 Wednesday
Met 2 Edition

## Audit Finds FBI Reports Of Detainee Abuse Ignored; Tactics Continued Against Detainees

**BYLINE:** Carrie Johnson and Josh White; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 1098 words

Complaints by FBI agents about abusive interrogation tactics at Guantanamo Bay, Cuba, and other U.S. military sites reached the National Security Council but prompted no effort to curb questioning that the agents considered ineffective and possibly illegal, according to an internal audit released yesterday.

Reports that Guantanamo detainees were being subjected to extreme temperatures, religious abuses and nude interrogation were conveyed at White House meetings of senior officials in 2003, yet these questionable tactics remained in use, a lengthy report by the Justice Department's inspector general concluded.

In one instance, colleagues of then-Attorney General John D. Ashcroft reported that he personally aired concerns about Defense Department strategy toward a particular detainee with Condoleezza Rice, then the national security adviser, while other Justice managers shared similar fears with the council's legal adviser in November 2003, the report said.

Ashcroft declined to be interviewed by investigators, so it remains uncertain how aggressively he pressed the issue, according to the report. Other senior Justice officials told investigators that no changes were made in interrogations at Guantanamo Bay even after these and other complaints filtered up to the National Security Council.

Nearly half of the 450 FBI agents who worked at Guantanamo reported that they had observed or heard about military interrogators using a variety of harsh interrogation techniques on detainees, with the most common being sleep deprivation and short-shackling -- or locking a detainee's hands and feet together to prevent comfortable sitting or standing -- for long periods of time.

Military officials at Guantanamo Bay used some aggressive techniques before they were approved, possibly in violation of Defense Department policy and U.S. law, the report said. They also continued to use "stress positions" and other such techniques well after they were prohibited by Defense Department policy in January 2003, the report said.

The 370-page report draws heavily on e-mail messages and contemporaneous memos to provide the clearest and most definitive account to date of the key tactics used by the government against suspected terrorists after the Sept. 11, 2001, attacks. It describes, for example, a "frequent flyer program" meant to lessen resistance by extensively disrupting sleep, use of strobe lights in conjunction with loud rock music, twisting of thumbs backward, and exposure of detainees to extreme temperatures, threatening dogs, pornography and sexual taunting.

Detainees in Iraq had water poured down their throats while they were cuffed and kneeling, the FBI agents told investigators.

"Some have suggested that the abuse of detainees in U.S. custody was simply the result of a few bad apples acting on their own," Senate Armed Services Committee Chairman Carl M. Levin (D-Mich.) said in a statement. "The report released today by the Department of Justice Inspector General is proof that that is simply not true. The IG found that scores of FBI agents observed the use of harsh interrogation techniques in Iraq, Afghanistan, and Guantanamo Bay."

Audit Finds FBI Reports Of Detainee Abuse Ignored; Tactics Continued Against Detainees The Washington Post May 21, 2008 Wednesday

The report also highlights intensifying friction between FBI agents and their military counterparts over these strategies, some of which were eventually repudiated by the Bush administration.

After hundreds of interviews and reviews of more than 500,000 documents, investigators working for Inspector General Glenn A. Fine also said they found an interrogation process awash with confusion and conflicting sets of rules. Fine generally praised the FBI's actions but faulted the bureau for waiting until abuses at Iraq's Abu Ghraib prison became public in early 2004 to develop a policy obliging its agents to report similar abuses by other government employees.

Even then, the bureau's guidelines remained a source of uncertainty for many agents in the field, the report said.

FBI Director Robert S. Mueller III decreed in 2002 that the bureau would not engage in such practices, favoring techniques that built rapport and gleaned more useful information about potential threats, the inspector general report said. But the Defense Department adopted a different view, which prevailed. Eventually FBI agents started conducting interviews on their own rather than participating in sessions with CIA and military counterparts.

One unnamed FBI agent tried to build rapport with injured al-Qaeda commander Abu Zubaida after his capture, "to the point of cleaning him up after bowel movements," the report said. The agent later referred to the CIA's much harsher treatment of Abu Zubaida, also known as Zayn al-Abidin Muhammed Hussein, as "borderline torture."

Unnamed FBI and Justice officials, however, floated a proposal in late 2002 that recommended that another detainee, alleged al-Qaeda member Mohammed al-Qahtani, be interrogated using similar protocols. Mueller and the chief of the Justice Department's criminal division told investigators they did not see the draft or take part in a specific discussion of the plan, which was never implemented.

Bryan Whitman, a Pentagon spokesman, said yesterday that "there is nothing new here. . . . The department has been operating for a number of years now with new and improved guidance with respect to detention operations and interrogation procedures."

Sean McCormack, a spokesman for Secretary of State Rice, said the assertions in the report were "pretty vague."

The report's release rekindled interest among Democrats on Capitol Hill for obtaining access to documents and testimony underlying the problematic interrogation practices. House Judiciary Committee Chairman John Conyers Jr. (D-Mich.) called the ineffective action by senior government officials in the face of complaints "very disturbing" and said he would ask Ashcroft and others to testify in upcoming hearings.

The CIA, for its part, objected to the report's characterization of the agency's methods. "Interrogation methods that the CIA has used in its terrorist detention program were examined and found lawful, by the Department of Justice itself," agency spokesman Mark Mansfield said.

The report complains that investigators were improperly blocked by the CIA from questioning Abu Zubaida about his treatment, partly because its officials worried that he might lie. But "the CIA was not convinced when the request was made that [investigators] had an immediate need" to interview the alleged terrorist, Mansfield said.

Staff researcher Julie Tate and staff writers Dan Eggen and Joby Warrick contributed to this report.

**LOAD-DATE:** May 21, 2008

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**PUBLICATION-TYPE:** Newspaper

Copyright 2008 The Washington Post
All Rights Reserved

Interrogation Tactics Were Challenged at White House The Washington Post May 22, 2008 Thursday

## The Washington Post

## washingtonpost.com

The Washington Post

May 22, 2008 Thursday
Suburban Edition

## Interrogation Tactics Were Challenged at White House

**BYLINE:** Carrie Johnson and Josh White; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A07

**LENGTH:** 1074 words

Five years ago, as troubling reports emerged about the treatment of detainees at Guantanamo Bay, Cuba, a career lawyer at the Justice Department began a long and relatively lonely campaign to alert top Bush administration officials to a strategy he considered "wrongheaded."

Bruce C. Swartz, a criminal division deputy in charge of international issues, repeatedly questioned the effectiveness of harsh interrogation tactics at White House meetings of a special group formed to decide detainee matters, with representatives present from the Pentagon, the State Department and the CIA.

Swartz warned that the abuse of Guantanamo inmates would do "grave damage" to the country's reputation and to its law enforcement record, according to an investigative audit released earlier this week by the Justice Department's inspector general. Swartz was joined by a handful of other top Justice and FBI officials who said the abuse would almost certainly taint any legal proceedings against the detainees.

Now their predictions appear to be coming true. A top Pentagon official chose this month to drop charges against a detainee who was roughly interrogated at Guantanamo, and U.S. officials believe it may be difficult to charge him at all. Defense lawyers for a group of alleged Sept. 11 conspirators in U.S. custody have said they plan to raise concerns about harsh techniques used by the CIA and will seek to keep evidence derived from such tactics out of court.

Concerns among FBI agents about the interrogations first came to light in 2004, when a series of internal memos disclosed to the American Civil Liberties Union made clear that the bureau withdrew its agents from interrogation rooms in protest. But the degree of dissent over the administration's aggressive tactics within the bureau's top ranks and within the Justice Department was unclear until the release of this week's report, which starkly describes some of these protests and the cool reception the dissenters got among some officials at the White House and elsewhere.

Besides Swartz, the others depicted as raising sustained objections are then-FBI assistant general counsel Marion "Spike" Bowman, who documented his concerns in written reports, and Pasquale D'Amuro, then the bureau's assistant director for counterterrorism. Michael Chertoff, who was then assistant attorney general in charge of the criminal division, raised concerns in November 2002 about the effectiveness of the military's methods, although he said later he did not recall hearing assertions that they were illegal.

One of Chertoff's concerns, according to the report, was that even if FBI agents interviewed detainees after they were harshly interrogated by the CIA, "he did not think this approach would successfully prevent the statement from being 'tainted' by any prior enhanced interview techniques."

At one point, FBI agents went so far as to collect allegations of abuse in what they labeled a "war crimes file," the inspector general's report said, but the file was closed without action shortly afterward.

Two major policy splits are highlighted in the report's account of the long to-and-fro over the tactics. One reflected a clash of cultures between the experienced interrogators at the FBI who were looking to prosecute terrorism crimes, and military and CIA officials who were seeking rapid information about al-Qaeda and were willing to push legal

3

Interrogation Tactics Were Challenged at White House The Washington Post May 22, 2008 Thursday

boundaries to do it. The report shows that FBI agents appeared more concerned about the long view, while others wanted detainees to break immediately in the panicked days after Sept. 11, 2001.

A softer split occurred within the Justice Department itself. On one side was its Office of Legal Counsel, where attorney John C. Yoo -- acting in direct consultation with Vice President Cheney's then-counsel David S. Addington -- wrote a series of memos that gave legal backing to harsh interrogation techniques. On the other side were career officials such as Swartz and some top Justice political appointees, even including then-Attorney General John D. Ashcroft, who sources say disliked some of Yoo's conclusions and resented his back-channel discussions with the White House.

Officials at the Justice Department and the FBI declined comment on the report or did not return calls yesterday, underscoring the sensitivity of these debates, even five years after they occurred. But the 370-page report says that after Ashcroft and FBI Director Robert S. Mueller III pressed their concerns, the interrogation tactics did not change.

"Attorney General Ashcroft raised concerns about the difference between FBI interrogation techniques and the Department of Defense methods at the highest levels of the interagency group," spokesman Mark Corallo said. "It is well-known that the Department of Justice was confident that the FBI methods would produce more valuable intelligence."

The government's response to the first and most serious flare-up -- in which an FBI agent complained in 2002 that the CIA's treatment of al-Qaeda commander Abu Zubaida at a secret detention site was "borderline torture" -- was complicated, the report said.

One agent at the site, called "Thomas" in the report, objected strongly to the tactics and was ordered by D'Amuro to depart immediately. But another, called "Gibson" in the report, told investigators that he did not morally object to having FBI agents present, because he had undergone similarly harsh interrogation techniques as part of Army training.

"Gibson" was allowed by the FBI to remain at the CIA facility for several weeks, continuing to work with intelligence operatives, and to take part in the interrogations of Zubaida, about which he briefed FBI supervisors by telephone.

D'Amuro told the investigators that he protested the tactics at a meeting with Mueller at the time, an account confirmed by his colleagues. D'Amuro stated that such aggressive interrogation techniques would not be effective, that they would impede the ability of FBI agents to appear as witnesses at trials, and that the tactics would blacken the country's reputation by helping al-Qaeda spread negative views.

D'Amuro recognized that the bureau would have a "taint problem" if the FBI did the interviews after the CIA had used its aggressive approaches, the report said. Mueller subsequently decided that the FBI agents would not go back to the sessions.

Staff writer Spencer S. Hsu and staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** May 22, 2008

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**PUBLICATION-TYPE:** Newspaper

Copyright 2008 The Washington Post
All Rights Reserved

4

Copyright 2008 The Washington Post
All Rights Reserved

# The Washington Post

## washingtonpost.com

The Washington Post

July 12, 2008 Saturday
Suburban Edition

**SECTION:** A-SECTION; Pg. A02

**DISTRIBUTION:** Maryland

**LENGTH:** 1005 words

**HEADLINE:** A Blind Eye to Guantanamo?;
Book Says White House Ignored CIA on Detainees' Innocence

**BYLINE:** Joby Warrick; Washington Post Staff Writer

**BODY:**

A CIA analyst warned the Bush administration in 2002 that up to a third of the detainees at Guantanamo Bay may have been imprisoned by mistake, but White House officials ignored the finding and insisted that all were "enemy combatants" subject to indefinite incarceration, according to a new book critical of the administration's terrorism policies.

The CIA assessment directly challenged the administration's claim that the detainees were all hardened terrorists -- the "worst of the worst," as then-Defense Secretary Donald H. Rumsfeld said at the time. But a top aide to Vice President Cheney shrugged off the report and squashed proposals for a quick review of the detainees' cases, author Jane Mayer writes in "The Dark Side," scheduled for release next week.

"There will be no review," the book quotes Cheney staff director David Addington as saying. "The president has determined that they are ALL enemy combatants. We are not going to revisit it."

The reported exchange is one of dozens recounted by Mayer in a volume that describes how Cheney and his legal

A Blind Eye to Guantanamo?; Book Says White House Ignored CIA on Detainees' Innocence The Washington Post
July 12, 2008 Saturday

advisers pushed for policies on domestic wiretapping, detention and interrogation of suspected terrorists in the months after the Sept. 11, 2001, attacks. Mayer, who has written extensively about terrorist detention for New Yorker magazine, argues that the administration set the stage for the use of waterboarding and other controversial techniques with a series of legal memos that gave government agencies virtually unchecked power in waging war against terrorist groups.

"For the first time in its history, the United States sanctioned government officials to physically and psychologically torment U.S.-held captives, making torture the official law of the land in all but name," she writes.

A spokeswoman for Cheney declined to comment, noting that the White House had not been provided a copy of Mayer's book. While the book officially goes on sale Tuesday, a copy was obtained in advance of release by The Washington Post. The New York Times reported some details of Mayer's findings in yesterday's editions.

The classified CIA report described by Mayer was prepared in the summer of 2002 by a senior CIA analyst who was invited to the prison camp in Cuba to help Defense Department officials grapple with a major problem: They were gleaning very little useful information from the roughly 600 detainees in custody at the time. After a study involving dozens of detainees, the analyst came up with an answer: A large fraction of them "had no connection with terrorism whatsoever," Mayer writes, citing officials familiar with the report. Many were essentially bystanders who had been swept up in dragnets or turned over to the U.S. military by bounty hunters. Previous published reports have described the CIA analyst's visit but have not provided details of its findings.

According to Mayer, the analyst estimated that a full third of the camp's detainees were there by mistake. When told of those findings, the top military commander at Guantanamo at the time, Major Gen. Michael Dunlavey, not only agreed with the assessment but suggested that an even higher percentage of detentions -- up to half -- were in error. Later, an academic study by Seton Hall University Law School concluded that 55 percent of detainees had never engaged in hostile acts against the United States, and only 8 percent had any association with al-Qaeda.

The CIA findings prompted a vigorous debate with the administration and prompted calls for a review of detainee cases. But "Addington's response was adamant and imperious. 'We are not second-guessing the President's decision. These are enemy combatants,' " Mayer wrote.

More than 200 detainees remain in the facility at Guantanamo Bay. One of them, Afghanistan national Mohammed Jawad, filed papers yesterday claiming that he suffered extensive health problems after being subjected to sleep deprivation for two weeks in 2004, the Associated Press reported. Jawad, through his lawyer, said he lost 10 percent of his body weight during the two weeks and also began urinating blood. A Pentagon spokesman declined to comment on the allegations.

The book also offers new detail on the findings of officials from the International Committee of the Red Cross who investigated the CIA's treatment of suspected al-Qaeda leaders in secret prisons overseas. In 2007, the ICRC produced a secret report, based on extensive interviews with the detainees, and shared the document with the CIA and the White House. It was the first independent accounting of CIA detention practices, and the findings were never publicly released, in keeping with long-standing ICRC rules intended to ensure continued access to prison sites worldwide. ICRC declined to comment on the specifics of the report.

Mayer, citing officials familiar with the report, said the ICRC described the CIA's treatment of the detainees "categorically as torture." Citing the experience of one al-Qaeda captive, Abu Zubaida, it said CIA interrogators had repeatedly locked the man inside a box so small that he had to fold his limbs into a fetal position to fit. He and other detainees were kept naked for long periods of time and exposed to temperature extremes and long bouts of sleep deprivation. Mayer acknowledges that the detainees' accounts could not be independently confirmed.

A CIA spokesman, George Little, declined to comment on the account but sharply differed with Mayer's conclusions about the agency's treatment of detainees.

A Blind Eye to Guantanamo?; Book Says White House Ignored CIA on Detainees' Innocence The Washington Post
July 12, 2008 Saturday

"The ICRC was granted access to terrorist detainees at Guantanamo and heard their claims," Little said. "The fact of the matter remains that the program was established in accordance with detailed, measured guidance from the Department of Justice, and the interrogation methods used to question detainees have been lawful, safe and effective. The program has yielded valuable information that has helped the United States and other countries save lives and disrupt terrorist operations."

Staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** July 12, 2008

CIA Tactics Endorsed In Secret Memos; Waterboarding Got White House Nod The Washington Post October 15, 2008 Wednesday

# The Washington Post

# washingtonpost.com

The Washington Post

October 15, 2008 Wednesday
Met 2 Edition

## CIA Tactics Endorsed In Secret Memos; Waterboarding Got White House Nod

**BYLINE:** Joby Warrick; Washington Post Staff Writer

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 1606 words

The Bush administration issued a pair of secret memos to the CIA in 2003 and 2004 that explicitly endorsed the agency's use of interrogation techniques such as waterboarding against al-Qaeda suspects -- documents prompted by worries among intelligence officials about a possible backlash if details of the program became public.

The classified memos, which have not been previously disclosed, were requested by then-CIA Director George J. Tenet more than a year after the start of the secret interrogations, according to four administration and intelligence officials familiar with the documents. Although Justice Department lawyers, beginning in 2002, had signed off on the agency's interrogation methods, senior CIA officials were troubled that White House policymakers had never endorsed the program in writing.

The memos were the first -- and, for years, the only -- tangible expressions of the administration's consent for the CIA's use of harsh measures to extract information from captured al-Qaeda leaders, the sources said. As early as the spring of 2002, several White House officials, including then-national security adviser Condoleezza Rice and Vice President Cheney, were given individual briefings by Tenet and his deputies, the officials said. Rice, in a statement to congressional investigators last month, confirmed the briefings and acknowledged that the CIA director had pressed the White House for "policy approval."

The repeated requests for a paper trail reflected growing worries within the CIA that the administration might later distance itself from key decisions about the handling of captured al-Qaeda leaders, former intelligence officials said. The concerns grew more pronounced after the revelations of mistreatment of detainees at the Abu Ghraib prison in Iraq, and further still as tensions grew between the administration and its intelligence advisers over the conduct of the Iraq war.

"It came up in the daily meetings. We heard it from our field officers," said a former senior intelligence official familiar with the events. "We were already worried that we" were going to be blamed.

A. John Radsan, a lawyer in the CIA general counsel's office until 2004, remembered the discussions but did not personally view the memos the agency received in response to its concerns. "The question was whether we had enough 'top cover,' " Radsan said.

Tenet first pressed the White House for written approval in June 2003, during a meeting with members of the National Security Council, including Rice, the officials said. Days later, he got what he wanted: a brief memo conveying the administration's approval for the CIA's interrogation methods, the officials said.

Administration officials confirmed the existence of the memos, but neither they nor former intelligence officers would describe their contents in detail because they remain classified. The sources all spoke on the condition of anonymity because they were not cleared to discuss the events.

CIA Tactics Endorsed In Secret Memos; Waterboarding Got White House Nod The Washington Post October 15, 2008 Wednesday

The second request from Tenet, in June 2004, reflected growing worries among agency officials who had just witnessed the public outcry over the Abu Ghraib scandal. Officials who held senior posts at the time also spoke of deteriorating relations between the CIA and the White House over the war in Iraq -- a rift that prompted some to believe that the agency needed even more explicit proof of the administration's support.

"The CIA by this time is using the word 'insurgency' to describe the Iraq conflict, so the White House is viewing the agency with suspicion," said a second former senior intelligence official.

As recently as last month, the administration had never publicly acknowledged that its policymakers knew about the specific techniques, such as waterboarding, that the agency used against high-ranking terrorism suspects. In her unprecedented account to lawmakers last month, Rice, now secretary of state, portrayed the White House as initially uneasy about a controversial CIA plan for interrogating top al-Qaeda suspects.

After learning about waterboarding and similar tactics in early 2002, several White House officials questioned whether such harsh measures were "effective and necessary . . . and lawful," Rice said. Her concerns led to an investigation by the Justice Department's criminal division into whether the techniques were legal.

But whatever misgivings existed that spring were apparently overcome. Former and current CIA officials say no such reservations were voiced in their presence.

In interviews, the officials recounted a series of private briefings about the program with members of the administration's security team, including Rice and Cheney, followed by more formal meetings before a larger group including then-Attorney General John D. Ashcroft, then-White House counsel Alberto R. Gonzales and then-Defense Secretary Donald H. Rumsfeld. None of the officials recalled President Bush being present at any of the discussions.

Several of the key meetings have been previously described in news articles and books, but Rice last month became the first Cabinet-level official to publicly confirm the White House's awareness of the program in its earliest phases. In written responses to questions from the Senate Armed Services Committee, Rice said Tenet's description of the agency's interrogation methods prompted her to investigate further to see whether the program violated U.S. laws or international treaties, according to her written responses, dated Sept. 12 and released late last month.

"I asked that . . . Ashcroft personally advise the NSC principles whether the program was lawful," Rice wrote.

Current and former intelligence officials familiar with the briefings described Tenet as supportive of enhanced interrogation techniques, which the officials said were developed by CIA officers after the agency's first high-level captive, al-Qaeda operative Zayn al-Abidin Muhammed Hussein, better known as Abu Zubaida, refused to cooperate with interrogators.

"The CIA believed then, and now, that the program was useful and helped save lives," said a former senior intelligence official knowledgeable about the events. "But in the agency's view, it was like this: 'We don't want to continue unless you tell us in writing that it's not only legal but is the policy of the administration.' "

One administration official familiar with the meetings said the CIA made such a convincing case that no one questioned whether the methods were necessary to prevent further terrorist attacks.

"The CIA had the White House boxed in," said the official. "They were saying, 'It's the only way to get the information we needed, and -- by the way -- we think there's another attack coming up.' It left the principals in an extremely difficult position and put the decision-making on a very fast track."

But others who were present said Tenet seemed more interested in protecting his subordinates than in selling the administration on a policy that administration lawyers had already authorized.

"The suggestion that someone from CIA came in and browbeat everybody is ridiculous," said one former agency official familiar with the meeting. "The CIA understood that it was controversial and would be widely criticized if it became public," the official said of the interrogation program. "But given the tenor of the times and the belief that more attacks were coming, they felt they had to do what they could to stop the attack."

The CIA's anxiety was partly fueled by the lack of explicit presidential authorization for the interrogation program. A secret White House "memorandum of notification" signed by Bush on Sept. 15, 2001, gave the agency broad authority to wage war against al-Qaeda, including killing and capturing its members. But it did not spell out how captives should be handled during interrogation.

9

CIA Tactics Endorsed In Secret Memos; Waterboarding Got White House Nod The Washington Post October 15, 2008 Wednesday

But by the time the CIA requested written approval of its policy, in June 2003, the population of its secret prisons had grown from one to nine, including Khalid Sheik Mohammed, the alleged principal architect of the Sept. 11, 2001, attacks. Three of the detainees had been subjected to waterboarding, which involves strapping a prisoner to a board, covering his face and pouring water over his nose and mouth to simulate drowning.

By the spring of 2004, the concerns among agency officials had multiplied, in part because of shifting views among administration lawyers about what acts might constitute torture, leading Tenet to ask a second time for written confirmation from the White House. This time the reaction was far more reserved, recalled two former intelligence officials.

"The Justice Department in particular was resistant," said one former intelligence official who participated in the discussions. "They said it doesn't need to be in writing."

Tenet and his deputies made their case in yet another briefing before the White House national security team in June 2004. It was to be one of the last such meetings for Tenet, who had already announced plans to step down as CIA director. Author Jane Mayer, who described the briefing in her recent book, "The Dark Side," said the graphic accounts of interrogation appeared to make some participants uncomfortable. "History will not judge us kindly," Mayer quoted Ashcroft as saying.

Participants in the meeting did not recall whether a vote was taken. Several weeks passed, and Tenet left the agency without receiving a formal response.

Finally, in mid-July, a memo was forwarded to the CIA reaffirming the administration's backing for the interrogation program. Tenet had acquired the statement of support he sought.

Staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** October 15, 2008

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**PUBLICATION-TYPE:** Newspaper

Copyright 2008 The Washington Post
All Rights Reserved

Justice Dept. Uses 'State Secrets' Defense; Obama Backs Bush Decision on Rendition Lawsuit The Washington Post
February 10, 2009 Tuesday

# The Washington Post

## washingtonpost.com

The Washington Post

February 10, 2009 Tuesday
Suburban Edition

## Justice Dept. Uses 'State Secrets' Defense;
## Obama Backs Bush Decision on Rendition Lawsuit

**BYLINE:** Peter Finn; Washington Post Staff Writer

**SECTION:** A-SECTION; Pg. A04

**LENGTH:** 561 words

The Obama administration invoked the same "state secrets" privilege as its predecessor in federal court in San Francisco yesterday in opposing the reinstatement of a lawsuit that alleges that a Boeing Co. unit flew people to countries where they were tortured as part of the CIA's "extraordinary rendition" program.

The Justice Department's stance on the case came despite a pledge by Attorney General Eric H. Holder Jr., first at his confirmation hearing and again yesterday in a statement, to review all assertions of the state secrets privilege.

The American Civil Liberties Union brought the case on behalf of five foreigners who were allegedly transferred to countries where they were tortured under interrogation. One of the five, Binyam Mohammed, a British resident, claims in court papers in the United States and in Britain that he was flown to Morocco and held there for nearly two years after his capture in Pakistan. He is now in the U.S. military prison at Guantanamo Bay, Cuba.

Mohammed and the others are seeking unspecified damages.

Leon E. Panetta, Obama's nominee to head the CIA, told Congress that he would end the practice of transferring suspects to countries where they are at risk of being tortured.

The Bush administration argued that the lawsuit against Jeppesen DataPlan, a Boeing unit based in Colorado, threatened the country's national security interests. In court yesterday, the panel of three judges asked the government if there was any change in its position because of the new administration.

A Justice Department attorney said the government stands by its brief, which was filed by the Bush administration.

A Justice official, speaking on the condition of anonymity because the case is ongoing, said the new administration decided the lawsuit involves state secrets that need to be protected.

Ben Wizner, an ACLU staff lawyer who argued the case for the plaintiffs, condemned the decision as Obama's ratification of the Bush administration's "extreme policies," which he said prevent torture victims from seeking redress.

"This administration is going to have to face the issue of accountability, and the administration cannot pretend the last seven years didn't happen," Wizner said in a phone interview.

The suit was filed by the ACLU in May 2007 and was dismissed last February. The organization told the federal appeals court yesterday that the suit ought to be reinstated.

The government has invoked the state secrets privilege in a number of cases in recent years, including various suits concerning the National Security Agency's wiretapping program.

11

Justice Dept. Uses 'State Secrets' Defense; Obama Backs Bush Decision on Rendition Lawsuit The Washington Post
February 10, 2009 Tuesday

Justice Department spokesman Matt Miller declined to discuss the ACLU's suit in San Francisco, citing ongoing litigation. A decision in the case may take several months.

But he said the department will scrutinize all cases involving claims of state secrets.

"The attorney general has directed that senior Justice Department officials review all assertions of state secret privilege to ensure that it is being invoked only in legally appropriate situations," Miller said. "It is vital that we protect information that if released could jeopardize national security, but the department will ensure the privilege is not invoked to hide from the American people information about their government's actions that they have a right to know."

Staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** February 10, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**GRAPHIC:** IMAGE; By Melina Mara -- The Washington Post; Attorney General Eric H. Holder Jr. has said that he will review all assertions of the state secrets privilege.
IMAGE; Binyam Mohammed says he was tortured.

**PUBLICATION-TYPE:** Newspaper

Copyright 2009 The Washington Post
All Rights Reserved

CIA Destroyed 92 Interrogation Tapes, Probe Says The Washington Post March 3, 2009 Tuesday Correction Appended

# The Washington Post

# washingtonpost.com

The Washington Post

March 3, 2009 Tuesday
Correction Appended
Met 2 Edition

## CIA Destroyed 92 Interrogation Tapes, Probe Says

**BYLINE:** Carrie Johnson and Joby Warrick; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 957 words

The CIA got rid of 92 videotapes depicting the harsh interrogations and confinement of "high value" al-Qaeda suspects, government lawyers disclosed yesterday, as a long-running criminal probe of the tapes' destruction inched toward a conclusion that is not expected to result in charges against CIA operations employees, three sources said.

Then-directorate of operations chief Jose A. Rodriguez Jr. gave an order to destroy the recordings in November 2005, as scrutiny of the CIA and its treatment of terrorism suspects intensified. The agency's then-Director Michael V. Hayden argued that the tapes posed "a serious security risk" because they contained the identities of CIA participants in al-Qaeda interrogations. Until yesterday, the exact number of destroyed tapes was not known. Agency officials have said they stopped taping detainees six years ago.

Federal prosecutor John Durham, who was appointed last year to investigate why the tapes were incinerated and whether any court directives were violated, has nearly completed formal interviews with all the key characters. Durham and FBI agents working alongside him conducted a lengthy session last week with a person who worked closely with Rodriguez at the time of the tapes' destruction, according to sources who have followed the case. Rodriguez has not yet been questioned, they added.

Durham appears unlikely to secure criminal indictments against Rodriguez and other agency operations personnel involved in the conduct, the sources said. In recent months, the prosecutor has focused special attention on CIA legal advisers who reviewed court directives and on agency lawyers who told Rodriguez that getting rid of the recordings was sloppy and unwise but that it did not amount to a clear violation of the law, the sources said. Durham has obtained internal e-mail messages and memos that detail the sometimes jarring or unpleasant substance of the interrogations chronicled on the destroyed tapes, they added.

At issue are recordings that chronicle the interrogation of two senior al-Qaeda members, Zayn al-Abidin Muhammed Hussein, better known as Abu Zubaida, and Abd al-Rahim al-Nashiri, while they underwent a simulated drowning practice known as waterboarding and in less hostile moments as they interacted with agency employees or sat in their prison cells, according to government officials who spoke on the condition of anonymity because the materials remain classified.

The Washington Post reported in late January that Durham had recently interviewed agency lawyers Robert Eatinger, who one source said was consulted days before the destruction order, and Steven Hermes.

Other questions remain, including a request by U.S. District Judge Leonie M. Brinkema for information to prepare for the sentencing of Zacharias Moussaoui around the same time that CIA operations officials made the decision to order that the tapes be destroyed, the sources said.

Such cases can be difficult to prosecute because of the need to convince jurors what government actors knew at the time and that their lapses went beyond carelessness and into intentional false statements. There is also a heavy volume of

13

CIA Destroyed 92 Interrogation Tapes, Probe Says The Washington Post March 3, 2009 Tuesday Correction Appended

classified information that can be challenging to present to a jury, according to lawyers who frequently work with CIA issues.

Tom Carson, a spokesman for Durham, declined to comment other than to say that the investigation is ongoing.

Human rights advocates and public interest groups pressed for more details and demanded that the CIA be sanctioned. "The sheer number of tapes at issue demonstrates that this destruction was not an accident," said Amrit Singh, a staff lawyer with the American Civil Liberties Union. "There was a deliberate attempt to destroy evidence of what we believe to be illegal conduct."

Singh said that the ACLU had secured a court order in September 2004, more than a year before the tapes were eradicated, directing the agency to preserve materials related to the interrogation of prisoners overseas. "It's about time the CIA was held accountable for its flagrant violation of the law," she said.

CIA officials rejected the assertion that the agency had sought to hide evidence from investigators and said they had cooperated fully with the Justice Department investigation.

"If anyone thinks it's agency policy to impede the enforcement of American law, they simply don't know the facts," spokesman George Little said.

Many of the agency employees who met with Durham over the past year did so voluntarily, without the threat of a subpoena or an appearance in front of a grand jury in Virginia. That may make it easier for Durham to report his findings to Justice Department leaders in Washington and for them to release his conclusions to lawmakers on Capitol Hill.

Senate intelligence committee Chairman Dianne Feinstein (D-Calif.) confirmed last week that her panel intends to broaden its investigation to encompass the entire history of the CIA's interrogation program. The new inquiry will delve into the origins of decisions to use harsh techniques and will also assess whether the controversial methods worked, congressional officials said. The inquiry has not yet formally begun.

Officials in the Obama administration have used the CIA practices in the Bush years to underscore their new approach to national security. In a speech yesterday to the Jewish Council for Public Affairs, Attorney General Eric H. Holder Jr. told the audience that a government-wide task force is reviewing options for how to treat terrorism suspects, as well as standards for the interrogation of detainees.

"Waterboarding is torture," Holder said. "My Justice Department will not justify it, rationalize it or condone it."

Staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** March 3, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**CORRECTION-DATE:** March 5, 2009 Thursday


**CORRECTION:** -- A March 3 Page One article appeared to imply that Michael V. Hayden was the CIA director in 2005 when agency officials ordered the destruction of interrogation tapes. Hayden became CIA director in May 2006.

**PUBLICATION-TYPE:** Newspaper


Copyright 2009 The Washington Post
All Rights Reserved


14

Red Cross Described 'Torture' at CIA Jails; Secret Report Implies That U.S. Violated International Law The Washington Post March 16, 2009 Monday

# The Washington Post

## washingtonpost.com

The Washington Post

March 16, 2009 Monday
Met 2 Edition

# Red Cross Described 'Torture' at CIA Jails; Secret Report Implies That U.S. Violated International Law

**BYLINE:** Joby Warrick, Peter Finn and Julie Tate; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 1246 words

The International Committee of the Red Cross concluded in a secret report that the Bush administration's treatment of al-Qaeda captives "constituted torture," a finding that strongly implied that CIA interrogation methods violated international law, according to newly published excerpts from the long-concealed 2007 document.

The report, an account alleging physical and psychological brutality inside CIA "black site" prisons, also states that some U.S. practices amounted to "cruel, inhuman or degrading treatment." Such maltreatment of detainees is expressly prohibited by the Geneva Conventions.

The findings were based on an investigation by ICRC officials, who were granted exclusive access to the CIA's "high-value" detainees after they were transferred in 2006 to the U.S. detention camp at Guantanamo Bay, Cuba. The 14 detainees, who had been kept in isolation in CIA prisons overseas, gave remarkably uniform accounts of abuse that included beatings, sleep deprivation, extreme temperatures and, in some cases, waterboarding, or simulating drowning.

At least five copies of the report were shared with the CIA and top White House officials in 2007 but barred from public release by ICRC guidelines intended to preserve the humanitarian group's strict policy of neutrality in conflicts. A copy of the report was obtained by Mark Danner, a journalism professor and author who published extensive excerpts in the April 9 edition of the New York Review of Books, released yesterday. He did not say how he obtained the report.

"The ill-treatment to which they were subjected while held in the CIA program, either singly or in combination, constituted torture," Danner quoted the report as saying.

Many of the details of alleged mistreatment at CIA prisons had been reported previously, but the ICRC report is the most authoritative account and the first to use the word "torture" in a legal context.

The CIA declined to comment. A U.S. official familiar with the report said, "It is important to bear in mind that the report lays out claims made by the terrorists themselves."

Often using the detainee's own words, the report offers a harrowing view of conditions at the secret prisons, where prisoners were told they were being taken "to the verge of death and back," according to one excerpt. During interrogations, the captives were routinely beaten, doused with cold water and slammed head-first into walls. Between sessions, they were stripped of clothing, bombarded with loud music, exposed to cold temperatures, and deprived of sleep and solid food for days on end. Some detainees described being forced to stand for days, with their arms shackled above them, wearing only diapers.

"On a daily basis . . . a collar was looped around my neck and then used to slam me against the walls of the interrogation room," the report quotes detainee Tawfiq bin Attash, also known as Walid Muhammad bin Attash, as saying. Later, he said, he was wrapped in a plastic sheet while cold water was "poured onto my body with buckets." He

Red Cross Described 'Torture' at CIA Jails; Secret Report Implies That U.S. Violated International Law The Washington Post March 16, 2009 Monday

added: "I would be wrapped inside the sheet with cold water for several minutes. Then I would be taken for interrogation."

ICRC officials did not dispute the authenticity of the excerpts, but a spokesman expressed dismay over the leak of the material. "We regret information attributed to the ICRC report was made public in this manner," spokesman Bernard Barrett said.

"The ICRC has been visiting the detainees formerly held by the CIA," he added, "at Guantanamo since 2006. Any concerns or observations the ICRC had when visiting the detainees are part of a confidential dialogue."

President George W. Bush acknowledged the use of coercive interrogation tactics on senior al-Qaeda captives detained by the CIA in the aftermath of the Sept. 11, 2001, terrorist attacks, but he insisted that the measures complied with U.S. and international law. Former CIA director Michael V. Hayden confirmed last year that the measures included the use of waterboarding on three captives before 2003.

President Obama outlawed such practices within hours of his inauguration in January. But Obama has expressed reluctance to conduct a legal inquiry into the CIA's policies.

The report gives a graphic account of the treatment of Zayn al-Abidin Muhammed Hussein, better known as Abu Zubaida, a Saudi-born Palestinian who was the first alleged senior al-Qaeda operative seized after Sept. 11 -- a characterization of his role that is disputed by his attorneys, who describe him as having a different philosophy of jihad than bin Laden.

Abu Zubaida was severely wounded during a shootout in March 2002 at a safe house he ran in Faisalabad, Pakistan, and survived thanks to CIA-arranged medical care, including multiple surgeries. After he recovered, Abu Zubaida describes being shackled to a chair at the feet and hands for two to three weeks in a cold room with "loud, shouting type music" blaring constantly, according to the ICRC report. He said that he was questioned two to three hours a day and that water was sprayed in his face if he fell asleep.

At some point -- the timing is unclear from the New York Review of Books report -- Abu Zubaida's treatment became harsher. In July 2002, administration lawyers approved more aggressive techniques.

Abu Zubaida said interrogators wrapped a towel around his neck and slammed him into a plywood wall mounted in his cell. He was also repeatedly slapped in the face, he said. After the beatings, he was placed in coffinlike wooden boxes in which he was forced to crouch, with no light and a restricted air supply, he said.

"The stress on my legs held in this position meant my wounds both in my leg and stomach became very painful," he told the ICRC.

After he was removed from a small box, he said, he was strapped to what looked like a hospital bed and waterboarded. "A black cloth was then placed over my face and the interrogators used a mineral bottle to pour water on the cloth so that I could not breathe," Abu Zubaida said.

After breaks to allow him to recover, the waterboarding continued.

"I struggled against the straps, trying to breathe, but it was hopeless," he said. "I though I was going to die."

In a federal court filing, Abu Zubaida's attorneys said he "has suffered approximately 175 seizures that appear to be directly related to his extensive torture -- particularly damage to Petitioner's head that was the result of beatings sustained at the hands of CIA interrogators and exacerbated by his lengthy isolation."

Danner said the organization's use of the word "torture" has important legal implications.

"It could not be more important that the ICRC explicitly uses the words 'torture' and 'cruel and degrading,' " Danner said in a telephone interview. "The ICRC is the guardian of the Geneva Conventions, and when it uses those words, they have the force of law."

He discounted the possibility that the detainees fabricated or embellished their stories, noting that the accounts overlap "in minute detail," even though the detainees were kept in isolation at different locations.

Human rights groups echoed his assessment.

"These reports are from an impeccable source," said Geneve Mantri, a counterterrorism specialist at Amnesty International. "It's clear that senior officials were warned from the very beginning that the treatment that detainees were

16

Red Cross Described 'Torture' at CIA Jails; Secret Report Implies That U.S. Violated International Law The
Washington Post March 16, 2009 Monday

subjected to amounted to torture. This story goes even further and deeper than many us of suspected. The more details
we find out, the more shocking this becomes."

**LOAD-DATE:** March 16, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Virginia

**GRAPHIC:** IMAGE; The report graphically describes abuse of Abu Zubaida.

**PUBLICATION-TYPE:** Newspaper

Copyright 2009 The Washington Post
All Rights Reserved

17

Detainee's Harsh Treatment Foiled No Plots; Waterboarding, Rough Interrogation of Abu Zubaida Produced False Leads, Officials Say The Washington Post March 29, 2009 Sunday

# The Washington Post

## washingtonpost.com

The Washington Post

March 29, 2009 Sunday
Met 2 Edition

## Detainee's Harsh Treatment Foiled No Plots; Waterboarding, Rough Interrogation of Abu Zubaida Produced False Leads, Officials Say

**BYLINE:** Peter Finn and Joby Warrick; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 2345 words

When CIA officials subjected their first high-value captive, Abu Zubaida, to waterboarding and other harsh interrogation methods, they were convinced that they had in their custody an al-Qaeda leader who knew details of operations yet to be unleashed, and they were facing increasing pressure from the White House to get those secrets out of him.

The methods succeeded in breaking him, and the stories he told of al-Qaeda terrorism plots sent CIA officers around the globe chasing leads.

In the end, though, not a single significant plot was foiled as a result of Abu Zubaida's tortured confessions, according to former senior government officials who closely followed the interrogations. Nearly all of the leads attained through the harsh measures quickly evaporated, while most of the useful information from Abu Zubaida -- chiefly names of al-Qaeda members and associates -- was obtained before waterboarding was introduced, they said.

Moreover, within weeks of his capture, U.S. officials had gained evidence that made clear they had misjudged Abu Zubaida. President George W. Bush had publicly described him as "al-Qaeda's chief of operations," and other top officials called him a "trusted associate" of al-Qaeda leader Osama bin Laden and a major figure in the planning of the Sept. 11, 2001, terrorist attacks. None of that was accurate, the new evidence showed.

Abu Zubaida was not even an official member of al-Qaeda, according to a portrait of the man that emerges from court documents and interviews with current and former intelligence, law enforcement and military sources. Rather, he was a "fixer" for radical Muslim ideologues, and he ended up working directly with al-Qaeda only after Sept. 11 -- and that was because the United States stood ready to invade Afghanistan.

Abu Zubaida's case presents the Obama administration with one of its most difficult decisions as it reviews the files of the 241 detainees still held in the U.S. military prison at Guantanamo Bay, Cuba. Abu Zubaida -- a nom de guerre for the man born Zayn al-Abidin Muhammed Hussein -- was never charged in a military commission in Guantanamo Bay, but some U.S. officials are pushing to have him charged now with conspiracy.

The Palestinian, 38 and now in captivity for more than seven years, had alleged links with Ahmed Ressam, an al-Qaeda member dubbed the "Millennium Bomber" for his plot to bomb Los Angeles International Airport on New Year's Eve 1999. Jordanian officials tied him to terrorist plots to attack a hotel and Christian holy sites in their country. And he was involved in discussions, after the Taliban government fell in Afghanistan, to strike back at the United States, including with attacks on American soil, according to law enforcement and military sources.

18

Detainee's Harsh Treatment Foiled No Plots; Waterboarding, Rough Interrogation of Abu Zubaida Produced False Leads, Officials Say The Washington Post March 29, 2009 Sunday

Others in the U.S. government, including CIA officials, fear the consequences of taking a man into court who was waterboarded on largely false assumptions, because of the prospect of interrogation methods being revealed in detail and because of the chance of an acquittal that might set a legal precedent. Instead, they would prefer to send him to Jordan.

Some U.S. officials remain steadfast in their conclusion that Abu Zubaida possessed, and gave up, plenty of useful information about al-Qaeda.

"It's simply wrong to suggest that Abu Zubaida wasn't intimately involved with al-Qaeda," said a U.S. counterterrorism official, speaking on the condition of anonymity because much about Abu Zubaida remains classified. "He was one of the terrorist organization's key facilitators, offered new insights into how the organization operated, provided critical information on senior al-Qaeda figures . . . and identified hundreds of al-Qaeda members. How anyone can minimize that information -- some of the best we had at the time on al-Qaeda -- is beyond me."

Until the attacks on New York and Washington, Abu Zubaida was a committed jihadist who regarded the United States as an enemy principally because of its support of Israel. He helped move people in and out of military training camps in Afghanistan, including some men who were or became members of al-Qaeda, according to interviews with multiple sources, who spoke on the condition of anonymity. He was widely known as a kind of travel agent for those seeking such training.

That role, it turned out, would play a part in deciding his fate once in U.S. hands: Because his name often turned up in intelligence traffic linked to al-Qaeda transactions, some U.S. intelligence leaders were convinced that Abu Zubaida was a major figure in the terrorist organization, according to officials engaged in the discussions at the time.

But Abu Zubaida had strained and limited relations with bin Laden and only vague knowledge before the Sept. 11 attacks that something was brewing, the officials said.

His account was echoed in another U.S. interrogation going on at the same time, one never previously described publicly.

Noor al-Deen, a Syrian, was a teenager when he was captured along with Abu Zubaida at a Pakistani safe house. Perhaps because of his youth and agitated state, he readily answered U.S. questions, officials said, and the questioning went on for months, first in Pakistan and later in a detention facility in Morocco. His description of Abu Zubaida was consistent: The older man was a well-known functionary with links to al-Qaeda, but he knew little detailed information about the group's operations.

The counterterrorism official rejected that characterization, saying, "Based on what he shared during his interrogations, he was certainly aware of many of al-Qaeda's activities and operatives."

One connection Abu Zubaida had with al-Qaeda was a long relationship with Khalid Sheik Mohammed, the self-proclaimed mastermind behind the Sept. 11 attacks, officials said. Mohammed had approached Abu Zubaida in the 1990s about finding financiers to support a suicide mission, involving a small plane, targeting the World Trade Center. Abu Zubaida declined but told him to try bin Laden, according to a law enforcement source.

Abu Zubaida quickly told U.S. interrogators of Mohammed and of others he knew to be in al-Qaeda, and he revealed the plans of the low-level operatives who fled Afghanistan with him. Some were intent on returning to target American forces with bombs; others wanted to strike on American soil again, according to military documents and law enforcement sources.

Such intelligence was significant but not blockbuster material. Frustrated, the Bush administration ratcheted up the pressure -- for the first time approving the use of increasingly harsh interrogations, including waterboarding.

Such treatment at the hands of the CIA has raised questions among human rights groups about whether Abu Zubaida is capable of standing trial and how the taint of torture would affect any prosecution.

The International Committee of the Red Cross said in a confidential report that the treatment of Abu Zubaida and other, subsequent high-value detainees while in CIA custody constituted torture. And Abu Zubaida refused to cooperate with FBI "clean teams" who attempted to re-interview high-value detainees to build cases uncontaminated by allegations of torture, according to military sources.

"The government doesn't retreat from who KSM is, and neither does KSM," said Joseph Margulies, a professor of law at Northwestern University and one of Abu Zubaida's attorneys, using an abbreviation for Mohammed. "With Zubaida,

19

Detainee's Harsh Treatment Foiled No Plots; Waterboarding, Rough Interrogation of Abu Zubaida Produced False Leads, Officials Say The Washington Post March 29, 2009 Sunday

it's different. The government seems finally to understand he is not at all the person they thought he was. But he was tortured. And that's just a profoundly embarrassing position for the government to be in."

His lawyers want the U.S. government to arrange for Abu Zubaida's transfer to a country besides Jordan -- possibly Saudi Arabia, where he has relatives.

The Justice Department declined repeated requests for comment.

Even before President Obama suspended military commissions at the military base in Cuba, prosecutors had expunged Abu Zubaida's name from the charge sheets of a number of detainees who were captured with him and stood accused of conspiracy and material support for terrorism.

When they were first charged in 2005, these detainees were accused of conspiring with Abu Zubaida, and the charge sheets contained numerous references to Abu Zubaida's alleged terrorist activities. When the charges were refiled last year, his name had vanished from the documents.

Abu Zubaida was born in 1971 in Saudi Arabia to a Palestinian father and a Jordanian mother, according to court papers. In 1991, he moved to Afghanistan and joined mujaheddin fighting Afghan communists, part of the civil war that raged after the 1989 withdrawal of the Soviet Union. He was seriously wounded by shrapnel from a mortar blast in 1992, sustaining head injuries that left him with severe memory problems, which still linger.

In 1994, he became the Pakistan-based coordinator for the Khalden training camp, outside the Afghan city of Khowst. He directed recruits to the camp and raised money for it, according to testimony he gave at a March 2007 hearing in Guantanamo Bay.

The Khalden camp, which provided basic training in small arms, had been in existence since the war against the Soviets. According to the 9/11 Commission's report, Khalden and another camp called Derunta "were not al Qaeda facilities," but "Abu Zubaydah had an agreement with Bin Laden to conduct reciprocal recruiting efforts whereby promising trainees at the camps could be invited to join al Qaeda."

Abu Zubaida disputes this, saying he admitted to such a connection with bin Laden only as the result of torture.

When the Sept. 11 attacks occurred, Abu Zubaida was in Kabul, the Afghan capital. In anticipation of an American attack, he allied himself with al-Qaeda, he said at a 2007 hearing, but he soon fled into hiding in Pakistan.

On the night of March 28, 2002, Pakistani and American intelligence officers raided the Faisalabad safe house where Abu Zubaida had been staying. A firefight ensued, and Abu Zubaida was captured after jumping from the building's second floor. He had been shot three times.

Cowering on the ground floor and also shot was Noor al-Deen, Abu Zubaida's 19-year-old colleague; one source said that he worshiped the older man as a hero. Deen was wide-eyed with fear and appeared to believe that he was about to be executed, remembered John Kiriakou, a former CIA officer who participated in the raid.

"He was frightened -- mostly over what we were going to do with him," Kiriakou said. "He had come to the conclusion that his life was over."

Deen was eventually transferred to Syria, but attempts to firmly establish his current whereabouts were unsuccessful.

His interrogations corroborated what CIA officials were hearing from Abu Zubaida, but there were other clues at the time that pointed to a less-than-central role for the Palestinian. As a veritable travel agent for jihadists, Abu Zubaida operated in a public world of Internet transactions and ticket agents.

"He was the above-ground support," said one former Justice Department official closely involved in the early investigation of Abu Zubaida. "He was the guy keeping the safe house, and that's not someone who gets to know the details of the plans. To make him the mastermind of anything is ridiculous."

As weeks passed after the capture without significant new confessions, the Bush White House and some at the CIA became convinced that tougher measures had to be tried.

The pressure from upper levels of the government was "tremendous," driven in part by the routine of daily meetings in which policymakers would press for updates, one official remembered.

20

Detainee's Harsh Treatment Foiled No Plots; Waterboarding, Rough Interrogation of Abu Zubaida Produced False Leads, Officials Say The Washington Post March 29, 2009 Sunday

"They couldn't stand the idea that there wasn't anything new," the official said. "They'd say, 'You aren't working hard enough.' There was both a disbelief in what he was saying and also a desire for retribution -- a feeling that 'He's going to talk, and if he doesn't talk, we'll do whatever.' "

The application of techniques such as waterboarding -- a form of simulated drowning that U.S. officials had previously deemed a crime -- prompted a sudden torrent of names and facts. Abu Zubaida began unspooling the details of various al-Qaeda plots, including plans to unleash weapons of mass destruction.

Abu Zubaida's revelations triggered a series of alerts and sent hundreds of CIA and FBI investigators scurrying in pursuit of phantoms. The interrogations led directly to the arrest of Jose Padilla, the man Abu Zubaida identified as heading an effort to explode a radiological "dirty bomb" in an American city. Padilla was held in a naval brig for 3 1/2 years on the allegation but was never charged in any such plot. Every other lead ultimately dissolved into smoke and shadow, according to high-ranking former U.S. officials with access to classified reports.

"We spent millions of dollars chasing false alarms," one former intelligence official said.

Despite the poor results, Bush White House officials and CIA leaders continued to insist that the harsh measures applied against Abu Zubaida and others produced useful intelligence that disrupted terrorist plots and saved American lives.

Two weeks ago, Bush's vice president, Richard B. Cheney, renewed that assertion in an interview with CNN, saying that "the enhanced interrogation program" stopped "a great many" terrorist attacks on the level of Sept. 11.

"I've seen a report that was written, based upon the intelligence that we collected then, that itemizes the specific attacks that were stopped by virtue of what we learned through those programs," Cheney asserted, adding that the report is "still classified," and, "I can't give you the details of it without violating classification."

Since 2006, Senate intelligence committee members have pressed the CIA, in classified briefings, to provide examples of specific leads that were obtained from Abu Zubaida through the use of waterboarding and other methods, according to officials familiar with the requests.

The agency provided none, the officials said.

Staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** March 29, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**GRAPHIC:** IMAGE

**PUBLICATION-TYPE:** Newspaper

Copyright 2009 The Washington Post
All Rights Reserved

21

Psychologists Helped Guide Interrogations; Extent of Health Professionals' Role at CIA Prisons Draws Fresh Outrage
From Ethicists The Washington Post April 18, 2009 Saturday

# The Washington Post

## washingtonpost.com

The Washington Post

April 18, 2009 Saturday
Met 2 Edition

## Psychologists Helped Guide Interrogations;
## Extent of Health Professionals' Role at CIA Prisons Draws Fresh Outrage From Ethicists

**BYLINE:** Joby Warrick and Peter Finn; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 1473 words

When the CIA began what it called an "increased pressure phase" with captured terrorism suspect Abu Zubaida in the summer of 2002, its first step was to limit the detainee's human contact to just two people. One was the CIA interrogator, the other a psychologist.

During the extraordinary weeks that followed, it was the psychologist who apparently played the more critical role. According to newly released Justice Department documents, the psychologist provided ideas, practical advice and even legal justification for interrogation methods that would break Abu Zubaida, physically and mentally. Extreme sleep deprivation, waterboarding, the use of insects to provoke fear -- all were deemed acceptable, in part because the psychologist said so.

"No severe mental pain or suffering would have been inflicted," a Justice Department lawyer said in a 2002 memo explaining why waterboarding, or simulated drowning, should not be considered torture.

The role of health professionals as described in the documents has prompted a renewed outcry from ethicists who say the conduct of psychologists and supervising physicians violated basic standards of their professions.

Their names are among the few details censored in the long-concealed Bush administration memos released Thursday, but the documents show a steady stream of psychologists, physicians and other health officials who both kept detainees alive and actively participated in designing the interrogation program and monitoring its implementation. Their presence also enabled the government to argue that the interrogations did not include torture.

Most of the psychologists were contract employees of the CIA, according to intelligence officials familiar with the program.

"The health professionals involved in the CIA program broke the law and shame the bedrock ethical traditions of medicine and psychology," said Frank Donaghue, chief executive of Physicians for Human Rights, an international advocacy group made up of physicians opposed to torture. "All psychologists and physicians found to be involved in the torture of detainees must lose their license and never be allowed to practice again."

The CIA declined to comment yesterday on the role played by health professionals in the agency's self-described "enhanced interrogation program," which operated from 2002 to 2006 in various secret prisons overseas.

"The fact remains that CIA's detention and interrogation effort was authorized and approved by our government," CIA Director Leon Panetta said Thursday in a statement to employees. The Obama administration and its top intelligence leaders have banned harsh interrogations while also strongly opposing investigations or penalties for employees who were following their government's orders.

22

Psychologists Helped Guide Interrogations; Extent of Health Professionals' Role at CIA Prisons Draws Fresh Outrage From Ethicists The Washington Post April 18, 2009 Saturday

The CIA dispatched personnel from its office of medical services to each secret prison and evaluated medical professionals involved in interrogations "to make sure they could stand up, psychologically handle it," according to a former CIA official.

The alleged actions of medical professionals in the secret prisons are viewed as particularly troubling by an array of groups, including the American Medical Association and the International Committee of the Red Cross.

AMA policies state that physicians "must not be present when torture is used or threatened." The guidelines allow doctors to treat detainees only "if doing so is in their [detainees'] best interest" and not merely to monitor their health "so that torture can begin or continue."

The American Psychological Association has condemned any participation by its members in interrogations involving torture, but critics of the organization faulted it for failing to censure members involved in harsh interrogations.

The ICRC, which conducted the first independent interviews of CIA detainees in 2006, said the prisoners were told they would not be killed during interrogations, though one was warned that he would be brought to "the verge of death and back again," according to a confidential ICRC report leaked to the New York Review of Books last month.

"The interrogation process is contrary to international law and the participation of health personnel in such a process is contrary to international standards of medical ethics," the ICRC report concluded.

The newly released Justice Department memos place medical officials at the scene of the earliest CIA interrogations. At least one psychologist was present -- and others were frequently consulted -- during the interrogation of Abu Zubaida, the nom de guerre of Zayn al-Abidin Muhammed Hussein, a Palestinian who was captured by CIA and Pakistani intelligence officers in March 2002, the Justice documents state.

An Aug. 1, 2002, memo said the CIA relied on its "on-site psychologists" for help in designing an interrogation program for Abu Zubaida and ultimately came up with a list of 10 methods drawn from a U.S. military training program known as Survival, Evasion, Resistance and Escape, or SERE. That program, used to help prepare pilots to endure torture in the event they are captured, is loosely based on techniques that were used by the Communist Chinese to torture American prisoners of war.

The role played by psychologists in adapting SERE methods for interrogation has been described in books and news articles, including some in The Washington Post. Author Jane Mayer and journalist Katherine Eban separately identified as key figures James Mitchell and Bruce Jessen, two psychologists in Washington state who worked as CIA contractors after 2001 and had extensive experience in SERE training. Mitchell, reached by telephone, declined to comment, and Jessen could not be reached yesterday.

The CIA psychologists had personal experience with SERE and helped convince CIA officials that harsh tactics would coerce confessions from Abu Zubaida without inflicting permanent harm. Waterboarding was touted as particularly useful because it was "reported to be almost 100 percent effective in producing cooperation," the memo said.

The agency then used a psychological assessment of Abu Zubaida to find his vulnerable points. One of them, it turns out, was a severe aversion to bugs.

"He appears to have a fear of insects," states the memo, which describes a plan to place a caterpillar or similar creature inside a tiny wooden crate in which Abu Zubaida was confined. CIA officials say the plan was never carried out.

Former intelligence officials contend that Abu Zubaida was found to have played a less important role in al-Qaeda than initially believed and that under harsh interrogation he provided little useful information about the organization's plans.

The memos acknowledge that the presence of medical professionals posed an ethical dilemma. But they contend that the CIA's use of doctors in interrogations was morally distinct from the practices of other countries that the United States has accused of committing torture. One memo notes that doctors who observed interrogations were empowered to stop them "if in their professional judgment the detainee may suffer severe physical or mental pain or suffering." In one instance, the CIA chose not to subject a detainee to waterboarding due to a "medical contraindication," according to a May 10, 2005, memo.

Yet some doctors and ethicists insist that any participation by physicians was tantamount to complicity in torture.

"I don't think we had any idea doctors were involved to this extent, and it will shock most physicians," said George Annas, a professor of health law, bioethics and human rights at Boston University.

23

Psychologists Helped Guide Interrogations; Extent of Health Professionals' Role at CIA Prisons Draws Fresh Outrage From Ethicists The Washington Post April 18, 2009 Saturday

Annas said the use of doctors to monitor prisoners subjected to torture is "totally unethical" and has been condemned by the American and World Medical Associations, among other professional bodies.

"In terms of ethics, it's not even a close call," he said.

Steven H. Miles, a professor of medicine at the University of Minnesota and author of "Oath Betrayed: America's Torture Doctors," said the actions described in the memos were the "kind of stuff that doctors have been tried, convicted and imprisoned for in other countries -- and that's what should happen here."

But Michael Gross, a professor at the University of Haifa in Israel and the author of "Bioethics and Armed Conflict: Moral Dilemmas of Medicine and Warfare," said that if physicians think particular harsh interrogation techniques do not constitute torture, there is no reason they should not participate.

"Physicians are faced with a hard dilemma," he said. "They have professional obligations to do no harm, but they also have a duty as a citizen to provide expertise to their government when the national security is at stake. In a national security crisis, I believe our duties as citizens take precedence."

Staff writers R. Jeffrey Smith and Dana Priest and staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** April 18, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Virginia

**PUBLICATION-TYPE:** Newspaper

Copyright 2009 The Washington Post
All Rights Reserved

24

Effectiveness Of Harsh Questioning Is Unclear; Detainee May Have Faced Few Traditional Tactics The Washington Post April 26, 2009 Sunday

# The Washington Post

## washingtonpost.com

The Washington Post

April 26, 2009 Sunday
Met 2 Edition

## Effectiveness Of Harsh Questioning Is Unclear; Detainee May Have Faced Few Traditional Tactics

**BYLINE:** Joby Warrick and Peter Finn; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 1511 words

During his first days in detention, senior al-Qaeda operative Khalid Sheik Mohammed was stripped of his clothes, beaten, given a forced enema and shackled with his arms chained above his head, according to the International Committee of the Red Cross. It was then, a Red Cross report says, that his American captors told him to prepare for "a hard time."

Over the next 25 days, beginning on March 6, 2003, Mohammed was put through a routine in which he was deprived of sleep, doused with cold water and had his head repeatedly slammed into a plywood wall, according to the report. The interrogation also included days of extensive waterboarding, a technique that simulates drowning.

Sometime during those early weeks, Mohammed started talking, providing information that supporters of harsh interrogations would later cite in defending the practices. Former vice president Richard B. Cheney has justified such interrogations by saying that intelligence gained from Mohammed resulted in the takedown of al-Qaeda plots.

But whether harsh tactics were decisive in Mohammed's interrogation may never be conclusively known, in large part because the CIA appears not to have tried traditional tactics for much time, if at all. According to the agency's own accounting, Mohammed was waterboarded 183 times during his first four weeks in a CIA secret prison.

The effectiveness of the Bush administration's use of harsh interrogation techniques has emerged as a key point of dispute in a burgeoning political and public debate sparked by the release this month of Justice Department memorandums authorizing the CIA to use such methods.

Six years after Mohammed was captured, the scrutiny of the agency's approach seems unfair to some intelligence veterans, who argue that the interrogation program cannot be separated from the atmosphere of the day, when further attacks seemed imminent. At the time, there was little or no dissent, including from congressional Democrats who were briefed on the program, according to former intelligence officials.

Two former high-ranking officials with access to secret information said the interrogations yielded details of al-Qaeda's operations that resulted in the identification of previously unknown suspects, preventing future attacks.

"The detainee-supplied data permitted us to round them up as they were being trained, rather than just before they came ashore," said one former intelligence official who spoke on the condition of anonymity because the cases are classified. "Not headline stuff, but the bread and butter of successful counterterrorism. And something that few people understand."

Other officials, including former high-ranking members of the Bush administration, argue that judging the program by whether it yielded information misses the point.

"The systematic, calculated infliction of this scale of prolonged torment is immoral, debasing the perpetrators and the captives," said Philip D. Zelikow, a political counselor to then-Secretary of State Condoleezza Rice who reviewed

25

Effectiveness Of Harsh Questioning Is Unclear; Detainee May Have Faced Few Traditional Tactics The Washington Post April 26, 2009 Sunday

secret Bush administration reports about the program in 2005. "Second, forfeiting our high ground, the practices also alienate needed allies in the common fight, even allies within our own government. Third, the gains are dubious when the alternatives are searchingly compared. And then, after all, there is still the law."

The Obama administration's top intelligence officer, Dennis C. Blair, has said the information obtained through the interrogation program was of "high value." But he also concluded that those gains weren't worth the cost.

"There is no way of knowing whether the same information could have been obtained through other means," Blair said in a statement. "The bottom line is these techniques have hurt our image around the world, the damage they have done to our interests far outweighed whatever benefit they gave us and they are not essential to our national security."

**'False Red-Alerts'**

It is unclear from unclassified reports whether the information gained was critical in foiling actual plots. Mohammed later told outside interviewers that he was "forced to invent in order to make the ill-treatment stop" and that he "wasted a lot of their time [with] several false red-alerts being placed in the U.S.," according to the Red Cross, whose officials interviewed Mohammed and other detainees after they were transferred to the military prison at Guantanamo Bay, Cuba, in September 2006.

The CIA's reviews of the value of its program remain classified, and any final assessment will probably await a painstaking, forensic accounting of the program.

A 2005 memo by the Justice Department's Office of Legal Counsel said that Mohammed and Abu Zubaida, the nom de guerre of Zayn al-Abidin Muhammed Hussein, an al-Qaeda associate who was also subjected to coercive interrogation, have been "pivotal sources because of their ability and willingness to provide their analysis and speculation about the capabilities, methodologies and mindsets of terrorists."

Counterterrorism officials also said the two men and other captured suspects provided critical information about senior al-Qaeda figures and identified hundreds of al-Qaeda members, associates and financial backers.

The accumulation and triangulation of information also allowed officials to vet the intelligence they were receiving and to push other prisoners toward making full and frank statements.

Mohammed continued to be a valued source of information long after the coercive interrogation ended. Indeed, he has gone on to lecture CIA agents in a classroom-like setting, on topics from Greek philosophy to the structure of al-Qaeda, and wrote essays in response to questions, according to sources familiar with his time in detention.

**Fear of Imminent Attacks**

But the government's justification for the CIA program hinged on the need to break up imminent terrorist threats, not the mapping of strategic intelligence, which can take weeks and months.

One of the Justice Department memos said waterboarding "may be used on a High Value Detainee only if the CIA has 'credible intelligence that a terrorist attack is imminent.' " It also stated that waterboarding can be employed only if "other interrogation methods have failed to elicit the information [or] CIA has clear indications that other methods are unlikely to elicit this information within the perceived time limit for preventing the attack."

The memo said the CIA waterboarded Mohammed only after it became apparent that standard interrogation techniques were not working, a judgment that appears to have been reached rapidly. Mohammed, according to the memo, resisted giving any answers to questions about future attacks, saying, "Soon you will know."

The memo, while saying it discussed only a fraction of the important intelligence gleaned from Abu Zubaida and Mohammed, cited three specific successes: the identification of alleged "dirty bomber" Jose Padilla; the discovery of a "Second Wave" attack targeting Los Angeles; and the break-up of the Indonesian Jemaah Islamiya cell, an al-Qaeda ally led by Riduan Isamuddin, better known as Hambali.

The last example was an undoubted success that led to the capture of several suspects, but the other two are much less clear-cut.

**'Dates Just Don't Add Up'**

26

Effectiveness Of Harsh Questioning Is Unclear; Detainee May Have Faced Few Traditional Tactics The Washington Post April 26, 2009 Sunday

The Office of Legal Counsel memo said Abu Zubaida provided significant information on two operatives, including Jose Padilla, who "planned to build and detonate a dirty bomb in the Washington D.C area."

Padilla, however, was arrested at Chicago's O'Hare International Airport on May 8, 2002, more than two months before the issuance of the Justice Department's Aug. 1, 2002, memo authorizing the use of harsh methods in interrogating Abu Zubaida.

"The dates just don't add up," wrote Ali Soufan, a former FBI special agent, in an opinion piece in the New York Times last week. Soufan, who questioned Abu Zubaida between his capture in March 2002 and early June of that year, said the detainee gave up Padilla without any physical or psychological duress. He also said Abu Zubaida identified Mohammed as the mastermind of the Sept. 11, 2001, attacks "under traditional interrogation methods."

Padilla, a U.S. citizen, was sentenced in January 2008 to 17 years in prison after being convicted of conspiracy and providing material support for terrorism.

An attack on both coasts was conceived by Mohammed before Sept. 11, 2001, but the plot was scaled back to target only New York and Washington. Mohammed continued to consider striking the U.S. Bank Tower in Los Angeles, administration officials said. His interrogation led to information that he planned "to use East Asian operatives to crash a hijacked airliner into a building in Los Angeles," according the 2005 Justice Department memo.

A number of officials have questioned the viability of the plot in the wake of the changes in airport security after Sept. 11. And President George W. Bush, in a speech in 2007, said the plot was broken up in 2002, before Mohammed's capture in Pakistan on March 1, 2003.

Staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** April 26, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**GRAPHIC:** IMAGE; Associated Press; Information provided by Khalid Sheik Mohammed has been cited by defenders of harsh interrogations.

**PUBLICATION-TYPE:** Newspaper

Copyright 2009 The Washington Post
All Rights Reserved

27

CIA Urges Judge To Keep Bush-Era Documents Sealed; Al-Qaeda Could Use Contents, Agency Says The Washington Post June 9, 2009 Tuesday



The Washington Post

June 9, 2009 Tuesday
Met 2 Edition

## CIA Urges Judge To Keep Bush-Era Documents Sealed; Al-Qaeda Could Use Contents, Agency Says

**BYLINE:** R. Jeffrey Smith; Washington Post Staff Writer

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 1025 words

The Obama administration objected yesterday to the release of certain Bush-era documents that detail the videotaped interrogations of CIA detainees at secret prisons, arguing to a federal judge that doing so would endanger national security and benefit al-Qaeda's recruitment efforts.

In an affidavit, CIA Director Leon E. Panetta defended the classification of records describing the contents of the 92 videotapes, their destruction by the CIA in 2005 and what he called "sensitive operational information" about the interrogations.

The forced disclosure of such material to the American Civil Liberties Union "could be expected to result in exceptionally grave damage to the national security by informing our enemies of what we knew about them, and when, and in some instances, how we obtained the intelligence we possessed," Panetta argued.

Although Panetta's statement is in keeping with his previous opposition to the disclosure of other information about the CIA's interrogation policies and practices during George W. Bush's presidency, it represents a new assertion by the Obama administration that the CIA should be allowed to keep such information secret. Bush's critics have long hoped that disclosure would pinpoint responsibility for actions they contend were abusive or illegal.

Last month, President Obama said he would seek to bar the release of photographs being sought by other nonprofit groups that depict abusive interrogations at military prisons during the Bush administration.

Panetta argued that none of the 65 CIA documents immediately at issue, which the ACLU has sought for several years in a Freedom of Information Act lawsuit, should be released. He asked U.S. District Judge Alvin K. Hellerstein to draw a legal distinction between the administration's release in April of Justice Department memos authorizing the harsh interrogations and the CIA's desire to keep classified its own documents detailing the specific handling of detainees at its secret facilities overseas.

He said that while the Justice Department memos discussed harsh interrogation "in the abstract," the CIA information was "of a qualitatively different nature" because it described the interrogation techniques "as applied in actual operations."

The "disclosure of explicit details of specific interrogations" would provide al-Qaeda "with propaganda it could use to recruit and raise funds," Panetta said, describing the information at issue as "ready-made ammunition." He also submitted a classified statement to the court that he said explains why detainees could use the contents to evade questions in the future, even though Obama has promised that the United States will not use the harsh interrogation techniques again.

Jameel Jaffer, director of the ACLU's national security program, said yesterday evening that it is "grim" and "troubling" for the Obama administration to say that information about purported abuses should be withheld because it might fuel

CIA Urges Judge To Keep Bush-Era Documents Sealed; Al-Qaeda Could Use Contents, Agency Says The Washington Post June 9, 2009 Tuesday

anti-American propaganda. He said that amounts to an assertion that "the greater the abuse, the more important it is that it should remain secret." Jaffer said the ACLU is convinced that the public should have "access to the complete record of what took place in the CIA's prisons and on whose authority."

Although the ACLU first sought CIA documents related to harsh interrogations in 2004, it moved in 2007 to have the court hold the CIA in contempt following disclosures about the agency's destruction of the videotapes. The ACLU demanded as a remedy access to internal e-mails and other information that would reveal the contents of the videotapes and who participated, approved or endorsed their destruction.

Hellerstein has repeatedly denied CIA motions demanding that the case be dismissed, but has not declared the agency in contempt. Instead, he ordered the CIA to surrender some of the records and provide details of others it is withholding; the agency has responded mostly by giving the documents to the court under seal.

A federal prosecutor continues to investigate the destruction of the videotapes.

In total, the CIA has said that 580 documents are related to the ACLU's 2007 request; Panetta said that his statement applies to all of the 65 documents selected so far by the court for potential release and that the CIA will in the future consider releasing "non-operational documents" in the larger set.

In two exhibits given to the court along with Panetta's affidavit, the CIA said the material that must be withheld includes a photograph of Zayn al-Abidin Muhammed Hussein, known as Abu Zubaida, the first detainee that the CIA believed to be of high value; a lengthy handwritten summary of notes taken after reviewing the videotapes; a five-page account by a CIA lawyer detailing the agency's policy and legal guidance about the destruction of the videotapes; an e-mail to CIA managers summarizing the opinions of others about the tapes; a six-page account by an agency employee of a discussion with an agency lawyer about the tapes; and a series of e-mails discussing what the CIA should say publicly about the destruction.

It also said that one of the documents summarized "details of waterboard exposures from the destroyed videotapes," referring to a simulated-drowning technique that Obama and his appointees have said amounted to illegal torture.

Although the CIA frequently redacts sometimes extensive portions of the documents it releases, Panetta said he had "determined that no meaningful segregable information can be released from the operational documents at issue." Some, he said, were covered by attorney-client privilege, and nearly all contain personal information about CIA employees and others that would, if disclosed, "constitute a clearly unwarranted invasion of personal privacy."

Panetta also said he wanted to emphasize that his request was "in no way driven by a desire to prevent embarrassment for the U.S. government or the CIA, or to suppress evidence of any unlawful conduct." He said his only purpose was to prevent harm to U.S. national security and to protect intelligence sources and methods.

Staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** June 9, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**PUBLICATION-TYPE:** Newspaper

Copyright 2009 The Washington Post
All Rights Reserved

29

CIA Fights Full Release Of Detainee Report; White House Urged to Maintain Secrecy The Washington Post June 17, 2009 Wednesday

# The Washington Post

## washingtonpost.com

The Washington Post

June 17, 2009 Wednesday
Met 2 Edition

# CIA Fights Full Release Of Detainee Report;
# White House Urged to Maintain Secrecy

**BYLINE:** R. Jeffrey Smith and Joby Warrick; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 1418 words

The CIA is pushing the Obama administration to maintain the secrecy of significant portions of a comprehensive internal account of the agency's interrogation program, according to two intelligence officials.

The officials say the CIA is urging the suppression of passages describing in graphic detail how the agency handled its detainees, arguing that the material could damage ongoing counterterrorism operations by laying bare sensitive intelligence procedures and methods.

The May 2004 report, prepared by the CIA's inspector general, is the most definitive official account to date of the agency's interrogation system. A heavily redacted version, consisting of a dozen or so paragraphs separated by heavy black boxes and lists of missing pages, was released in May 2008 in response to a Freedom of Information Act lawsuit by the American Civil Liberties Union.

After an ACLU appeal, the Obama administration promised in May to review the report, which consists of more than 100 pages of text and six appendixes of unknown length, and to produce by Friday any additional material that could be released.

CIA spokesman George Little said the agency "is reviewing the report to determine how much more of it can be declassified in accordance with the Freedom of Information Act."

An administration official said the CIA has not yet forwarded the document to the White House or the Justice Department for final review.

A senior intelligence official who has studied the document defended the CIA's redactions. "There is a lot about how the CIA operated the overall program of detention and interrogation -- not just about how they used techniques -- that would be sensitive and rightly redacted," the official said. "I think the Obama administration has made the correct decision that transparency only goes so far on the national security side."

Some former agency officials said that CIA insiders are fighting a rear-guard action to prevent disclosures that could embarrass the agency and lead to new calls for a "truth commission" to investigate the Bush administration's policies.

Two former agency officials who read the 2004 report said most of its contents could be safely released and, if anything, would seem familiar. General information about the agency's interrogation program has already been made public through the Obama administration's release of memos by the Justice Department's Office of Legal Counsel authorizing the harsh CIA techniques and through the earlier leak of a 2005 report on CIA interrogations by the International Committee of the Red Cross. The broad conclusions of the inspector general's report, as well as its specific assertion that some interrogators exceeded limits approved by the Justice Department, have previously been disclosed.

30

CIA Fights Full Release Of Detainee Report; White House Urged to Maintain Secrecy The Washington Post June 17, 2009 Wednesday

"[CIA Director] Leon Panetta has been captured by the people who were the ideological drivers for the interrogation program in the first place," said a former senior officer, who spoke on the condition of anonymity when discussing the still-classified report.

But one intelligence official countered that Panetta "was never a fan of the interrogation program."

"He's reached his own independent decisions on these issues. He's standing up for people who followed lawful guidance" issued to the agency during the Bush administration, the official said.

The report was based on more than a year of investigation, including more than 100 interviews and a review of 92 interrogation videotapes -- which the CIA later said it had destroyed -- as well as thousands of internal CIA e-mails and other documents. Then-Inspector General John L. Helgerson and his team of investigators traveled to secret CIA prisons and witnessed interrogations firsthand, making them the only observers allowed into the detention sites who were not participants in the program, officials said.

The report's critical comments helped prompt a suspension of the interrogations for several months, until the agency received fresh affirmations of their legality from President George W. Bush's appointees at the Justice Department. The CIA's lawyers and its counterterrorism center also prepared detailed written rebuttals, which the CIA is considering releasing alongside the censored report this week.

According to a summary of the report incorporated in a declassified Justice Department memo, its authors concluded that some useful information was produced by the CIA program but that "it is difficult to determine conclusively whether interrogations have provided information critical to interdicting specific imminent attacks" -- the principal justification for using harsh techniques.

The report also expressed particular concern that questioners had violated a legal prohibition against "degrading" conduct by stripping detainees, sometimes in the presence of women, according to a source who has read it. The report said waterboarding, meant to simulate drowning, was used more often than had been proved effective, and it quoted CIA doctors as saying that interrogators from the military's survival school who took part in the sessions had probably misrepresented their expertise.

The report further questioned the legality of using different combinations of techniques -- for example, sleep deprivation combined with forced nudity and painful stress positions, according to sources familiar with the document. While Justice Department lawyers had determined in August 2002 that the individual techniques did not constitute torture, the report warned that using several techniques at once could have a far greater psychological impact, according to officials familiar with the document.

"The argument was that combining the techniques amounted to torture," said a former agency official who read the report. "In essence, [Helgerson] was arguing in 2004 that there were clear violations of international laws and domestic laws."

Another former official who read the report said its full text laid bare "the good, the bad and the ugly" and added that "I believe that some people would find offensive" what was done, because it was "not in keeping with American values."

At the CIA, the report was welcomed by some lower-ranking officials who were privy to what was happening at the prisons and had complained to Helgerson's office about apparent abuses, according to an official familiar with the study. But it provoked immediate anger and resistance among the agency's top managers, lawyers and counterterrorism experts, who charged that Helgerson had overstepped his authority and that the report contained factual inaccuracies and a misreading of the law.

A former intelligence official said that at the time, Helgerson seemed to be on a moral crusade: "He was out to prove a theory, and it came across as simply 'You're wrong,' " said the official, who cited the report's secrecy in speaking on the condition of anonymity. "He was calling in officers willy-nilly and then bringing them in a second time. It was like he was conducting his own interrogations." Most of those involved in the program felt at the time, and still do, that they took great pains to follow the law, the official said.

After the report was issued, then-CIA Director George J. Tenet demanded that the Justice Department and the White House reaffirm their support for the agency's harsh interrogation methods, even when used in combination, telling others at the time, "No papers, no opinions, no program." At a White House meeting in mid-2004, he resisted pressures to reinstate the program immediately, before receiving new legal authorization, according to a source familiar with the episode.

31

CIA Fights Full Release Of Detainee Report; White House Urged to Maintain Secrecy The Washington Post June 17, 2009 Wednesday

The Justice Department subsequently sent interim supporting opinions to the CIA, allowing the program's resumption after Tenet's departure, and went on to complete three lengthy reports in 2005 that affirmed in detail the legality of the interrogation techniques with some new safeguards that the CIA had begun to implement in 2003.

Helgerson, who retired from the agency this year, declined to comment for this story. A former CIA employee familiar with Helgerson's views said he has advocated for the release of the whole report, with minimal redactions, so that interested parties can see the context. "The report says a number of things positive about the agency as well as raising some serious questions about the legal underpinnings of the program and the way it was carried out," the official said.

Staff writers Peter Finn and Carrie Johnson and staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** June 17, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**PUBLICATION-TYPE:** Newspaper

Copyright 2009 The Washington Post
All Rights Reserved

Internal Rifts on Road to Torment; Interviews Offer More Nuanced Look At Roles of CIA Contractors, Concerns Of Officials During Interrogations The Washington Post July 19, 2009 Sunday

# The Washington Post

## washingtonpost.com

The Washington Post

July 19, 2009 Sunday
Met 2 Edition

## Internal Rifts on Road to Torment;
## Interviews Offer More Nuanced Look At Roles of CIA Contractors, Concerns Of Officials During Interrogations

**BYLINE:** Joby Warrick and Peter Finn; Washington Post Staff Writers

**SECTION:** A-SECTION; Pg. A01

**LENGTH:** 3016 words

In April 2002, as the terrorism suspect known as Abu Zubaida lay in a Bangkok hospital bed, top U.S. counterterrorism officials gathered at CIA headquarters in Langley, Va., for a series of meetings on an urgent problem: how to get him to talk.

Put him in a cell filled with cadavers, was one suggestion, according to a former U.S. official with knowledge of the brainstorming sessions. Surround him with naked women, was another. Jolt him with electric shocks to the teeth, was a third.

One man's certitude lanced through the debate, according to a participant in one of the meetings. James E. Mitchell, a retired clinical psychologist for the Air Force, had studied al-Qaeda resistance techniques.

"The thing that will make him talk," the participant recalled Mitchell saying, "is fear."

Now, as the Senate intelligence committee examines the CIA's interrogation program, investigators are focusing in part on Mitchell and John "Bruce" Jessen, former CIA contractors who helped design and oversee Abu Zubaida's interrogation. These men have been portrayed as eager proponents of coercion, but the former U.S. official, whose account was corroborated in part by Justice Department documents, said they also rejected orders from Langley to prolong the most severe pressure on the detainee. The former official's account, alongside the recollections of those familiar with events at the CIA's secret prison in Thailand, yields a more nuanced understanding of their role than has previously been available.

Interviews with nearly two dozen current and former U.S. officials also provide new evidence that the imposition of harsh techniques provoked dissension among the officials charged with questioning Abu Zubaida, from the time of his capture through the period when the most grueling torments were applied.

In August 2002, as the first anniversary of the Sept. 11, 2001, attacks approached, officials at CIA headquarters became increasingly concerned that they were not learning enough from their detainee in Thailand. When the interrogators concluded that Abu Zubaida had no more to tell, Langley scolded them: "You've lost your spine." If Mitchell and his team eased up and then al-Qaeda attacked the United States again, agency managers warned, "it would be on the team's back," recalled the former U.S. official, who spoke on the condition of anonymity to discuss classified information.

The officials who authorized or participated in harsh interrogations continue to dispute how effective such methods were and whether important information could have been obtained from Abu Zubaida and others without them. In March, The Washington Post reported that former senior government officials said that not a single significant plot was foiled as a result of Abu Zubaida's coerced confessions.

Internal Rifts on Road to Torment; Interviews Offer More Nuanced Look At Roles of CIA Contractors, Concerns Of Officials During Interrogations The Washington Post July 19, 2009 Sunday

The International Committee of the Red Cross, in a 2007 report made public this year, said the application of harsh interrogation methods, "either singly or in combination, constituted torture."

George Little, a CIA spokesman, said harsh interrogation was always "a small fraction of the agency's counterterrorism mission." Now, he added, "the CIA is focused not on the past, but on analyzing current terrorist threats and thwarting terrorist plots."

Mitchell, 58, who remained a CIA contractor until this spring, declined to be interviewed. In conversations with close colleagues in recent months, he has rejected the popular portrayal of his role, maintaining that he steered the agency away from far more brutal methods toward practices that would not cause permanent harm to detainees.

Jessen, 60, declined to comment.

Yesterday, Mitchell issued a brief statement: "It may be easy for people who were not there and didn't feel the pressure of the threats to say how much better they could have done it. But they weren't there. We were and we did the best that we could."

### The 'Manchester Manual'

A silver-maned, voluble man, Mitchell had retired from the Air Force before the Sept. 11 attacks and won several government contracts, including one from the CIA to study ways to assess people who volunteered information to the agency. While still in the military training program known as SERE -- for Survival, Evasion, Resistance, Escape -- he and his colleagues called themselves "Masters of the Mind [Expletive]," according to two military officials who worked in the program.

In December 2001, the CIA asked Mitchell to analyze the "Manchester Manual," a document seized in a raid in Britain that described al-Qaeda resistance techniques. Mitchell asked Jessen, a senior SERE psychologist, to help prepare the assessment, according to Senate investigators.

The Mitchell-Jessen memo, which was distributed widely within the CIA, discussed the efficacy of techniques such as sleep deprivation and noise bombardment but did not broach waterboarding.

"It is not realistic to think someone who is hardened will talk unless they fear that something bad is going to happen to them," said the former U.S. official, describing Mitchell and Jessen's thinking. "They didn't think rapport-building techniques would work. But they also didn't [advocate] using waterboarding right away."

Mitchell told acquaintances that he also drew important lessons from the theory of "learned helplessness," a term psychologists use to describe people or animals reduced to a state of complete helplessness by some form of coercion or pain, such as electric shock. Mitchell insisted, however, that coercive interrogation should not reduce a prisoner to despair. Instead, he argued, "you want them to have the view that something they could say would hold the key to getting them out of the situation they were in," according to the former official.

"If you convince [a terrorism suspect] he's helpless, he's no good to you," the former official said.

### A Breakthrough in Bangkok

In early April 2002, some officials at the CIA's Counterterrorist Center were not convinced that the man in U.S. custody was indeed Zayn al-Abidin Muhammed Hussein, Abu Zubaida's given name. The Saudi-born Palestinian, then 29, had been sought by the FBI on suspicion that he played a role in a foiled 1999 plan to attack Los Angeles International Airport and tourist destinations in Jordan.

The detainee had been captured in Pakistan in late March 2002 after a firefight that left him wounded in the thigh, groin and stomach. After being treated in Pakistan, he was flown to Thailand for interrogation.

The CIA dispatched FBI agents Ali Soufan and Steve Gaudin for an initial look. The two men arrived a few hours before the wounded man was transferred to a hastily assembled CIA interrogation facility near one of Bangkok's airports.

Details of their experience and that of the CIA officials who followed them to Thailand with Mitchell were gleaned from public testimony, official documents and interviews with current and former intelligence and law-enforcement officials with access to confidential files. Through the FBI, Gaudin declined to comment for this article, and Soufan referred reporters to his congressional testimony and other public statements.

34

Internal Rifts on Road to Torment; Interviews Offer More Nuanced Look At Roles of CIA Contractors, Concerns Of Officials During Interrogations The Washington Post July 19, 2009 Sunday

Soufan, a Lebanese American, later described the FBI's method as "informed interrogation." It was based on "leveraging our knowledge of the detainee's culture and mind-set, together with using information we already know about him," he told a Senate panel in May.

On the agents' first night in Thailand, Abu Zubaida went into septic shock because of his wounds and was rushed to a local hospital. Gaudin and Soufan dabbed his lips with ice, told him to ask God for strength and cleaned him up after he soiled himself, according to official documents and interviews.

At his bedside, Gaudin asked Soufan to show Abu Zubaida a photograph of Abdullah Ahmed Abdullah, an Egyptian suspect in the bombings of two U.S. embassies in Africa in 1998. The two agents had photos of terrorism suspects on a handheld computer, and Gaudin accidentally displayed the wrong photo.

Abu Zubaida said: "This is Mukhtar. This is the mastermind of 9/11."

The agents did not know that Mukhtar, a name that had surfaced in some raw intelligence and an Osama bin Laden video, was a nickname for Khalid Sheik Mohammed. Nor did they know that Mohammed was an al-Qaeda member.

Abu Zubaida had given the agents the first positive link to the man who would later be charged as the chief planner of the Sept. 11 attacks.

### 'Creating the Atmosphere'

With the FBI's breakthrough, the CIA recognized that the captured man was indeed Abu Zubaida and began assembling a team to send to Thailand. Agency officials had no firm notion of what a post-Sept. 11 interrogation of a terrorism suspect should look like.

"It was not a job we sought out," said one former senior intelligence official involved in early decisions on interrogation. "The generals didn't want to do it. The FBI said no. It fell to the agency because we had the [legal] authorities and could operate overseas."

In Mitchell, the CIA found an authoritative professional who had answers, despite an absence of practical experience in interrogating terrorism suspects or data showing that harsh tactics work.

"Here was a guy with a title and a shingle," recalled the participant in the Langley meeting, "and he was saying things that others in the room already believed to be true."

Mitchell boarded a CIA plane for Bangkok with R. Scott Shumate, a CIA psychologist; two agency officers who worked undercover; and a small team of analysts and support staff, including security personnel to control Abu Zubaida.

Among those on the plane was an agency expert on interrogation and debriefing, an officer who was part of a training program intended to help the agency detect double agents and assess recruits for foreign espionage. The trainers taught strategies for extracting sensitive information but prohibited coercive tactics.

When Mitchell and the CIA team arrived in Thailand, Abu Zubaida was still in the hospital. The two FBI agents, Soufan and Gaudin, met the CIA officers at a nearby hotel for a debriefing.

Although senior CIA officials in Bangkok were nominally in charge, they deferred to Mitchell, according to several sources familiar with events at the prison.

"There was a big sense of arrogance about him," one source said.

After Abu Zubaida was discharged, the FBI was shut out of the interrogations as Mitchell began establishing the conditions for Abu Zubaida's interrogation -- "creating the atmosphere," as he put it to colleagues.

In the initial stages, Abu Zubaida was stripped of his clothes while CIA officers took turns at low-intensity questioning. Later, Mitchell added sleep deprivation and a constant bombardment of loud music, including tracks by the Red Hot Chili Peppers. After each escalation, he would dispatch an interrogator into Abu Zubaida's cell to issue a single demand: "Tell me what I want to know."

Mitchell sometimes spoke directly to the prisoner, but unlike the CIA officers, he wore a mask, according to two sources familiar with the events in Thailand.

He repeatedly sought authorization from the CIA's Counterterrorist Center for his actions.

35

Internal Rifts on Road to Torment; Interviews Offer More Nuanced Look At Roles of CIA Contractors, Concerns Of Officials During Interrogations The Washington Post July 19, 2009 Sunday

"The program was fully put together, vetted and run by the counterterrorism folks at the agency," the former U.S. official said. "CIA headquarters was involved directly in every detail of interrogation. Permission had to be obtained before every technique was used, and the dialogue was very heavy. There were cables and also an IM system. All Mitchell's communications were with the Counterterrorist Center."

In Bangkok, word circulated among those at the secret site that the tactics had been approved "downtown" -- agency jargon for the White House.

### Escalating Torment

Soufan testified to Congress in May that Abu Zubaida went silent once Mitchell took charge. Within days of the CIA team's arrival, the cables between Bangkok and Langley became devoid of new revelations. Agency officials decided to let the FBI back into the interrogations, but on the condition that forced nudity and sleep deprivation be allowed to continue.

The CIA team lowered the temperature in Abu Zubaida's cell until the detainee turned blue. The FBI turned it back up, setting off a clash over tactics.

Under FBI questioning, Abu Zubaida identified an operative he knew as Abdullah al-Mujahir, the alias, he said, of an American citizen with a Latino name. An investigation involving multiple agencies identified the suspect as Jose Padilla, the al-Qaeda operative later convicted of providing material support for terrorism.

"In two different bits, after sleep deprivation, is when Abu Zubaida gave clues about who Padilla might be," the former U.S. official said. "When that was put together with other CIA sources, they were able to identify who he was. . . . The cables will not show that the FBI just asked friendly questions and got information about Padilla."

As more miseries were heaped on Abu Zubaida, some members of the CIA team joined the FBI agents in pushing back. Among them was Shumate, the CIA psychologist, who voiced regret that he had played a role in recommending Mitchell to the agency, former associates said. Shumate did not return phone calls and e-mails seeking comment.

Soufan later told Justice Department investigators examining the FBI's role in detainee interrogations that he viewed Mitchell's early methods as "borderline torture."

In addition, one of the CIA team members told others in the group that he believed Abu Zubaida was being honest when he claimed to know nothing about significant al-Qaeda plots, according to two officials with access to classified reports.

Although Abu Zubaida was not a member of al-Qaeda and had limited relations with bin Laden, he was a font of information on the membership of the terrorist group because of his long-standing ties with Mohammed and North African jihadists, according to former intelligence and law-enforcement officials who have read his files. Abu Zubaida's attorneys maintain that he had no connection with al-Qaeda.

"You've got it all wrong," the detainee told one interrogator in May 2002, according to a former intelligence official with access to sensitive records. Abu Zubaida said that al-Qaeda had been surprised at the devastating efficacy of the Sept. 11 attacks and that any plans for future attacks were mere aspirations.

Abu Zubaida was lying but eventually would disclose everything, Mitchell asserted to his colleagues, citing his backers at the Counterterrorist Center. He repeated that his methods had been approved "at the highest levels," one of the interrogators later told the Justice Department investigators.

At the secret prison, dissent over Mitchell's methods peaked. First Shumate left, followed by Soufan. At the site, Shumate had expressed concerns about sleep deprivation, and back in Langley he complained again about Mitchell's tactics, according to the former U.S. official and another source familiar with events in Thailand.

Then one of the CIA debriefers left. In early June, Gaudin flew to Washington for a meeting on what was happening in Thailand, and the FBI did not allow him to return.

Jessen, newly retired from the military, arrived in Thailand that month. Mitchell and his partner continued to ratchet up the pressure on Abu Zubaida, although Bush administration lawyers had not yet authorized the CIA's harshest interrogation measures. That came verbally in late July and then in writing on Aug. 1, paving the way to new torments.

36

Internal Rifts on Road to Torment; Interviews Offer More Nuanced Look At Roles of CIA Contractors, Concerns Of Officials During Interrogations The Washington Post July 19, 2009 Sunday

Interrogators wrapped a towel around Abu Zubaida's neck and slammed him into a plywood wall mounted in his cell. He was slapped in the face. He was placed in a coffin-like wooden box in which he was forced to crouch, with no light and a restricted air supply, he later told delegates from the Red Cross.

Finally, he was waterboarded.

Abu Zubaida told the Red Cross that a black cloth was placed over his face and that interrogators used a plastic bottle to pour water on the fabric, creating the sensation that he was drowning.

The former U.S. official said that waterboarding forced Abu Zubaida to reveal information that led to the Sept. 11, 2002, capture of Ramzi Binalshibh, the key liaison between the Hamburg cell led by Sept. 11 hijacker Mohammed Atta and al-Qaeda's leadership in Afghanistan.

But others contend that Binalshibh's arrest was the result of several pieces of intelligence, including the successful interrogation by the FBI of a suspect held at Bagram air base in Afghanistan who had been in contact via satellite phone with Binalshibh, as well as information gleaned from an interview Binalshibh gave to the television network al-Jazeera.

Abu Zubaida was waterboarded 83 times over four or five days, and Mitchell and Jessen concluded that the prisoner was broken, the former U.S. official said. "They became convinced that he was cooperating. There was unanimity within the team."

**One More Time**

CIA officials at the Counterterrorist Center were not convinced.

"Headquarters was sending daily harangues, cables, e-mails insisting that waterboarding continue for 30 days because another attack was believed to be imminent," the former official said. "Headquarters said it would be on the team's back if an attack happened. They said to the interrogation team, 'You've lost your spine.' "

Mitchell and Jessen now found themselves in the same position as Soufan, Shumate and others.

"It was hard on them, too," the former U.S. official said. "They are psychologists. They didn't enjoy this at all."

The two men threatened to quit if the waterboarding continued and insisted that officials from Langley come to Thailand to watch the procedure, the former official said.

After a CIA delegation arrived, Abu Zubaida was strapped down one more time. As water poured over his cloth-covered mouth, he gasped for breath. "They all watched, and then they all agreed to stop," the former official said.

A 2005 Justice Department memo released this year confirmed the visit. "These officials," the memo said, "reported that enhanced techniques were no longer needed."

Staff writers Walter Pincus and R. Jeffrey Smith and staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** July 19, 2009

**LANGUAGE:** ENGLISH

**DISTRIBUTION:** Maryland

**GRAPHIC:** IMAGE; Getting terrorism suspect Abu Zubaida to talk was a challenge.
IMAGE; Courtesy Of Abc News; Abu Zubaida was captured in March 2002 in Faisalabad, Pakistan. After being treated there for his injuries, he was flown to Thailand for interrogation.

**PUBLICATION-TYPE:** Newspaper

Copyright 2009 The Washington Post
All Rights Reserved

37

Copyright 2009 The Washington Post
All Rights Reserved

# The Washington Post

# washingtonpost.com

The Washington Post

August 29, 2009 Saturday
Met 2 Edition

**SECTION:** A-SECTION; Pg. A01

**DISTRIBUTION:** Maryland

**LENGTH:** 1526 words

**HEADLINE:** How a Detainee Became An Asset;
Sept. 11 Plotter Cooperated After Waterboarding

**BYLINE:** Peter Finn, Joby Warrick and Julie Tate; Washington Post Staff Writers

**BODY:**

After enduring the CIA's harshest interrogation methods and spending more than a year in the agency's secret prisons, Khalid Sheik Mohammed stood before U.S. intelligence officers in a makeshift lecture hall, leading what they called "terrorist tutorials."

In 2005 and 2006, the bearded, pudgy man who calls himself the mastermind of the Sept. 11, 2001, attacks discussed a wide variety of subjects, including Greek philosophy and al-Qaeda dogma. In one instance, he scolded a listener for poor note-taking and his inability to recall details of an earlier lecture.

Speaking in English, Mohammed "seemed to relish the opportunity, sometimes for hours on end, to discuss the inner workings of al-Qaeda and the group's plans, ideology and operatives," said one of two sources who described the sessions, speaking on the condition of anonymity because much information about detainee confinement remains classified. "He'd even use a chalkboard at times."

These scenes provide previously unpublicized details about the transformation of the man known to U.S. officials

38

How a Detainee Became An Asset; Sept. 11 Plotter Cooperated After Waterboarding The Washington Post August 29, 2009 Saturday

as KSM from an avowed and truculent enemy of the United States into what the CIA called its "preeminent source" on al-Qaeda. This reversal occurred after Mohammed was subjected to simulated drowning and prolonged sleep deprivation, among other harsh interrogation techniques.

"KSM, an accomplished resistor, provided only a few intelligence reports prior to the use of the waterboard, and analysis of that information revealed that much of it was outdated, inaccurate or incomplete," according to newly unclassified portions of a 2004 report by the CIA's then-inspector general released Monday by the Justice Department.

The debate over the effectiveness of subjecting detainees to psychological and physical pressure is in some ways irresolvable, because it is impossible to know whether less coercive methods would have achieved the same result. But for defenders of waterboarding, the evidence is clear: Mohammed cooperated, and to an extraordinary extent, only when his spirit was broken in the month after his capture March 1, 2003, as the inspector general's report and other documents released this week indicate.

Over a few weeks, he was subjected to an escalating series of coercive methods, culminating in 7 1/2 days of sleep deprivation, while diapered and shackled, and 183 instances of waterboarding. After the month-long torment, he was never waterboarded again.

"What do you think changed KSM's mind?" one former senior intelligence official said this week after being asked about the effect of waterboarding. "Of course it began with that."

Mohammed, in statements to the International Committee of the Red Cross, said some of the information he provided was untrue.

"During the harshest period of my interrogation I gave a lot of false information in order to satisfy what I believed the interrogators wished to hear in order to make the ill-treatment stop. I later told interrogators that their methods were stupid and counterproductive. I'm sure that the false information I was forced to invent in order to make the ill-treatment stop wasted a lot of their time," he said.

Critics say waterboarding and other harsh methods are unacceptable regardless of their results, and those with detailed knowledge of the CIA's program say the existing assessments offer no scientific basis to draw conclusions about effectiveness.

"Democratic societies don't use torture under any circumstances. It is illegal and immoral," said Tom Parker, policy director for counterterrorism and human rights at Amnesty International. "This is a fool's argument in any event. There is no way to prove or disprove the counterfactual."

John L. Helgerson, the former CIA inspector general who investigated the agency's detention and interrogation program, said his work did not put him in "a position to reach definitive conclusions about the effectiveness of particular interrogation methods."

"Certain of the techniques seemed to have little effect, whereas waterboarding and sleep deprivation were the two most powerful techniques and elicited a lot of information," he said in an interview. "But we didn't have the time or resources to do a careful, systematic analysis of the use of particular techniques with particular individuals and independently confirm the quality of the information that came out."

After his capture, Mohammed first told his captors what he calculated they already knew.

"KSM almost immediately following his capture in March 2003 elaborated on his plan to crash commercial airlines into Heathrow airport," according to a document released by the CIA on Monday that summarizes the intelligence provided by Mohammed. The agency thinks he assumed that Ramzi Binalshibh, a Sept. 11 conspirator captured in September 2002, had already divulged the plan.

How a Detainee Became An Asset; Sept. 11 Plotter Cooperated After Waterboarding The Washington Post August 29, 2009 Saturday

One former U.S. official with detailed knowledge of how the interrogations were carried out said Mohammed, like several other detainees, seemed to have decided that it was okay to stop resisting after he had endured a certain amount of pressure.

"Once the harsher techniques were used on [detainees], they could be viewed as having done their duty to Islam or their cause, and their religious principles would ask no more of them," said the former official, who requested anonymity because the events are still classified. "After that point, they became compliant. Obviously, there was also an interest in being able to later say, 'I was tortured into cooperating.' "

Mohammed provided the CIA with an autobiographical statement, describing a rebellious childhood, his decision to join the Muslim Brotherhood as a teenager, and his time in the United States as a student at North Carolina Agricultural and Technical State University, from where he graduated in 1986 with a degree in mechanical engineering.

"KSM's limited and negative experience in the United States -- which included a brief jail stay because of unpaid bills -- almost certainly helped propel him on his path to becoming a terrorist," according to the intelligence summary. "He stated that his contact with Americans, while minimal, confirmed his view that the United States was a debauched and racist country."

Mohammed provided $1,000 to Ramzi Yousef, a nephew, to help him carry out the 1993 attack on the World Trade Center. In 1994, he worked in the Philippines with Yousef, now serving a life sentence at the federal "supermax" prison in Colorado, on a failed plot to down 12 U.S. commercial aircraft over the Pacific.

Mohammed told interrogators it was in the Philippines that he first considered using planes as missiles to strike the United States. He took the idea to Osama bin Laden, who "at first demurred but changed his mind in late 1999," according to the summary.

Mohammed described plans to strike targets in Saudi Arabia, East Asia and the United States after the Sept. 11 attacks, including using a network of Pakistanis "to target gas stations, railroad tracks, and the Brooklyn bridge in New York." Cross-referencing material from different detainees, and leveraging information from one to extract more detail from another, the CIA and FBI went on to round up operatives both in the United States and abroad.

"Detainees in mid-2003 helped us build a list of 70 individuals -- many of who we had never heard of before -- that al-Qaeda deemed suitable for Western operations," according to the CIA summary.

Mohammed told interrogators that after the Sept. 11 attacks, his "overriding priority" was to strike the United States, but that he "realized that a follow-on attack would be difficult because of security measures." Most of the plots, as a result, were "opportunistic and limited," according to the summary.

One former agency official recalled that Mohammed was once asked to write a summary of his knowledge about al-Qaeda's efforts to obtain weapons of mass destruction. The terrorist group had explored buying either an intact nuclear weapon or key components such as enriched uranium, although there is no evidence of significant progress on that front.

"He wrote us an essay" on al-Qaeda's nuclear ambitions, the official said. "Not all of it was accurate, but it was quite extensive."

Mohammed was an unparalleled source in deciphering al-Qaeda's strategic doctrine, key operatives and likely targets, the summary said, including describing in "considerable detail the traits and profiles" that al-Qaeda sought in Western operatives and how the terrorist organization might conduct surveillance in the United States.

Mohammed was moved to the U.S. military facility at Guantanamo Bay, Cuba, in September 2006, and his loquaciousness is now largely confined to occasional appearances before a military commission. Back in his

40

How a Detainee Became An Asset; Sept. 11 Plotter Cooperated After Waterboarding The Washington Post August 29, 2009 Saturday

86-square-foot cell at the secret Camp 7 at Guantanamo, he spends most of his waking hours in prayer, according to a source familiar with his confinement who spoke on the condition of anonymity.

But Mohammed has not abandoned his intellectual pursuits. He requested a Bible for study in his cell, according to the source, in order to better understand his enemy.

Staff writer Walter Pincus contributed to this report.

**LOAD-DATE:** October 12, 2009

41