1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA          .      Criminal No. 1:12cr127
                                  .
     vs.                          .      Alexandria, Virginia
                                  .      October 23, 2012
JOHN KIRIAKOU,                    .      11:00 a.m.
                                  .
             Defendant.           .
                                  .
.  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF PLEA HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            W. NEIL HAMMERSTROM, JR., AUSA
                              IRIS LAN, AUSA
                              MARK SCHNEIDER, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              RYAN P. FAYHEE
                              Trial Attorney
                              U.S. Department of Justice
                              National Security Division
                              Counterespionage Section
                              600 E Street, N.W.
                              Washington, D.C. 20004

FOR THE DEFENDANT:            ROBERT P. TROUT, ESQ.
                              JESSE I. WINOGRAD, ESQ.
                              Trout Cacheris, PLLC
                              1350 Connecticut Avenue, N.W.
                              Suite 300
                              Washington, D.C. 20036

OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                              U.S. District Court, Fifth Floor
                              401 Courthouse Square
                              Alexandria, VA 22314
                              (703)299-8595

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

(Defendant present.)

THE CLERK:  Criminal Case 12-127, United States of America v. John Kiriakou.  Would counsel please note their appearances for the record.

MR. HAMMERSTROM:  Good morning, Your Honor.  Neil Hammerstrom, Mark Schneider, Iris Lan, and Ryan Fayhee for the United States.

THE COURT:  Good morning.

MR. TROUT:  Good morning, Your Honor.  Robert Trout and Jesse Winograd from the firm of Trout Cacheris, on behalf of Mr. Kiriakou.

THE COURT:  Good morning.

MR. TROUT:  Good morning.

THE COURT:  All right, we have the original plea agreement and statement of facts.

MR. HAMMERSTROM:  Your Honor, I need to point out one difference between what was delivered to chambers.

THE COURT:  Yes, sir.

MR. HAMMERSTROM:  The fine amount should be $250,000.  An amendment to that provision of Title 50 imposed the Title 18 fine schedule, so I've made that change on the original documents that have been provided to the Court today.

THE COURT:  And is there -- there is not a -- I'm sorry, yes, there is a special assessment.  All right, that's

3

fine.

Now, counsel, just so you know before we start the process, you-all submitted this plea under Rule 11(c)(1)(C), which is what we call a binding plea.  In other words, the parties have agreed in this agreement to a specific sentence, and the Court must accept that or the plea is not accepted. The government did provide the Court with a draft of the plea agreement ahead of time, and I reviewed it quite carefully.

It is not the general practice in this courthouse for judges to take binding Rule 11 pleas.  I've done it at least once in the past in another national security case, and I have carefully considered the pros and cons of that type of plea.  I also looked very carefully at the proposed sentence, which I understand is the same sentence that was imposed on Scooter Libby in a similar kind of situation.

I think it is reasonable under the circumstances balancing the various interests, so assuming everything goes forward this morning without any hitches, I will accept this plea with the recommendation that's in it, all right?

Are there any preliminary matters before we begin the process?

MR. HAMMERSTROM:  Not for the government, Your Honor.

THE COURT:  Mr. Trout, anything before we start?

MR. TROUT:  No, Your Honor.

THE COURT:  All right, Mr. Kiriakou, come up to the

4

lectern.  The clerk is going to place you under an affirmation.

JOHN CHRIS KIRIAKOU, DEFENDANT, AFFIRMED

THE COURT:  All right, Mr. Kiriakou, you have just taken a promise to tell the truth in answering all of the Court's questions.  That means that if you should lie in answering any question, you could be prosecuted for a new and separate crime called perjury.  Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  For the record, what is your full name?

THE DEFENDANT:  John Chris Kiriakou.

THE COURT:  And, Mr. Kiriakou, how old are you?

THE DEFENDANT:  I'm 48 years old.

THE COURT:  How much education have you completed?

THE DEFENDANT:  I have finished my master's degree.

THE COURT:  I assume then that you do not have any problem reading, writing, understanding, or speaking English?

THE DEFENDANT:  I do not.

THE COURT:  And you are a United States citizen, correct?

THE DEFENDANT:  I am.

THE COURT:  Are you presently on probation, parole, or supervised release from any other criminal case?

THE DEFENDANT:  No.

THE COURT:  Are you at this time under the care of a doctor for any physical or mental condition?

5

THE DEFENDANT:  A physical condition.

THE COURT:  And the condition is what?

THE DEFENDANT:  Diabetes.

THE COURT:  All right.  Are you taking medication for that condition?

THE DEFENDANT:  I am.

THE COURT:  Have you taken your medication on schedule?

THE DEFENDANT:  Yes.

THE COURT:  Other than the diabetes medication, within the last 24 hours, have you taken any medication, whether by prescription or over the counter?

THE DEFENDANT:  No.

THE COURT:  Are you at this time under the influence of any alcohol or drugs?

THE DEFENDANT:  No.

THE COURT:  All right.  We have in court this morning a written plea agreement which is seven pages long, and I see what appears to be your signature at the top of page 7 with today's date.  Did you, in fact, sign the written plea agreement?

THE DEFENDANT:  I did.

THE COURT:  And you signed it this morning before court?

THE DEFENDANT:  Yes.

6

THE COURT:  All right.  Now, before you signed the plea agreement, did you read it over for yourself word for word?

THE DEFENDANT:  Yes.

THE COURT:  And approximately when did you first see a copy of the plea agreement which is in court today? Approximately.

THE DEFENDANT:  Approximately three days ago.

THE COURT:  All right.  And other than the fine, has any change been made to the copy that you first read three days ago?

THE DEFENDANT:  No.

THE COURT:  All right.  And when you read the plea agreement, was counsel present?

THE DEFENDANT:  Yes.

THE COURT:  So you read it at the law firm?

THE DEFENDANT:  Initially at the law firm and then we've, we've spoken about it several times over the telephone.

THE COURT:  All right.  Now, have you had enough time to ask your counsel all the questions that you have about the plea agreement?

THE DEFENDANT:  Yes.

THE COURT:  Have they answered all of your questions to your satisfaction?

THE DEFENDANT:  Yes.

7

THE COURT:  Do you have any questions you want to ask me about the plea agreement?

THE DEFENDANT:  I do not.

THE COURT:  I want you to look at page 7.  The next question is somewhat repetitive, but I want to make sure you're crystal clear.  If you look at the two sentences immediately above where your signature would be, they go, "I have read this plea agreement and carefully reviewed every part of it with my attorney.  I understand this agreement and voluntarily agree to it."

Do you see those two sentences?

THE DEFENDANT:  Yes, I do.

THE COURT:  Are they completely true in every respect?

THE DEFENDANT:  Yes, they are.

THE COURT:  Now, Mr. Kiriakou, by telling the Court that you've read the entire plea agreement and discussed it thoroughly with counsel and that you understand it and you're voluntarily agreeing to it, that means you will be bound by everything that's written in this seven-page document even if I don't go over every paragraph or page with you in court today.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  And the reason for that result is that this plea agreement is really a written contract between you

8

and the United States government, and when a person signs a written contract after he's carefully reviewed it with counsel and he understands it when he signs it and he signs it voluntarily, then you can't just come back to court in a couple of weeks and say, "You know, I really don't like what's on page 4.  I want to change it."

That's just too late.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Now, other than the plea agreement that's in court this morning, do you have any side deals or side understandings of any kind with anyone from your former employer, the U.S. Attorney's Office, the Department of Justice, or anybody else concerning this case?

THE DEFENDANT:  No.

THE COURT:  Mr. Trout, is that correct?

MR. TROUT:  That's correct, Your Honor.

THE COURT:  All right.  Let's turn then to page 1, paragraph 1, and there it indicates you've agreed to plead guilty to Count 1 of the pending indictment that charges you with intentionally disclosing information identifying a covert agent, in violation of Title 50, United States Code, section 421(a).  That is a felony offense exposing you to the possible sentence of up to ten years of imprisonment followed by three years of supervised release, a fine of up to $250,000, and there'll be an automatic special assessment of $100.

9

Do you understand the penalties that by law you're facing?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Now, parole is not available in the federal system.  That means whatever term of imprisonment is imposed must be fully served.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And after the prison portion of the sentence has been satisfied, that's when the supervised release portion of the sentence goes into effect.  Now, when a person is on supervised release, he is under the control of a federal probation officer.  It's much like the bond that you're on right now, where you're under the control of a court official, and there will be conditions of things that you must do and things that you cannot do while you're on supervision.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  I can't tell you the specific conditions yet because I haven't seen the pre-sentence report.  However, what you need to understand at this point is that if you violate any condition of supervised release, you could be sent back to prison for as long as the period of supervised release, which is three years.

Do you understand that?

10

THE DEFENDANT:  Yes.

THE COURT:  Now, because this is a binding Rule 11(c)(1)(C) plea, I want to turn your attention to paragraph 2. Normally in a plea colloquy, I would explain to a defendant how the sentencing guidelines work and how Section 3553(a) of Title 18 work, but in this case, I don't believe that's necessary.

What you need to understand and appreciate is paragraph 2.  It indicates there that you and the government have agreed that the sentence to be imposed will be a period of imprisonment of 30 months on Count 1 followed by a term of three years of supervised release, and there will be an automatic special assessment of $100.

Is that your understanding of the agreement you have reached with the government?

THE DEFENDANT:  Yes.

THE COURT:  And as I already indicated to you, assuming everything goes well with the rest of these questions and answers, this Court will accept the plea agreement as you-all have proposed in paragraph 2.

Now, in paragraph 3 of the plea agreement, there's an indication that the United States does not oppose your request that will be made at the sentencing hearing that the Court recommend that the Bureau of Prisons designate you for the service of your sentence to a minimum security camp at Federal Correctional Institution Loretto, Pennsylvania.

11

I want to make sure you understand that no matter what the Court recommends, the Bureau of Prisons makes the ultimate decision, No. 1, as to the level of security, whether it would be a camp or a level 1, 2, 3, whatever, and they also make the decision as to the specific facility, and if they do not follow the recommendation, that is not a violation of the plea agreement, and it will not give you a basis to withdraw your guilty plea.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  In paragraph 6 of the plea agreement, that addresses the forfeiture of certain pension rights. You've agreed in paragraph 6(a) that you may not be paid annuity or retirement payments arising from your federal service as a result of this conviction for Count 1, and so you have agreed to forfeit any interest that you might have in such future payments.

Is that part of your understanding of this agreement?

THE DEFENDANT:  It is, but I'm still unclear, Your Honor, as to the money that I contributed to the pension, what happens to that money.

THE COURT:  We're not a pension expert.  Does the government have any idea, Mr. Hammerstrom?

MR. HAMMERSTROM:  I don't know, Your Honor, but I think that next paragraph makes that sort of moot because --

12

THE COURT:  Because of the spouse?

MR. HAMMERSTROM:  That is an option here if they take advantage of that.

THE COURT:  All right.  Well, let's get to paragraph 6(b).  There it indicates that you also acknowledge -- again, this is governed by Title 5 of the United States Code, section 8318(e) -- that your spouse shall be eligible for spousal pension benefits only if the attorney general of the United States determines that your spouse fully cooperates with federal authorities in the ongoing criminal investigation and prosecution of yourself.

The decision to invoke the provisions of Title 5 is vested solely in the attorney general, and any determination by the attorney general that the defendant's spouse has not fully cooperated shall not be a basis for the defendant to withdraw his guilty plea.

Do you understand that's part of this plea agreement?

THE DEFENDANT:  Yes.

THE COURT:  So that probably answers the question. Obviously, there wouldn't be any pension benefit if you hadn't made contributions.

I assume that's what you meant, Mr. Hammerstrom?

MR. HAMMERSTROM:  Yes, Your Honor.

THE COURT:  All right.  So that's something you're going to need to work out with your counsel and maybe a pension

13

expert, all right?

THE DEFENDANT:  (Nodding head.)

THE COURT:  Defendants normally have a right to appeal their conviction as well as any sentence that's imposed on them, but if you look at paragraph 7, as part of this plea agreement, you are waiving -- which means giving up -- your right to appeal the conviction for Count 1 and any sentence that's within the statutory maximum.

Do you understand that's part of your plea agreement?

THE DEFENDANT:  Yes.

THE COURT:  My understanding is from paragraph 9 that there's not going to be any other monetary penalties.  Is that correct, Mr. Hammerstrom?

MR. HAMMERSTROM:  Correct, Your Honor.

THE COURT:  All right.  In paragraph 10, the government has agreed that it will not further criminally prosecute you in this district for any of the specific conduct described in the indictment or the statement of facts.  Now, paragraph 10 does not give you universal immunity, so if you were involved in some other illegal activity in the District of Columbia or Maryland, for example, those authorities could still prosecute you.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  In addition, if you were involved in

14

criminal activity other than what's described in the indictment in this district, the U.S. Attorney's Office for this district could still prosecute you here.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  In paragraph 11, the government has agreed that it will upon your guilty plea being accepted move to dismiss the remaining counts of the indictment.  Is that also part of your understanding?

THE DEFENDANT:  Yes.

THE COURT:  Now, have you had enough time to explain everything you know about this case to your counsel?

THE DEFENDANT:  I have.

THE COURT:  And have they discussed with you the nature of the charge in Count 1 and any ways in which you could possibly defend yourself against that charge?

THE DEFENDANT:  Yes.

THE COURT:  Are you fully satisfied with the way your counsel have worked for you in this case?

THE DEFENDANT:  Yes.

THE COURT:  And, Mr. Trout, just for the record, because I think the Supreme Court now really requires us to look a little bit more into the plea bargaining history in the case, other than the few changes that were made to the plea agreement that's in court today, were there any other significant offers before this one?  In other words, were there

15

any other proposed plea agreements coming from the government to you-all other than this one?

MR. TROUT:  Your Honor, there was an offer that was made pre-indictment which was rejected.

THE COURT:  Was it significantly different from this one?

MR. TROUT:  In my judgment, it was not as favorable.

THE COURT:  This is more favorable?

MR. TROUT:  In my judgment.

THE COURT:  All right.

MR. TROUT:  And then we did have negotiations or conversations and some back-and-forth, I would say, beginning a couple of weeks ago.

THE COURT:  All right.  And have you shared with Mr. Kiriakou all of the proposals that you've received from the government?

MR. TROUT:  Yes, Your Honor.

THE COURT:  And given him an assessment as to whether he should consider accepting that proposal or try to negotiate something else?

MR. TROUT:  Both in meetings and in written communications, Your Honor.

THE COURT:  All right.  Now, Mr. Kiriakou, do you understand you still at this time have a right to continue with your not guilty plea to Count 1 of the indictment?

16

THE DEFENDANT:  Yes.

THE COURT:  And if you decided to go to trial on Count 1, then obviously, the burden would be on the government to prove you guilty, and specifically, in order for them to prove that you are guilty of the charge in Count 1, they'd have to be able to prove that on or about July 11, 2008, that you essentially revealed the name of the person who was considered to be a covert agent.

The government would have to be able to prove that the person, in fact, was covert, in other words, that the government had steadfastly tried to keep that person's identity secret.  That's a major issue in this case.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  They would have to show beyond a reasonable doubt that you knowingly made the disclosure.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And they'd have to make sure -- they'd have to be able to prove beyond a reasonable doubt that the disclosure occurred or had some connection to the Eastern District of Virginia.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Now, if a person pleads not guilty and goes to trial, then there are a series of rights and

17

protections that he has at trial that he doesn't really have when he pleads guilty.  First, at trial you could see all of the government's witnesses and evidence and test it through the questions of your attorney.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  You could ask the Court to issue subpoenas to require the presence of witnesses and/or evidence at the courthouse that you could use in your defense.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  You could testify as a witness at trial.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  However, you could also invoke your Fifth Amendment right to remain silent, and if you chose not to testify, no inference of guilt could be drawn from your silence.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  You would, of course, have the right to be represented by counsel throughout your trial, and if you could not afford counsel, we would make sure you had counsel at taxpayers' expense.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Now, you opted for a trial by jury.  A jury trial would be conducted with 12 ordinary citizens brought

18

basically together on a random basis, and in order for a jury to reach a decision as to any issue in the case, the jury would have to be unanimous.  So if, for example, just one juror had a reasonable doubt about your guilt, that jury could not convict you.  It would be what we call a hung jury, and you'd have a right to a new trial with a new jury on that issue.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  If you continued with a not guilty plea, your counsel could continue their efforts to attack the prosecution's case.  As you know, there were still a lot of CIPA issues that have not yet been resolved, and there may be other types of issues that could be raised pretrial or at trial.

What you need to appreciate is that by pleading guilty, you're giving up your right first of all to appeal any of the Court's previous decisions involving CIPA or anything else, and you're also giving up any of the defenses that you might have.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And lastly, if you pled not guilty to Count 1 and you were found guilty on that count, you could appeal that finding of guilt to a higher-level court.  Do you understand, as I indicated earlier, under the terms of this plea agreement as well as the way the law is structured, when a

19

person is found guilty based upon his own guilty plea, he gives up his right to appeal his conviction?  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Other than the written plea agreement that's in court this morning, has anybody promised or suggested to you that by pleading guilty, you would get a lighter sentence or more favorable treatment by the Court?

THE DEFENDANT:  No.

THE COURT:  Has anyone put any force or pressure on you to plead guilty today?

THE DEFENDANT:  No.

THE COURT:  All right.  Mr. Kiriakou, the last document we have, which is part of your plea agreement, is the written statement of facts, and that statement of facts, which is quite extensive, is 11 pages long.  I see on page 11 what appears to be your signature, and again, there is no date, but I'm assuming you signed it this morning.  Is that correct?

THE DEFENDANT:  No, Your Honor.  I signed it yesterday.

THE COURT:  Yesterday?  The 22nd?

MR. TROUT:  Yes.  He re-signed it this morning.

THE DEFENDANT:  I did actually re-sign it this morning.

THE COURT:  All the attorneys signed it today.

THE DEFENDANT:  I was looking at the photocopy.

20

THE COURT:  All right.  Mr. Kiriakou, before you signed the statement of facts, did you read it over carefully for yourself?

THE DEFENDANT:  Yes.

THE COURT:  I assume because this normally happens that you and your counsel negotiated to some degree the statement of facts?

THE DEFENDANT:  Yes, that's correct.

THE COURT:  And the one that's in court today reflects the final result of those negotiations?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that by signing the statement of facts, you're doing two things:  One, you're admitting the truth of everything that is written in the 26 numbered paragraphs before your signature.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And secondly, you are also admitting that if the case had gone to trial, the government could have proven all of those facts beyond a reasonable doubt.

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  I'm not going to go over the long statement of facts with you verbatim, but I will just

21

touch on a few of these paragraphs just to make sure there's no slippage. Do you agree that in the 2008-2009 time period, in this district and elsewhere, that you intentionally -- and that means not by an accident or mistake -- disclosed information identifying a covert agent to an individual not authorized to receive classified information, and that at that time, you knew that the information disclosed identified the covert agent and that the United States government was taking affirmative measures to conceal that covert agent's intelligence relationship to the United States?

Do you agree that that happened?

THE DEFENDANT: Yes.

THE COURT: All right. And you certainly can consult with counsel. Remember, my earlier question to you was if you have any -- if you have any dispute with any factual allegation in this statement of facts, this is the time to set the record straight, and so if you want to clarify the record, you need to do it now.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: Do you want to clarify the record?

THE DEFENDANT: No, I do not.

THE COURT: You're sure?

THE DEFENDANT: Yes.

THE COURT: Because you're going to live with this statement of facts forever.

22

THE DEFENDANT:  Yes.

THE COURT:  All right.  I'm not going to go through the statement here in court any further because you've clearly indicated that you've read it carefully and you're not disputing any of it.  I'll give you one last chance:  If there's anything that you want to nuance, anything else you think the Court should know, this is the time.

THE DEFENDANT:  I do have one question, Your Honor.

THE COURT:  Go ahead.

THE DEFENDANT:  It is still unclear to me why paragraphs 17 and onward are even in this statement of facts. If the prosecution is dropping all of these charges, it seems to me that these paragraphs are irrelevant and even inflammatory.  If I'm only being charged -- or if I'm only pleading guilty to Count 1, I just don't understand why Counts 2 through 5 are even in this statement of facts when they're not in the plea agreement.

THE COURT:  I'm assuming your counsel and the government counsel fought long and hard over this statement of facts.

Is that a fair assumption, Mr. Trout?

MR. TROUT:  Very fair, Your Honor.

THE COURT:  All right.  In some respects, it's window dressing, I agree with you, because this is a binding plea.  If this were not a binding plea, this would be relevant conduct

23

which the Court would or would not -- this Court's not crazy about relevant conduct, frankly, but it would factor into the guideline calculations, and I think for the record, we will need to have the guidelines calculated in this case, but the bottom line is it isn't going to make any difference to the outcome of this case.

THE DEFENDANT: Certainly.

THE COURT: All right? Now, again, this is your day in court, and I don't want you to feel in any respect pressured into this plea. If you feel strongly enough about this statement of facts that you don't want to acknowledge these paragraphs, you can, you know, withdraw, but, I mean, this is the plea that you've been offered by the government, and you need to decide now -- if you want to talk to Mr. Trout for a few more minutes, you certainly may -- whether you want to accept this statement of facts as it is or not.

THE DEFENDANT: Your Honor, I'll accept it. I just, I just wanted to point that out. Thank you for the opportunity.

THE COURT: All right. And it's not lost on the Court.

THE DEFENDANT: Thank you.

THE COURT: All right. Now, do you understand, Mr. Kiriakou, that if the Court accepts your guilty plea this morning, there's going to be no further trial of this case, and

24

you will be found guilty as of today of Count 1?

THE DEFENDANT:  Yes.

THE COURT:  Do you claim in any respect you're innocent of the charge in Count 1?

THE DEFENDANT:  No.

THE COURT:  How then do you plead to that charge?

THE DEFENDANT:  Guilty.

THE COURT:  All right.  Mr. Trout, have you carefully gone over this plea with your client?

MR. TROUT:  I have, Your Honor.

THE COURT:  Does the plea fully accord with your understanding of the facts and circumstances?

MR. TROUT:  It does.

THE COURT:  And in your opinion, is the plea voluntarily and understandingly made by the defendant?

MR. TROUT:  It is.  And I would add that Mr. Kiriakou has had time not only with me but with colleagues of mine who are counsel to him in this case.  So we've had a great deal of time with Mr. Kiriakou discussing this case.

THE COURT:  All right.  And the only other question I'll just throw out there is I've had a case like this once before where a spouse's pension rights might be affected by the plea.  I believe in that case, the spouse had signed off on the agreement.

Mr. Kiriakou, it really doesn't affect your

25

culpability and this plea, but I assume you have fully discussed that pension ramification with your wife?

THE DEFENDANT:  I have, Your Honor.

THE COURT:  And can you represent to the Court since you're under oath that she has agreed to what's in the plea agreement?

THE DEFENDANT:  She has.

THE COURT:  All right.  Then based upon the answers to the Court's questions, the Court is satisfied that the defendant has entered his plea in a knowing and voluntary fashion, with the full advice of competent counsel, and that the written statement of facts, which has been fully acknowledged by the defendant, is more than sufficient evidence to establish guilt beyond a reasonable doubt as to Count 1, so you're found guilty of that count.

I will enter the government's motion -- grant the motion to dismiss Counts 2, 3, 4, and 5 of the indictment, so they'll be dismissed right now.

And we need to set this case for sentencing.  We still need a pre-sentence report because the Bureau of Prisons needs that, and I also need it for purposes of evaluating what, if any, conditions are going to be needed during supervised release.  I assume you-all expected that there would be a sentencing hearing?

MR. TROUT:  We certainly did.

26

THE COURT:  And I assume the government did as well?

MR. HAMMERSTROM:  Yes, Your Honor.

THE COURT:  All right, that's fine.

Have you looked at your calendars for a possible date?  I think we should give the Probation Office their regular time, so I know we're well into January at this point. We have the 18th or the 25th of January.  What works on your calendars?

MR. TROUT:  Either.

THE COURT:  Does the government have a preference?

MR. HAMMERSTROM:  No preference, Your Honor.

THE COURT:  All right, I think we'll do it on the 25th then.  It's at 9:00.

Now, Mr. Kiriakou, I really don't have to alert you to this, but I do want this to be a complete record.  I assume that Mr. Trout has discussed with you the implications of a felony conviction in terms of employment potential down the road?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  In other words, it would make getting government contracts most likely quite difficult if not impossible.  It may affect your ability to work with entities that contract with the government.  It also could affect bonding if you need bonds for any kind of work that you do.

And you have fully discussed that with counsel?

THE DEFENDANT:  Yes.

THE COURT:  All right, that's fine.

All right, when you leave court today, you need to check in with Pretrial Services to advise them that the plea was accepted and to give them your next court date, which is Friday, January 25, at 9:00.  You then need to go over to the Probation Office to enroll in the presentence investigation.

And I'm sure that Probation will know this, but, Mr. Trout, just remind them that they'll need a probation officer who has the necessary clearances, because I'm sure some of the information they may need to look at might be classified, all right?

MR. TROUT:  Very well.

THE COURT:  Anything further on this case?

MR. HAMMERSTROM:  No, Your Honor.

THE COURT:  No?  Then we'll recess court for the day.

(Which were all the proceedings had at this time.)


CERTIFICATE OF THE REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


_____/s/_____
                        Anneliese J. Thomson