1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA     .     Criminal No. 1:12cr127
                             .
     vs.                     .     Alexandria, Virginia
                             .     January 25, 2013
JOHN KIRIAKOU,               .     9:15 a.m.
                             .
          Defendant.         .
                             .
. . . . . . . . . . .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:              W. NEIL HAMMERSTROM, JR., AUSA
                                IRIS LAN, AUSA
                                MARK SCHNEIDER, AUSA
                                United States Attorney's Office
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                  and
                                RYAN P. FAYHEE
                                Trial Attorney
                                U.S. Department of Justice
                                National Security Division
                                Counterespionage Section
                                600 E Street, N.W.
                                Washington, D.C. 20004

FOR THE DEFENDANT:              ROBERT P. TROUT, ESQ.
                                JOHN F. HUNDLEY, ESQ.
                                JESSE I. WINOGRAD, ESQ.
                                Trout Cacheris, PLLC
                                1350 Connecticut Avenue, N.W.
                                Suite 300
                                Washington, D.C. 20036


(APPEARANCES CONT'D. ON PAGE 2)


(Pages 1 - 24)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES


Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

2

APPEARANCES:   (Cont'd.)

FOR THE DEFENDANT:                 MARK J. MAC DOUGALL, ESQ.
                                   JAMES E. SHERRY, ESQ.
                                   KAREN D. WILLIAMS, ESQ.
                                   Akin Gump Strauss Hauer &
                                   Feld LLP
                                   1333 New Hampshire Ave., N.W.
                                   Washington, D.C. 20036-1564


OFFICIAL COURT REPORTER:           ANNELIESE J. THOMSON, RDR, CRR
                                   U.S. District Court, Fifth Floor
                                   401 Courthouse Square
                                   Alexandria, VA 22314
                                   (703)299-8595

3

P R O C E E D I N G S

(Defendant present.)

THE CLERK:  Criminal Case 12-127, United States of America v. John Kiriakou.  Would counsel please note their appearances for the record.

MR. HAMMERSTROM:  Good morning, Your Honor.  Neil Hammerstrom, Mark Schneider, Iris Lan, and Ryan Fayhee for the United States.  Mr. Schneider will be allocuting on behalf of the United States.

THE COURT:  All right.

MR. TROUT:  Good morning, Your Honor.  Robert Trout at the firm of Trout Cacheris.  With me, Mr. Kiriakou is at counsel table, and also with me at counsel table is cocounsel, Mark MacDougall, of the firm of Akin Gump.

THE COURT:  All right.

MR. TROUT:  Also in the courtroom, Your Honor, are colleagues John Hundley and Jesse Winograd from Trout Cacheris as well as James Sherry and Karen Williams from the firm of Akin Gump.

THE COURT:  All right.  Well, Mr. Trout, who's going to be the main spokesperson for the defendant?

MR. TROUT:  I will, Your Honor.

THE COURT:  All right.  Have you had enough time to go over the pre-sentence report yourself and with your client?

MR. TROUT:  Yes, Your Honor.

4

THE COURT:  Are there any factual corrections, changes, additions, or deletions you want made to the report itself?

MR. TROUT:  No, Your Honor --

THE COURT:  All right.

MR. TROUT:  -- other than what, I mean, we -- no, Your Honor.

THE COURT:  All right.  Now, as you know, some of this is form over substance, because this is a binding Rule 11(c)(1)(C) plea, but for the record, we need to go through the exercise.  The guidelines as calculated by the Probation Office are an offense level of 30.  Mr. Kiriakou has a criminal history of I.  That establishes an advisory guideline range of 97 to 121 months.  There's a one- to three-year period of supervised release, a fine range of $15,000 to $150,000, and a $100 special assessment.

And I don't think you're really disputing those guidelines.  I mean, there's been some back-and-forth on a few things, but they really have no practical effect on the sentence.

MR. TROUT:  I agree that they have no practical effect.  We did express an objection to the 30-month as opposed to 28-month calculation, Your Honor.  We have contested -- and I don't know, I assume the Court has seen our sentencing memorandum.

5

In our sentencing memorandum, which was filed a week ago, although it was only released by the court security officer for public distribution yesterday evening, we did challenge the two-point enhancement for obstruction, Your Honor, and expressed our view on that and argued that the proper calculation of the guidelines was 28.  We believe the record should reflect that.

As you say, I don't think it is of great practical moment.

THE COURT:  All right.  I'll hear from the United States.

MR. SCHNEIDER:  Judge, we would agree that that guideline calculation is not of any consequence to the ultimate agreed sentence in the case.  We would agree as well with the probation officer's assessment that the obstruction adjustment -- obstruction of justice enhancement does apply.

The facts as described in the PSR are relatively straightforward.  In July, the government served -- July of 2010, the government served a preservation order on Apple for the defendant's e-mail account.  In August of that year, according to a statement the defendant made to the FBI, the defendant met with the reporter, who advised him that he was, in effect, a target of the FBI's investigation, specifically, that he was under surveillance by the FBI, in the defendant's words, that they know that you are the guy who leaked the

6

identities of the Abu Zubaydah interrogators to the ACLU and that they are on your e-mails and on your phones.

We then executed a search warrant in November of that year.  The results of that search warrant did not include any of the e-mails between the defendant and Journalist A that are identified in the indictment.

We went back and obtained the e-mails that had been preserved by Apple in July, prior to the defendant being informed that he was a target of the investigation, and what that revealed was that in the defendant's sent e-mail folders, there were 81 e-mails deleted.  Of the 81 e-mails deleted, one was an e-mail in connection with the Publications Review Board at the CIA.  The other 80 e-mails of the defendant's sent e-mail box that were deleted were e-mails between the defendant to Journalist A.

So we think that based on that evidence, by the preponderance standard that applies, that that is sufficient to support that the defendant knowingly destroyed the evidence of his crime after being advised that he was the subject of an investigation.

Those are what the facts are.  We leave it to the Court to make whatever inference and finding based on those facts that it deems appropriate.

THE COURT:  All right.  Mr. Trout, do you want to respond to that?

7

MR. TROUT:  I do, Your Honor.  We during the course of the discovery and after the charges in this case, we have been trying to find all of the data that was supporting, you know, these charges.  We were never really provided with data in the discovery that would allow us to evaluate what was, you know, all of the -- what were the e-mails, what were all of the e-mails that were deleted, benign and suspicious, and so we were never able to see the evidence, the entire evidence that may well have refuted these allegations.

This was not part of the indictment in the case, and it was really not part of the discovery in the case, and as a result, we were really never able to evaluate the evidence there and perhaps refute it.

THE COURT:  Well, did you see -- did you get from the government copies of the 80 or 81 messages that counsel referred to?

MR. TROUT:  Your Honor, I would have to confer with one of my cocounsel on that because I, I did not review every single --

THE COURT:  I assume the government would know.  Did you turn over those?

MR. SCHNEIDER:  We did, Your Honor.  We turned over both productions, the search warrant production as well as the July production as well as the interview with the defendant that was recorded by the FBI, and those are the three sources

8

of data on which we rely here.

THE COURT: This would be so --

MR. SCHNEIDER: Mr. Trout has not been hesitant in the past when there have been concerns about whether he's had evidence, to raise those concerns with the government, and this has not been raised before.

THE COURT: These would be so basic, I would not be shocked that you would not have gotten them. I mean, if you want to take a second and check with Mr. Hundley or one of your other --

MR. TROUT: That's all right, Your Honor. The point that we made in our sentencing memorandum was that this has not really been part of the case, and we have not really had an opportunity to evaluate it and have not evaluated it and have not gone back and tested it.

What we can -- what we do know is that Mr. Kiriakou, after August of 2010, when supposedly he was on notice that he was a target of the investigation, he was invited by the -- he was asked by the FBI to come down to meet with them, and he did so without counsel. He fully, you know, he spoke with the FBI openly, and as a result, we would argue he never anticipated that he was -- when he went down there without counsel, that he was thinking that he was the target of an investigation. He never would have done that, certainly not without counsel.

And so the point is, is that he lacked the corrupt

intent back in August of 2010, when he was deleting e-mails.

THE COURT:  Well, the burden of proof for these types of matters is not proof beyond a reasonable doubt.  It's basically by a preponderance, and certainly it's not an unreasonable inference that one would delete these types of messages in the context of the concerns about being under investigation.

There -- this is the same issue we get all the time in civil cases with spoliation of evidence that's electronically stored, and I think at this point, again, since the Probation Office has spent a fair amount of time looking into this issue, I'm satisfied there's enough evidence to allow the guidelines to remain as they are, so the Court is going to overrule the objection and leave the guidelines as calculated in the report.  As I said, it's basically form over substance in this point.

So having done that, I think that was really the only area of dispute.  You know, there are some fine points.  The government has raised some concerns about whether the defendant really should get acceptance of responsibility given some of the statements that appear to be floating around now about why he did what he did, etc.  I'm not going to address that.  I'm leaving the guidelines as they are, and so we'll turn now to the allocution, all right?

I do want to make sure, you did get access to the

10

classified filings?

MR. TROUT:  We did, Your Honor.

THE COURT:  All right.  And Mr. Kiriakou had a chance to read them as well?

MR. TROUT:  He actually was not cleared for access to the classified filing.

THE COURT:  Oh, he was not?

MR. TROUT:  No.

THE COURT:  So he has not seen the victim letter?

MR. TROUT:  He has not.

THE COURT:  I had assumed, though, he saw your memo.

MR. TROUT:  He did.

THE COURT:  All right.  I just wanted to make sure for the record we know what has been seen, all right.

I'll hear then from the government first.

MR. SCHNEIDER:  Your Honor, the government recognizes that there is an agreed sentence in this case, and we believe the agreed sentence is appropriate and ask that the Court impose it.  Aside from the deterrence value, there are, there are two factors under 3553 that we would just briefly draw the Court's attention to.

The first is that the national security crime to which the defendant has admitted and pleaded guilty is extraordinarily serious.  As this Court has observed, the identification of a covert intelligence officer is information

11

that goes directly to the heart of the nation's intelligence activities.  Disclosing the identification of the covert officer threatens not only the personal safety of the officer, but it also damages and undermines the confidence in the government's ability to conduct intelligence operations and specifically to protect its intelligence officers overseas.

That harm is reflected most powerfully, we would submit, in Covert Officer A's classified victim impact statement and, in particular, in the fact that members of Covert Officer A's own immediate family in some circumstances did not know that he worked for the CIA, notwithstanding his 20-plus years of service with the CIA, and the defendant single-handedly by the disclosure that he made here betrayed Officer A's lifetime of service.

The seriousness is also reflected in the fact that the defendant himself knew from personal experience as a CIA officer the grave danger that a blown cover can create.  As the defendant wrote in one of his e-mails, "The jobs we've chosen are difficult and stressful enough without having to worry about an attorney outing you to an accused terrorist.  The government owes them a little protection."

He describes the discovery of the photograph of Officer B as terrifying, which is a quote, and he said with respect to the disclosure regarding Officer B, the leak of the name was, in his words, despicable, put him in personal danger,

12

and that the publication of the name would be immoral.  Those are the defendant's words.

And once you've disclosed that information, there's no telling where that information goes, and that's certainly something that the defendant had knowledge of.

The second factor related to the nature and circumstances of the offense is that it's important to emphasize that what the defendant did here was act willfully; that is, he knew what he was doing was illegal.  That's an element of the offense that he's admitted in court.

This is not a case about negligence.  It's not a case even about recklessness.  It's about the intentional, deliberate violation of the law, and that's what the defendant admitted.  He had signed eight disclosure agreements with the CIA.  He admitted in his statement of facts that he knew his conduct was illegal.

At the plea colloquy, the Court asked very specific questions on this point, and the defendant acknowledged that he had not acted by accident or by mistake, and those admissions in court are consistent, of course, with the rest of the evidence in the case, including the defendant's recorded interview with the FBI in which when asked about Officer A, the defendant said, "He was always undercover.  His entire career was undercover."

Asked about whether Officer B's association with the

13

Abu Zubaydah operation was classified, the defendant said, "Absolutely, absolutely."  That's a quote.

And as the government explained in its sentencing submission and as the classified discovery that the defense has seen and the Court has seen in part shows that the disclosures here with respect to A and B were but the tip of the iceberg and that the defendant had disclosed the identities of numerous other covert officers beyond those identified in the charging documents.

What those e-mails reveal is that when -- the e-mails show that when uncleared reporters asked for information about classified personnel, the defendant simply answered, without concern for the welfare of those persons or without concern for his lifelong secrecy agreement.

So in short, with respect to the nature of the offense, this was not an accidental slip of the tongue.  It was a deliberate, knowing betrayal of the defendant's obligations that strikes really to the core of the country's ability to conduct intelligence operations.

And then the second fact that I would just mention very briefly are the history and characteristics of the defendant, and the defense -- the Court, rather, alluded to this question of acceptance of responsibility, and we're not challenging the assignment of acceptance of responsibility credit under the PSR.

14

It is noteworthy, though, that the conduct here was motivated and, I think, revealed two aspects of the defendant's character. The first is that he acted in this case out of a sense of ego and narrow-minded self-interest to raise his media profile, enhance his employment prospects, get consulting work. There are worse motives, but this was what the evidence shows that his motive, in fact, was in this case.

And second aspect of the character is this habit of deceit that the evidence in this case reveals, which bears upon under 3553 the characteristics of the defendant as well as the acceptance of responsibility, and I would just simply cite three quick examples.

The first are the defendant's lies to the Publications Review Board at the CIA in which he lied to trick the CIA to authorize him to publish classified information in his memoirs. He specifically admitted that deceit in his e-mail to the coauthor of his book in which he said, "I laid it on thick. I said some things were fictionalized when, in fact, they weren't. There's no way they're going to go through years of cable traffic to see if it's fictionalized, so we might get some things through."

And then secondly, he lied to the FBI when the FBI interviewed him a year ago in January. When asked about Officer A, the defendant specifically denied providing Officer A's name or any other information about Officer A to any

15

journalist.  In one part of the interview, he pretended to be mystified, asking how the heck did they get him.

When asked about whether he had anything to do with providing Officer B's name or other information about Officer B to Journalist B prior to the July 2, 2008 *New York Times* article, the defendant lied again, saying, "Heavens no, Heavens no," and had the defendant actually been concerned for the welfare of those officers and of the others he betrayed, he could have helped at that moment.  He could have told the agents who else was at risk.  Instead, he lied to the agents.

And that kind of tendency to lay it on thick, to lie to the FBI, is also revealed, frankly, in some of the defendant's grossly misleading public statements about this prosecution, which are really untethered to the factual reality of what's happened in this courtroom.

You know, a first example is the defendant's assertions really ad nauseam that he's not really a wrongdoer, as he admitted in court, but instead, somehow the victim of a selective or vindictive prosecution.  That's a claim this Court has addressed and rejected.  The defendant is obviously not the victim here; he is an offender.

And as a second example, just two weeks ago, as we pointed out in our sentencing submission, based on what *The New York Times* described as recent interviews, it reported the defendant saying, "If I'd known the guy was still undercover, I

16

would never have mentioned him."  That, of course, is directly contradicted by the admissions that the defendant made in response to the Court's questions in the plea colloquy, and it's directly contradicted by the statements that the defendant made to the FBI.

And then even this week, Your Honor, after that article, after the government's sentencing submission, the defendant gave yet another interview in which he suggested that that interview at *The New York Times* in which he denied an element of the offense had occurred prior to the plea agreement, but that's likely to be false for two reasons. First is that *The New York Times* itself described that article as a recent -- or that interview as a recent interview; and secondly, as the Court knows, the journalist who wrote that article, Scott Shane, was, in fact, a witness subpoenaed by the defense to testify at trial, and that subpoena was only withdrawn very shortly before the change of plea hearing.

So the notion that experienced counsel would allow their client to give an interview to *The New York Times* to a witness they were seeking to testify at trial about the conduct at issue in the case is false, but regardless of when that interview happened, it does go to the extent to which the defendant has accepted responsibility or not, that we are not challenging the acceptance of responsibility enhancement.

So in sum, Your Honor, this is a case involving a

17

defendant who worked at the CIA for 15 years, who admitted that his conduct in this case was illegal.  He admitted that he knew the dangers that disclosures such as his posed to his former colleagues and to the United States, and he chose instead deliberately to violate the law, and for these reasons, we would ask that the Court impose the agreed sentence of 30 months.

THE COURT:  All right.  Mr. Trout?

MR. TROUT:  Thank you, Your Honor.  Your Honor, we've expressed ourselves in the sentencing memorandum, but there are -- there is one -- and I don't want to belabor the points that we've already made in the sentencing memorandum, they're clear, and the Court has that, but I do want to say one thing particularly with respect to the motivations of Mr. Kiriakou.

I think it is clear that at no time did Mr. Kiriakou intend to harm the United States or to cause injury to anyone. He loves the United States.  He regards himself as very patriotic.  He loves the CIA.  Even today, he loves the CIA.

He would have stayed in the CIA and continued his service to the government except for the imperatives of his custody situation with his children.  He had to -- he was not able to continue to travel as he did with the CIA, but make no mistake, this is where his loyalty is.

He was, yes, concerned about certain practices that were employed in the fight against terrorism.  It is true that

18

at an early point, when he first began discussing this publicly, he was justifying practices, rationalizing practices, and it is true that his thinking about this has evolved, and it has changed, and let me say, speaking for myself and, I think, for him, the world would be a better place if everybody's views about those practices had changed and that if everybody rejected some of the abusive practices that were employed.

He felt strongly about that, and he felt this after all was a topic of great national debate long before he ever had any contact with any journalist.  It was a topic that had been widely disclosed.  The rendition, detention, the interrogation program had been long and well exposed by the time he had his first contact with the press.

Mr. Kiriakou, because of his feelings about the matter, felt that the spotlight continued to be -- should be shone on this matter of great public interest, and I believe it is that motivation that caused him to decide that various individuals could shed light on this, individuals with whom he had worked, and so he gave names to individuals, with the expectation that those individuals would be contacted or may be contacted and may choose themselves to be a witness to history as he was.

He thoughtlessly and naively did not appreciate that once he made any disclosure of any information that was classified, he lost control of it, and so it is understandable

19

that, you know, he takes no issue with the, with the reality that we have these laws that prohibit making these disclosures, but he was clearly thoughtless, clearly naive in thinking that somehow he could control its use. He certainly never expected, he never intended that the information that he was disclosing would be made public, that the identity would be made public, and, of course, it never was.

Now, we have drawn a comparison in our sentencing memorandum to what happened in the Valerie Plame case, and we have pointed out that there, the motivations were ugly and petty, and none of the -- it had nothing to do with some of the -- with the sort of motivations that Mr. Kiriakou had to continue to maintain the focus and the spotlight on the practices that were -- have now been condemned by even our President of the United States.

So we, we draw that comparison because in that case, there was no prosecution of -- based on the outing of the covert agent. There was a prosecution, and in that case, the judge after a trial, not a plea, after a trial, the sentence that was imposed was 30 months, and of course, Mr. Libby was -- Mr. Libby's sentence was commuted. He did not serve so much as an hour in confinement.

I felt it was important, Your Honor, to make clear and to take issue with the government's characterization of Mr. Kiriakou's motivations in acting as he did. We believe

20

that the 30-month sentence that is stipulated in the plea agreement is appropriate.  Thank you.

THE COURT:  All right.  Mr. Kiriakou, come up to the lectern.  This is your chance to say anything you'd like the Court to consider before sentence is imposed.

THE DEFENDANT:  Thank you.  No, Your Honor.

THE COURT:  All right.  Perhaps you've already said too much.

Mr. Trout, the Court has great respect for you.  I've always enjoyed having you in my court, but I must say your allocution did not ring well in my ears.  This case is not a case about a whistle-blower.  It's a case about a man who betrayed a very solemn trust, and that is a trust to keep the integrity of his agency intact and specifically to protect the identity of coworkers.

The letter of Covert Agent A is a telling example of what happens when that trust is breached.  That agent's life has been changed forever, and I take that victim letter very seriously in thinking about the appropriate sentence in this case.

I think the government's position is reasonable and correct.  Were this not a binding plea, I would be sentencing within the guidelines.  I accepted the binding plea because I recognize the difficulty the government has in prosecuting these types of cases.  They have to balance the potential

21

danger of disclosure of very sensitive information when deciding how to proceed, and in balancing those concerns, they came up with this plea.  I think 30 months is, frankly, way too light because the message has to be sent to every covert agent that when you leave the agency, you can't just start all of a sudden revealing the names of the people with whom you worked.

I don't think that there was any truly appropriate reason for doing so, and the argument that a man as sophisticated as Mr. Kiriakou, with the record that he has of service to the country, that he would somehow naively believe that the information he gave out would remain within the custody of that one person I don't find at all credible.

The Court is going to follow the plea agreement, and therefore, the sentence of the Court will be 30 months in the custody of the Bureau of Prisons.  There's no time served in this case, correct?  The defendant was never taken into custody?

MR. SCHNEIDER:  He was taken into custody and released on the same day, Your Honor.

THE COURT:  Well, he might get one-day credit then for that.

That 30-month sentence, I believe there was a recommendation that he be sentenced or serve the sentence at the minimum security camp at FCI Loretto.

MR. TROUT:  That's correct, Your Honor.

22

THE COURT:  And why was Loretto chosen?

MR. TROUT:  It's close by.  He's got family.  It's one of the closer facilities.

THE COURT:  All right.  Then we'll go ahead and make that recommendation.  Again, the Bureau of Prisons is not bound by that recommendation.

At the completion of the 30-month sentence, the defendant will serve three years of supervised release.  The terms and conditions of the supervision are first of all the defendant's uniform good behavior, and that means, Mr. Kiriakou, you cannot violate any federal, state, or local laws while on supervision.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  And secondly, you will have to follow all the general conditions of supervision that will be printed on the judgment order and that will be explained to you by the Probation Office.  Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  Now, are there any special conditions of supervision the government wants the Court to impose?

MR. SCHNEIDER:  No, Your Honor.

THE COURT:  There really is no need for that in this case.  There's no history of drug abuse, so the mandatory drug testing is waived, although the Probation Office can demand a

23

drug test from you at any time.

The plea agreement did not call for any fine or financial penalty other than the $100 special assessment, and so no fines are being imposed.  Again, because of the plea agreement, the Court finds for the record that we have to follow that agreement literally, but the $100 special assessment is mandatory.  That should already have been paid. If it hasn't been, it should be taken care of promptly.

Now, is there a forfeiture order in this case?

MR. SCHNEIDER:  No, Your Honor.

THE COURT:  All right.  And there's no other issue about Mrs. Kiriakou that has to be addressed in the Court's order?

MR. SCHNEIDER:  No, Your Honor.

MR. TROUT:  No.

THE COURT:  Nothing, all right.

The government has agreed that a voluntary surrender would be appropriate in this case, and so, Mr. Kiriakou, I'm going to continue you on your current bond, with the same terms and conditions you've been working under, adding as an additional condition that when you are designated to a facility and given a time to self-surrender, you must make sure you get yourself to that facility by that time.

Do you understand that?

THE DEFENDANT:  I do.

24

THE COURT:  All right.  When you leave court today, you need to check in with the Marshals Service, because you're going to be a voluntary surrender, and you need to check in with both the Pretrial Office, because they're continuing you on bond, and the Probation Office, because they'll touch base with you, and then obviously, you'll be in touch with them while you're on supervised release.

Is there anything else we need to address with this case?

MR. SCHNEIDER:  No, Your Honor.

MR. TROUT:  No, Your Honor.

THE COURT:  Mr. Trout, no?

Then you're all free to go.

(Which were all the proceedings

had at this time.)


CERTIFICATE OF THE REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


_____/s/_____
Anneliese J. Thomson

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595